**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------x

In re:                                                    :      Chapter 11

                                                          :

MACKEYSER HOLDINGS, LLC, et al.,          :      Case No. 14-11550 (__)

                                                          :

                                                                 Joint Administration Requested

                                                          :

Debtors.[1]                                            :

---------------------------------------------------------x

## DECLARATION OF THOMAS J. ALLISON IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Thomas J. Allison, declare and state as follows:

1.        I am the Chief Executive Officer of MacKeyser Holdings, LLC

("MacKeyser"), a limited liability company organized under the laws of the state of Delaware,

and an officer of the other debtors and debtors-in-possession in the above-captioned chapter 11

cases (collectively, the "Debtors"). I also am a member of the board of managers of MacKeyser

(the "Board").

2.        To minimize any disruption to the Debtors' business and ensure a smooth

transition into chapter 11, the Debtors intend to request various types of relief in "first day"

applications and motions (collectively, the "First Day Pleadings") in connection with these

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: MacKeyser Holdings, LLC (5620); American Optical Services, Inc. (5707); Exela Hearing Services, LLC (6175); Optical Management Systems, Inc. (8300); Riverfront Hearing, Inc. (9220); AOS-OMS, LLC (4445); American Optical Services, LLC (4879); EHS-Riverfront, LLC (4530); 926 N. Wilcrest, LLC (2497); Epic Management Group, LLC (3385); Eyeglasses Etc., Inc. (7753); Eyes On You Eyecare, Inc. (2091); Genesis Billing Systems, LLC (1548); Genesis Eye Center, PLLC (8427); J. Richard Susi, D.O., P.A. (1936); Joseph D. Udvari, Jr., O.D., P.C. (0856); Joseph Kurstin, M.D., P.A. (7339); Lakewood Eye Clinic, P.C. (2251); Larry R. Moorman, M.D., P.C. (5458); Philip H. Clark, O.D., P.A. (6411); Steven T. Olkowski, M.D., P.C. (1813); Thomas Retinal Eye Specialists, P.C. (0492); Thomas G. Abell, M.D., P.S.C. (1810). The corporate headquarters and the mailing address for each entity listed above is 8076 West Sahara Avenue, Las Vegas, NV 89117.

chapter 11 cases (the "Chapter 11 Cases").[2]  I submit this declaration in support of the Debtors'

(a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code") and (b) the First Day Pleadings.  I am over the age of 18, competent to

testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

3.       I have held my current position as Chief Executive Officer of MacKeyser

since June 9, 2014.  I am an experienced turnaround executive with over 30 years of experience

in the corporate renewal industry and have led successful turnarounds for major healthcare

organizations, including in the physician services industry.  I served as global head of

restructuring of several preeminent turnaround firms including Arthur Andersen, Huron

Consulting and Mesirow Financial.  I am a Fellow in the American College of Bankruptcy, and a

founder and former Chairman of the Association for Certified Turnaround Professionals and past

Chairman of the Turnaround Management Association (TMA).  As a result of my time with the

Debtors, my review of relevant documents and my discussions with other members of the

Debtors' management team, I am generally familiar with the Debtors' day-to-day operations,

business affairs and books and records.

4.       Except as otherwise noted, all facts set forth in this Declaration are based

on my personal knowledge, my discussions with other members of the Debtors' management,

my review of relevant documents or my opinion, based on my experience and knowledge of the

Debtors' operations and financial condition.  In making this Declaration, I also have relied on

information and materials that the Debtors' personnel and advisors have gathered, prepared,

verified and provided to me, in each case under my ultimate supervision, at my direction and/or

---

[2]    Except as otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the relevant First Day Pleading.

for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

5.      This Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, their capital structure, and the circumstances surrounding the commencement of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

**PART I**

**BACKGROUND**

**A.      The Chapter 11 Filings**

6.      On June 20, 2014 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to manage and operate their business as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**B.      The Debtors' Business**

7.      The Debtors manage the first nationally-integrated eye care and hearing systems provider with over 80 optical retail, optometry and ophthalmology locations in 14 states. In addition, within certain of the Debtors' locations, dedicated audiology and dispensing staff conduct diagnostics, fitting and dispensing of hearing systems.  The Debtors' corporate offices are located in Las Vegas, Nevada.

8.      The Debtors' business model has been to provide a plan for optometrists and ophthalmologists to exit their practices over time and seamlessly transition new doctors in, thereby creating a clean transition invisible to patients, leaving the natural flow of patients to the practice unchanged, and ensuring the well-being of the patient base.  Over time, the Debtors

3

replace retiring doctors with younger optometrists and ophthalmologists, who benefit from the arrangement by avoiding the need to build an entirely new patient base.

9.    In a typical purchase transaction, the Debtors purchase the non-medical assets of a practice (*e.g.*, medical equipment and the lease for the real property at which the practice operates) (collectively, the "Practice Assets"), while the medical assets of the practice (*e.g.*, patient records and controlled substances) are sold to a professional corporation (each, an "Amedco") owned by a physician (each, a "Medical Director").[3]  The Debtors then typically enter into a management services agreement with the Amedco, pursuant to which the Debtors lease the Practice Assets to the Amedco and provide the necessary personnel to staff the medical office.[4]  The Debtors also provide necessary back-office support to the Amedcos (*e.g.*, centralized accounting, finance, marketing and sales), thereby allowing doctors to focus on patient care.

10.    The Debtors have sought to establish regionally dense "hubs" of optometry, ophthalmology and retail assets and create a self-contained network of vision providers.  The Debtors believe that this structure drives (i) increased volume and procedures through cross referrals among optometrist, ophthalmologist and retail locations; (ii) practice management efficiencies (*e.g.*, consolidated and centralized billing, collections, purchasing and accounting); (iii) direct expense reduction by virtue of scale, group purchasing and key vendor relationships; (iv) opportunities for increased reimbursements from payors upon meeting certain

---

[3]    Many states prohibit the corporate practice of medicine.  In such states, a professional association or corporation (*i.e.*, the Amedco) owned by a licensed physician must own patient records and other medical assets.

[4]    The optometrists and ophthalmologists themselves typically are employed by the Amedco.

53032/0001-10694568v4

volume or coverage thresholds; and (v) cost control and productivity improvements due to regional management oversight.

**C.    The Debtors' Corporate Structure**

11.    MacKeyser is a holding company and the ultimate parent of the other Debtors in these cases, and has five direct subsidiaries: American Optical Services, Inc. ("AOS, Inc."), AOS-OMS, LLC, American Optical Services, LLC ("AOS, LLC"), EHS-Riverfront, LLC ("EHS- Riverfront") and Exela Hearing Services, LLC ("Exela").  AOS, Inc. and Exela each have a single subsidiary, while AOS, LLC has 15 wholly-owned subsidiaries.

12.    The ownership interests of MacKeyser include preferred units and series A and B common units.  Health Evolution Partners Fund I, L.P. (f/k/a Health Evolution Partners Growth (AIV I), LP) and Series F and G of Health Evolution Partners Co-Invest, LLC collectively are the majority equity owner of MacKeyser, holding 75.58% of the outstanding capital units.  The other capital units are held by: (i) PKO, LLC, an entity owned and controlled by Pierre Keyser, the Debtors' former Chief Executive Officer (19.34%); (ii) Essilor of America, Inc., one of the Debtors' vendors (3.83%); and (iii) Erica Perreira, the Debtors' former Chief Operating Officer (1.24%).

**D.    The Debtors' Prepetition Debt Structure**

13.    The Debtors are borrowers, guarantors and/or obligors under various credit agreements, promissory notes and other financial arrangements.  As of the Petition Date, the Debtors' secured and unsecured debt obligations totaled approximately $58 million.

**(i)    Secured Debt**

14.    As of the Petition Date, the Debtors had aggregate outstanding secured debt totaling approximately $23 million arising in connection with various loans and equipment financings, as described in more detail below.

5

a.    HEP

15.    MacKeyser executed a Secured Promissory Note dated as of May 29, 2014 (the "HEP Secured Note") in favor of Health Evolution Partners Fund I, L.P. and Series F of Health Evolution Partners Co-Invest, LLC (together, the "HEP Secured Lenders") in an amount of up to $4,617,000. The HEP Secured Note accrues interest at 7.0% per annum, which is added to the principal balance quarterly. The note is due and payable upon demand of the HEP Secured Lenders.

16.    The HEP Secured Note is jointly and severally guaranteed by the other Debtors in these Chapter 11 Cases (the "Debtor Guarantors"), and such guarantees are secured by a first priority lien on substantially all assets of the Debtor Guarantors (the "HEP Prepetition Secured Collateral"). As of the Petition Date, the HEP Secured Lenders had advanced $3,461,681.96 under the HEP Secured Note.

b.    Essilor of America, Inc.

17.    MacKeyser executed a Senior Secured Promissory Note dated January 11, 2013 (the "Essilor Note") in favor of Essilor of America, Inc. ("Essilor") in the amount of $4 million. The Essilor Note accrues interest at 5.0% per annum.

18.    The Essilor Note is jointly and severally guaranteed by certain direct and indirect subsidiaries of MacKeyser, including AOS, LLC. In accordance with that certain security agreement dated January 11, 2013 (the "Essilor Security Agreement"), AOS, LLC's guaranty obligations are secured by a first priority lien in that portion of its assets owned or used exclusively in the operation of the optometric practice and optical eye care retailing business commonly known as "The Eye Gallery," including, but not limited to, all of the AOS, LLC's

cash on hand, deposit on accounts, receivables, inventory, fixtures, equipment, other intangibles and the proceeds therefrom relating to these practices (the "Essilor Secured Collateral").

19.    As of the Petition Date, the Debtors estimate that the amount outstanding under the Essilor Note is approximately $3.7 million.

c.    Audiology Holding Company, LLC

20.    On December 15, 2010, MacKeyser executed (i) a Secured Note Purchase Agreement with Audiology Holding Company, LLC ("Audiology Holding"), and (ii) a Secured Promissory Note in the amount of $5 million (the "Audiology Holding Note"). The Audiology Holding Note accrues interest at the greater of (x) prime plus two percent (2.0%) or (y) four and one-half percent (4.5%). The unpaid balance as of the second anniversary of the Audiology Holding Note is due and payable in eighty-four (84) equal consecutive monthly installments in an amount sufficient to amortize the unpaid balance in full.

21.    No recorded UCC-1 financing statements have been filed against MacKeyser in connection with the Audiology Holding Note. MacKeyser's obligations under the Audiology Holding Note, however, are purportedly secured by a pledge of all of its equity interests in Exela and AOS, Inc. (the "Audiology Holding Pledged Interests") pursuant to pledge agreements dated December 15, 2010 (the "Audiology Holding Pledge Agreements"). Under the Audiology Holding Pledge Agreements, the collateral includes, among other things, all rights, benefits, distributions, premiums, profits, dividends, interest, cash, instruments, documents of title, accounts, contract rights, inventory, equipment, general intangibles, payment intangibles, deposit accounts, chattel paper and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution for, any of the Audiology Holding Pledged Interests or proceeds thereof (including any cash, equity

7

interests or other securities or instruments issued after any recapitalization, readjustment, reclassification, merger or consolidation with respect to Exela) (the "<u>Audiology Holding Secured Collateral</u>").

22.     The obligations of MacKeyser under the Audiology Holding Note also are guaranteed by Exela and AOS, Inc., pursuant to guaranties dated December 15, 2010.  However, Audiology Holding has filed a UCC-1 financing statement only against Exela (and not against AOS, Inc.).

23.     As of the Petition Date, MacKeyser estimates that the amount outstanding under the Audiology Holding Note is $5 million.

        d.     <u>The Meyers Family Agreement of Trust</u>

24.     Exela and The Meyers Family Agreement of Trust dated October 14, 1996 (the "<u>Meyers Trust</u>") entered into that certain Stock Purchase Agreement (the "<u>Riverfront Stock Purchase Agreement</u>") dated November 1, 2010 under which Exela purchased from the Meyers Trust one hundred percent (100%) of the issued and outstanding stock of Riverfront Hearing, Inc. ("<u>Riverfront</u>").  As part of the purchase, Exela executed a secured promissory note in favor of the Meyers Trust in the amount of $1 million (the "<u>Meyers Note</u>").  The Meyers Note accrues interest at 1.72% per year and is payable in twenty (20) equal quarterly installments of $52,291.50 commencing on February 1, 2011 and continuing until November 1, 2015, at which time the entire unpaid balance together with interest on the Meyers Note is payable in full.

25.     The Meyers Note is secured by (i) a Stock Pledge Agreement dated November 1, 2010, among Exela, the Meyers Trust and Sklar Williams LLP (as escrow agent) pursuant to which Exela pledged its interest in Riverfront; (ii) a Security Agreement dated November 1, 2010, by Riverfront in favor of the Meyers Trust pursuant to which Riverfront

8

granted a lien on substantially all of its assets; and (iii) a Guaranty dated November 1, 2010, by

Pierre Keyser to the Meyers Trust.

26.     As of the Petition Date, the Debtors estimate that the amount outstanding

under the Meyers Note is approximately $360,000.

e.     Starkey Laboratories, Inc.

27.     Exela entered into a revolving credit agreement and promissory note dated

December 4, 2013 with Starkey Laboratories, Inc. ("Starkey"), pursuant to which Starkey agreed

to make loans to Exela for business purposes in an amount not to exceed $2 million.  Interest on

the line of credit accrues at the rate of prime plus one percent (1%) and becomes payable,

together with principal, nine months after the date of the line of credit on a monthly basis.

28.     The Starkey line of credit is secured by, among other things, a security

interest in all "Accounts," "General Intangibles," "Equipment," "Fixtures" and "Inventory" (as

those terms are defined in the Minnesota Uniform Commercial Code) of Exela pursuant to that

certain Security Agreement dated December 4, 2013 (the "Starkey Secured Collateral").

29.     As of the Petition Date, the Debtors estimate that the amount outstanding

on the Starkey line of credit is $1 million.  Starkey filed a UCC-1 financing statement with

respect to the Starkey line of credit on May 20, 2014.

f.     Keilson and Segall

30.     Since February 22, 2010, AOS, LLC has acquired the non-medical assets

of 33 ophthalmology and optometry practices.  Stemming from these acquisition transactions,

there remain 26 outstanding promissory notes issued by AOS, LLC to the sellers in consideration

for the sale of their respective practices.  Notwithstanding AOS, LLC's execution of security

agreements in connection with most of these transactions, only Drs. Louis Keilson and Morris

9

Segall ("Keilson and Segall" and, together with the HEP Secured Lenders, Essilor, Audiology Holding and Starkey, shall be referred to herein collectively as the "Prepetition Secured Lenders") filed UCC-1 financing statements to purportedly perfect their liens on certain of AOS, LLC's assets.

31.     Keilson and Segall purportedly are secured parties pursuant to separate security agreements dated November 12, 2012 in connection with seller notes issued to each of them in the original principal amount of $5 million (for a total of $10 million).  Under the security agreements, Keilson and Segall purportedly were granted liens on substantially all of AOS, LLC's assets at the locations owned by South Florida Eye Associates, P.A. and Eye Care Services of America, Inc., to the extent obtained by AOS, LLC as part of a stock purchase agreement involving Amedco SF, LLC (the "Keilson and Segall Secured Collateral" and, together with the HEP Prepetition Secured Collateral, Essilor Secured Collateral, Audiology Holding Secured Collateral and Starkey Secured Collateral, shall be referred to herein collectively as the "Prepetition Secured Collateral").

32.     As of the Petition Date, the Debtors' books and records reflected a potential liability to Keilson and Segall of approximately $9.7 million, although such amount is the subject of litigation and is in dispute.

g.     Lease Financing

33.     AOS, LLC has incurred debt in connection with its acquisition or lease of certain equipment used in the ordinary course of its operations (the "Equipment Lease Obligations"), and a number of equipment lessors and lease financing companies have filed UCC-1 financing statements against AOS, LLC.  As of the Petition Date, the Debtors estimate that the Equipment Lease Obligations total approximately $650,000.

53032/0001-10694568v4

h.    Secured Debt of AOS, LLC Subsidiary Debtors

34.    UCC-1 financing statements have been filed against six of AOS, LLC's Debtor subsidiaries: (i) Steven T. Olkowski, M.D., P.C., (ii) Joseph D. Udvari, Jr., O.D., P.C., (iii) Eyes On You Eyecare, Inc., (iv) Joseph Kurstin, M.D., P.A., (v) Thomas G. Abell, M.D., P.S.C., and (vi) Philip H. Clark, O.D., P.A.  However, the Debtors believe that these Debtor entities either have shuttered their businesses or have no assets.

**(ii)    Unsecured Debt**

35.    As set forth in more detail below, as of the Petition Date the Debtors had aggregate outstanding unsecured debt of approximately $35 million arising in connection with (i) notes issued in connection with practice acquisitions (approximately $14.3 million), (ii) other loan transactions (approximately $5.6 million), and (iii) accounts payable, accrued liabilities and other liabilities (approximately $15.1 million).

a.    Seller Notes

36.    As discussed above, despite the Debtors' execution of security agreements in connection with most physician practice acquisition transactions, none of the notes issued in these transactions, except for those held by Keilson and Segall, are subject to filed UCC-1 financing statements.  As such, any purported liens relating to such notes are avoidable and unsecured as against the Debtors' estates.  The balance owed on these notes according to the Debtors' books and records is approximately $14.3 million.

b.    Exela, LLC

37.    MacKeyser executed an unsecured promissory note (undated) in favor of Exela, LLC in the amount of $1.6 million (the "Exela Note") in connection with the buyout of the equity of the former president of MacKeyser, Stephen J. McCormack, Ph.D., pursuant to that

11

certain Membership Interest Purchase Agreement dated April 30, 2012 by and among Exela, LLC, Stephen J. McCormack, Ph.D. and MacKeyser. The Exela Note does not accrue interest.

38.    The Exela Note is guaranteed by AOS, LLC pursuant to that certain guaranty dated April 30, 2012 (the "Exela Guaranty") by and between Exela, LLC and AOS, LLC. Pursuant to the Exela Guaranty, AOS, LLC unconditionally and absolutely guaranteed to Exela, LLC the full and prompt payment by MacKeyser of all sums due under the Exela Note.

39.    As of the Petition Date, the Debtors estimate that the amount outstanding under the Exela Note is approximately $1.1 million.

c.    HEP

40.    MacKeyser executed an unsecured Promissory Note dated as of February 4, 2014 in favor of Health Evolution Partners Fund I, L.P., a Delaware limited partnership, and Series F of Health Evolution Partners Co-Invest, LLC (together, the "HEP Unsecured Lenders") in the amount of $4 million (the "HEP Initial Unsecured Note"). The HEP Initial Unsecured Note earns interest at 7.0% per annum, and matured and became due and payable on February 18, 2014.

41.    As of April 1, 2014, MacKeyser executed an unsecured Promissory Note in favor of the HEP Unsecured Lenders in the amount of $500,000 (the "HEP Subsequent Unsecured Note" and, together with the HEP Initial Unsecured Note, the "HEP Unsecured Notes"). The HEP Subsequent Unsecured Note earns interest at 7.0% per annum and is payable on demand. As of the Petition Date, the full amount remained outstanding under each of the HEP Unsecured Notes.

53032/0001-10694568v4

d.    Other Unsecured Debt

42.    In addition to the unsecured seller obligations, Exela Note and HEP Unsecured Note, the Debtors had incurred approximately $15 million in other unsecured debt in the ordinary course of their business in the form of accounts payable, accrued liabilities and other liabilities as of the Petition Date.

**D.    Factors Leading To Chapter 11 Filing**

43.    In January 2014, the Debtors' then chief financial officer (CFO) notified the MacKeyser board of managers (the "Board") that the Debtors were rapidly approaching a liquidity crisis.  In mid-February, the Debtors' CFO was terminated and, several weeks later, Ms. Teresa Robinson was hired as the Debtors' interim CFO.  Ms. Robinson subsequently identified inaccuracies in the Debtors' historical books and records and deficiencies in financial forecasting and reporting, cash management and medical billing.  As the magnitude of the Debtors' accounting irregularities became more apparent, the Debtors retained outside accountants in the first week of May 2014 to rebook 2013 revenue entries.  Later in May, the Debtors retained GlassRatner Advisory & Capital Group, LLC to provide support to Ms. Robinson and the Debtors' accounting department.

44.    Although the Debtors' poor financial condition had not been apparent before January 2014 due to the Debtors' deficient (and indeed misleading) accounting practices, the Debtors' financial situation had been deteriorating over time due to a variety of factors, including the following:

(a)    Non-Strategic Acquisitions.  Over the past several years, the Debtors pursued an aggressive growth strategy, expanding their practice management business through the addition of 33 ophthalmology and optometry practices since 2010.

13

In some cases, these acquisitions were not strategic in that the acquisitions were not in core geographic markets. As such, the Debtors could not take advantage of economies of scale with respect to marketing, support, inventory management, distribution and other operational matters.

(b)    Non-Economical Acquisitions. In addition to acquiring geographically non-strategic practices, the Debtors also paid too much for some acquisitions. As a consequence, the Debtors have been burdened with supporting a significant number of money-losing operations that, even with performance improvements, will never be profitable.

(c)    Costs of Integration. The costs of the Debtors' acquisitions, along with the associated transaction costs (*e.g.*, redeployment of manpower, systems and billing integration, etc.), have caused a drain on the Debtors' liquidity.

(d)    Electronic Medical Records ("EMR") Implementation. The Debtors recently implemented Medinfomatix practice management and EMR software in 17 locations. While the implementation of this software ultimately will make practice and records management more efficient, doctor and staff productivity have been impacted in the short term.

45.    These factors—along with general mismanagement (*e.g.*, failing to timely collect accounts receivable, and having poor inventory control and inefficient billing practices) and the accounting irregularities discussed above—have forced the Debtors to take the drastic step of filing for chapter 11 protection.

53032/0001-10694568v4

E.    **Objectives of Chapter 11 Filing**

46.    The Debtors have filed for chapter 11 protection to stabilize their business and sell as many of their profitable operations as possible.  As part of the implementation of the Debtors' new strategic direction, the Debtors have closed or are in the process of closing numerous facilities and are ceasing certain operations in markets that were unprofitable or otherwise would be undesirable to potential purchasers.  MacKeyser's Board approved the Debtors' strategic operating plan and the Debtors began its implementation prior to the Petition Date.

47.    After the Debtors have sold their profitable operations and completed the winddown of the balance of their operations—whether through closure of such practices or the transition of such practices to medical providers that are willing to assume the practices' obligations—the Debtors hope to conclude the Chapter 11 Cases through the implementation of a plan of liquidation.

## PART II

## FIRST DAY PLEADINGS

48.    In furtherance of these objectives, the Debtors filed the First Day Pleadings, and respectfully request that the Court consider entering the proposed orders granting the relief sought in such First Day Pleadings.  I have reviewed each of the First Day Pleadings and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their business or loss of productivity or value and (b) constitutes a critical element in maximizing value during the Chapter 11 Cases.

53032/0001-10694568v4

A.     **Motion of Debtors for Order Under Fed. R. Bankr. P. 1015 and Del. Bankr. L.R. 1015-1 Authorizing Joint Administration of Chapter 11 Cases** ("Joint Administration Motion")

49.     By the Joint Administration Motion, the Debtors seek entry of an order authorizing the joint administration of the Debtors' chapter 11 cases for procedural purposes only, under the case number assigned to MacKeyser.  The Debtors in these cases consist of twenty-three related entities.  MacKeyser is the direct owner of AOS, Inc., Exela, AOS-OMS, LLC, AOS, LLC, and EHS-Riverfront, LLC.  AOS, Inc. and Exela are in turn the direct owners of Optical Management Systems, Inc. and Riverfront Hearing, Inc., respectively.  The remaining entities are wholly owned subsidiaries of AOS, LLC.

50.     In addition, the Debtors request (i) that an entry, as set forth in the Joint Administration Motion, be made on the docket of each of the Debtors' cases (except that of MacKeyser), to reflect the joint administration of the Chapter 11 Cases and (ii) that the Court direct any creditor filing a proof of claim against any of the Debtors or their respective estates clearly assert its claim against the particular Debtor obligated on such claim, and not against the jointly administered Debtors.

51.     I am advised by counsel that jointly administering these cases will save time and money and avoid duplicative and potentially confusing filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be served and filed herein and (b) file the papers in one case rather than in multiple cases.

52.     Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

16

**B.     Application of Debtors for Order Appointing American Legal Claim Services, LLC as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. § 105(a) and Del. Bankr. L. R. 2002-1(f) ("Claims and Noticing Agent Application")**

53.     By the Claims and Noticing Agent Application, the Debtors request entry of an order appointing American Legal Claim Services, LLC ("ALCS") as claims and noticing agent in these Chapter 11 Cases.  I understand that such appointment is required by the rules of this Court.  Moreover, I believe that such relief is prudent in light of the fact there will be in excess of 1,000 entities to be noticed.  In view of the number of anticipated claimants and other notice parties and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors.

54.     As more fully detailed the Claims and Noticing Agent Application, I understand that ALCS will engage in certain Claims and Noticing Services, including, but not limited to, maintenance, processing and docketing proofs of claim filed in the Chapter 11 Cases.  ALCS will also work with the office of the Clerk of the United States Bankruptcy Court for the District of Delaware (the "Clerk") to ensure that their methodology conforms with all of the Court's procedures, the Local Bankruptcy Rules and the provisions of any order entered by this Court.  Moreover, I am informed that the Claims and Noticing Agent Application pertains only to the work to be performed by ALCS under the Clerk's delegation of duties permitted by 28 U.S.C. § 156(c) and Local Bankruptcy Rule 2002-1(f).

55.     I am advised that ALCS has acted as the claims and noticing agent in numerous cases of comparable size, including several cases that were commenced in the United States Bankruptcy Court for this District, and that ALCS, therefore, is well qualified to provide

17

the Debtors with experienced noticing, claims, and balloting services in connection with these

cases.  Given the need for the services described above and ALCS's expertise in providing such

services, I believe that retaining ALCS will expedite service of notices, streamline the claims

administration and balloting processes, and permit the Debtors to focus on their chapter 11

efforts.

      56.      Accordingly, on behalf of the Debtors, I respectfully submit that the

Claims and Noticing Agent Application should be approved.

**C.**      **Motion of Debtors for Order Pursuant to 11 U.S.C. §§ 105(a), 345, 363 and 364, Fed. R. Bankr. P. 6003 and 6004 and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Authorizing Continuation of Intercompany Transactions, (IV) Authorizing the Continuation of Transactions with Various Amedcos, (V) Granting Administrative Priority Status to Postpetition Intercompany Claims Between Debtors and (VI) Waiving the Requirements of 11 U.S.C. § 345(b) ("Cash Management Motion")**

      57.      By the Cash Management Motion, the Debtors seek entry of an order

(a) authorizing, but not directing, the Debtors to continue to maintain and use their existing cash

management system, including maintenance of the Debtors' existing bank accounts, checks and

business forms; (b) granting the Debtors a waiver of certain bank account and related

requirements of the United States Trustee to the extent that such requirements are inconsistent

with (i) the Debtors' existing practices under the cash management system or (ii) any action

taken by the Debtors in accordance with any order granting this Motion or any other order

entered in the Chapter 11 Cases; (c) authorizing, but not directing, the Debtors to continue to

maintain and use their existing deposit practices notwithstanding the provisions of section 345(b)

of the Bankruptcy Code, (d) authorizing, but not directing, the Debtors to continue certain

ordinary course intercompany transactions; (e) authorizing, but not directing, the Debtors to

continue certain ordinary course of business transactions with various Amedcos and

(f) according administrative status to postpetition intercompany claims between Debtors.

### (i)   The Debtors' Cash Management System and Bank Accounts

58.   In the ordinary course of their businesses, the Debtors maintain a cash

management system (the "Cash Management System") which includes operating, reserve,

payable and other accounts.  The Cash Management System is integral to the operation and

administration of the Debtors' businesses.  In this regard, the Cash Management System allows

the Debtors to efficiently (a) identify the Debtors' cash requirements, (b) transfer cash as needed

to respond to cash requirements, and (c) track intercompany transfers.  I believe that the Cash

Management System is similar to those utilized by many other companies of comparable size

and complexity to collect, transfer and disburse funds in a cost-effective and efficient manner.

59.   As of the Petition Date, the Debtors maintained approximately thirty-two

(32)  bank accounts (collectively, the "Bank Accounts").  The three (3) institutions at which the

Debtors currently maintain their main Bank Accounts are (a) Bank of America, N.A. ("BoA" and

such accounts, the "BoA Accounts"), (b) Wells Fargo Bank, N.A. ("Wells Fargo" and such

accounts, the "Wells Fargo Accounts"), and (c) PNC Bank ("PNC" and such accounts, the "PNC

Accounts").[5]

60.   In addition, as discussed in the Cash Management Motion, the Amedcos[6]

and certain practice entities maintain accounts (the "Amedco Accounts") which remit receivables

---

[5]   The Debtors also maintain bank accounts at Branch Banking and Trust Company, Citizens Bank, Fifth
Third Bank, Mercantile Commercebank, Regions Bank, and US Bank.

[6]   As discussed above, the Amedcos typically have entered into management service agreements with the
Debtors whereby the latter agree to provide the Amedco with the assets necessary to operate the practice.
The Debtors pay numerous expenses of the practice from the receipts of the Amedcos in connection with
the management of the practice.

19

to the Bank Accounts, primarily the Main Operating Account and the Additional Operating

Account, via check and intrabank transfer. The Debtors are authorized signers on the vast

majority of Amedco Accounts, which are swept by the Debtors two to three times per week, as

needed. At some times, a small amount of cash may be left in the Amedco Accounts to pay for

patient refunds and small petty cash items at the respective locations. All disbursements from

the Amedco Accounts require authorization from the Debtors.

61.    Certain of the Amedco Accounts are held by Debtor practice entities,

while others are non-Debtor Accounts. The Debtors request authority to continue cash

management practices with respect to the Amedco Accounts in the ordinary course of business.

In accordance with their ordinary course prepetition practices and related agreements, the

Debtors request that the Doctors and those acting in concert with them be required to continue to

remit receivables to the Amedco Accounts or Debtor accounts, as applicable, and be prohibited

from withdrawing funds from the Amedco Accounts without the Debtors' consent. In addition,

the Debtors request that they be authorized to continue to sweep the Amedco Accounts in

accordance with their ordinary course prepetition practices and related agreements.

62.    The Debtors seek authority to continue using the Cash Management

System on a postpetition basis as more fully described in the Cash Management Motion. The

continued use of the Cash Management System during the pendency of the Chapter 11 Cases is

essential to the Debtors' business operations and their goal of maximizing value. Requiring the

Debtors to adopt new cash management systems at this early and critical stage would be

expensive, impose needless administrative burdens, and cause undue disruption. Any such

disruption would adversely (and perhaps irreparably) affect the Debtors' ability to maximize

estate value for the benefit of creditors and other parties in interest. Moreover, such a disruption

53032/0001-10694568v4

would be wholly unnecessary insofar as the Cash Management System provides a valuable and efficient means for the Debtors to address their cash management requirements and, to the best of the Debtors' knowledge, the Bank Accounts are in financially stable institutions that are insured by the Federal Deposit Insurance Corporation ("FDIC") (up to an applicable limit per Debtor per institution).

63.    Consequently, maintaining the existing Cash Management System without disruption is both essential to the Debtors' ongoing operations, and in the best interests of the Debtors, their estates, and all interested parties.

**(ii)    <u>Maintenance of Existing Checks and Business Forms</u>**

64.    I have been advised that Local Rule 2015-2(a) requires that once a debtor's existing checks have been used, it shall, when reordering checks, require the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all such checks.  Although the Debtors believe that they will be able to quickly comply with the Local Rule requirements, there may be a short time lag in their ability to do so immediately following the Petition Date. Accordingly, out of an abundance of caution, the Debtors seek authorization to continue using all checks substantially in the form existing immediately prior to the Petition Date, without reference to the Debtors' status as debtors-in-possession; <u>provided</u>, <u>however</u>, that once the Debtors are able to practically do so, the Debtors will generate new checks to be utilized during the pendency of the Chapter 11 Cases, which checks will include a legend referring to the Debtors as "Debtors in Possession."  To the extent necessary, the Debtors also seek authority to use all correspondence and other business forms (including, without limitation, letterhead,

21

purchase orders and invoices) without reference to the Debtors' status as debtors-in-possession.[7]

65.    In addition, I believe that changing the Debtors' existing checks, correspondence and other business forms would be expensive, unnecessary and burdensome to the Debtors' estates.  Further, such changes would be disruptive to the Debtors' business operations and would not confer any benefit upon those dealing with the Debtors.

(iii)    **Waiver of Certain Requirements of the United States Trustee**

66.    As set forth in the Cash Management Motion, the Debtors submit that (x) they are able to work with their current banks to ensure that this goal of separation between the prepetition and postpetition period is observed and (y) enforcing certain of these UST Requirements would disrupt the Debtors' operations and impose a financial burden on the Debtors' estates.

67.    To begin, I believe that closing all of the Debtors' existing Bank Accounts will, among other things, create confusion with respect to the large number of payors who currently remit payments to the Debtors via electronic funds transfer.  The distraction and inconvenience that the Debtors' employees would experience from contacting payors and requesting changes to these long-standing practices will not only waste valuable time and resources of the Debtors at the early stages of these cases, but has the potential to create dissatisfaction at the very time that the Debtors are attempting to do everything in their power to protect valuable relationships.

---

[7]    Although the UST Requirements would require the Debtors to obtain and use new checks bearing the "Debtor in Possession" designation, the Debtors do not believe that they impose any limitation on the Debtors' other correspondence and business forms.  Nevertheless, out of an abundance of caution, the Debtors seek explicit authority to continue using their existing correspondence and business forms without reference to the Debtors' status as debtors in possession.

(iv)    **Continuation of Deposit Practices**

68.    The Debtors deposit funds and manage their cash in accordance with the Cash Management System described above.  As described above, the Bank Accounts are in financially stable institutions that are insured by the FDIC (up to an applicable limit per Debtor per institution).  Therefore, the funds are not at risk.[8]  In addition, the Debtors do not have any excess cash to invest and, thus, the "investment" requirements of section 345(b) of the Bankruptcy Code is here inapplicable.  Nevertheless, the Debtors request a waiver of the requirements of section 345(b) out of an abundance of caution.

69.    I have been advised of the restrictions imposed by section 345(b) of the Bankruptcy Code.  The Debtors are large, sophisticated entities with a complex Cash Management System that relies on multiple banks and Bank Accounts on a daily basis.  All of the Bank Accounts the Debtors seek to continue to use are federally insured, but the balances on the Bank Accounts, such as the Debtors' Main Operating Account and Reserve Account, on any given day may exceed the federally insured limit.  Furthermore, in light of the limited cash that is held in any of the Bank Accounts, requiring the posting of a bond to the extent that the balances of these accounts exceed FDIC insurance limits at a given time would be especially disruptive, unnecessary and wasteful.

(v)    **Continuation of Intercompany Transactions**

70.    In connection with the daily operation of the Debtors' businesses, as funds are moved within the Cash Management System at any given time, there may be intercompany claims owing by one Debtor to another Debtor (the "Debtor Intercompany Transactions").

---

[8]    While the funds held in the Bank Accounts generally do not exceed the FDIC insured limit, the Reserve Account and the Main Operating Account are occasionally over $250,000 and the Escrow Accounts may be over the limit for a period of time.

23

Debtor AOS, LLC currently provides services and pays for costs that inure to the benefit of certain of the other Debtors, including but not limited to payment of professional fees, rent, insurance and payroll services and other business expenses. The Debtors maintain records of all Debtor Intercompany Transactions.

71.     The Debtors routinely engaged in Debtor Intercompany Transactions prior to the Petition Date. Therefore, they submit that the Debtor Intercompany Transactions are within the ordinary course of their business. The Debtors believe that their business judgment to continue the Intercompany Transactions is sound because, among other reasons discussed herein, the Intercompany Transactions reduce the administrative costs of certain of the Debtors and facilitate the satisfaction of the Debtors' obligations and are integral to the Debtors' daily operations. Thus, the Debtors submit that continuation of the Intercompany Transactions is in the best interests of the Debtors' estates and their creditors.

### (vi)    Continuation of Certain Ordinary Course of Business Transactions with Certain Amedcos

72.     As a crucial part of their practice management for the Amedcos, the Debtors centralize accounting, marketing and sales for the Amedcos and receive a fee from the Amedcos for their practice management services ( the "Management Service Fee"). Typically, accounts receivable from all business conducted by the Amedcos (collectively, the "Amedco Receipts") are deposited into various Amedco bank accounts or directly into Debtor accounts as set forth on Attachment 1 to the Cash Management Motion. The Debtors in turn use the Amedco Receipts to pay various expenses of the Amedcos that may include rent and salaries for the doctors or optometrists and the Management Service Fee (the "Amedco Expenses").[9] In

---

[9] Typically, the Debtors remit payment for doctor salaries affiliated with the Amedcos through ADP which then pays those amounts on behalf of the respective Amedcos unless the doctors are independent contractors of the Debtors.

24

addition, in the event that the Amedco Receipts are not sufficient to pay the Amedco Expenses, the Debtors advance funds to pay the Amedco Expenses and have an outstanding claim for that advance (the "Debtors' Advance").  The Debtors are then entitled to use the Amedco Receipts to pay back the Debtors' Advance.

73.    All transfers between the Amedcos and the Debtors or on behalf of the Amedcos by the Debtors are accounted for in the Debtors' books and records (collectively, the "Amedco Transactions").  Pursuant to this Motion, the Debtors seek authority to continue the Amedco Transactions in the ordinary course of business as described above for the practices that remain open and continue to collect the Amedco Receipts for those practices that have closed or close during these Chapter 11 Cases.  In accordance with prepetition practices and related agreements, the Debtors request that the doctors affiliated with the Amedcos and the  Accounts (the "Doctors") and those acting in concert with the Doctors continue to remit receivables to the Amedco Accounts, and be prohibited from withdrawing funds from the Amedco Accounts without the Debtors' consent.  In addition, the Debtors request that they be authorized to continue to sweep the Amedco Accounts in accordance with their ordinary course prepetition practices and related agreements.

74.    If the Amedco Transactions were to be discontinued or interfered with, then I believe the Debtors' Cash Management System would be disrupted and that would unnecessarily and severely hinder operations.  Absent continuation of the Amedco Transactions, the Debtors' ability to operate their business during the Chapter 11 Cases would be severely prejudiced, and their ability to maximize value for their creditors would be drastically reduced. Avoiding such potentially crippling hindrances by continuing the Amedco Transactions is, therefore, in the best interests of the estates.

75.    Accordingly, on behalf of the Debtors, I respectfully submit that Cash Management Motion should be approved.

**D.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Certain Prepetition Employee Obligations, Including Compensation, Benefits, Expense Reimbursements and Related Obligations, (II) Confirming Right to Continue Employee Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Employee Programs, (V) Authorizing Payment of Independent Contractor Obligations, and (VI) Directing Banks to Honor Prepetition Checks and Fund Transfers For Authorized Payments ("Wage Motion")**

76.    By the Wage Motion, the Debtors seek entry of an order, (i) authorizing the Debtors to pay certain prepetition amounts owing to or for the benefit of their current and former Employees for compensation, benefits and reimbursable expenses; (ii) confirming the Debtors' right to continue postpetition, in the ordinary course of business, the Employee-related plans, programs and policies in effect immediately prior to the filing of these cases; (iii) authorizing the Debtors to pay any and all local, state and federal withholding and payroll-related or similar taxes relating to prepetition periods; (iv) confirming the Debtors' right to continue to deduct and to transmit deductions from payroll checks as authorized by Employees or required under any Employee-related plan, program or policy or as required by law; (v) authorizing the Debtors to pay any prepetition claims owing to the administrators of, or third party providers under, their Employee-related plans, programs and policies as necessary to ensure the delivery of compensation, benefits and expense reimbursements to their Employees; (vi) authorizing the Debtors to continue to pay prepetition amounts owing to or for the benefit of Independent Contractors (as defined in the Wage Motion) and temporary Employees in the ordinary course of business and utilize such individuals in the ordinary course of business; and (vii) authorizing and directing all banks to receive, process, honor and pay all of the Debtors'

26

prepetition checks and fund transfers on account of any obligations authorized to be paid pursuant hereto.

77.    In addition, the Debtors seek authorization, in their discretion, to pay any prepetition claims owed to or on behalf of any independent contractors (collectively, the "Independent Contractors") who are not Employees of the Debtors but who have been retained and have rendered services on behalf of the Debtors (the "Prepetition IC Obligations") and to continue to utilize such Independent Contractors in the ordinary course of their businesses.

78.    As of the Petition Date, the Debtors' workforce consisted of approximately 434 Employees.  As of the Petition Date, 379 Employees are full time and 55 are part-time.  Approximately 34 of these Employees are represented by a union and covered under a collective bargaining agreement.  The Debtors' workforce of Employees is augmented by services received from approximately six Independent Contractors, including physicians and optometrists (collectively, the "Doctors"), who devote all or the substantial portion of their working time to providing services to or for the Debtors.

79.    I am advised that sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code require that certain claims for prepetition wages, salaries, bonuses, commissions, vacation, sick leave, independent contractor sales commissions, and employee benefit contributions be accorded priority in payment in an amount not to exceed $12,475 for each individual.  Because of the number of Employees and Independent Contractors working for the Debtors, and because some amounts are unknown pending submission of claims, the Debtors do not know the exact amount due each Employee and Independent Contractor for the prepetition period.  However, the Debtors' believe that the vast majority of their Employees and Independent Contractors are owed amounts under the $12,475 cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy

27

Code, to the extent such caps are applicable. Accordingly, granting the relief requested will not adversely affect the Debtors' other unsecured creditors.

80.    To the extent that any Employees and Independent Contractors are owed aggregate amounts in excess of these caps, or certain of the Independent Contractors payments are not subject to priority treatment, the Debtors submit, and I agree, that payment of the Prepetition Employee Obligations and Prepetition IC Obligations in such higher amounts or otherwise non-priority amounts is nonetheless justified in these cases. The amount by which the claims of Employees or Independent Contractors exceed such cap, or are otherwise non-priority, if any, is de minimis in relation to the Debtors' periodic gross payroll and the value to the Debtors' chapter 11 efforts of honoring all Prepetition Employee Obligations and Prepetition IC Obligations in the ordinary course. Moreover, the Debtors' Employees and Independent Contractors are extremely important in maintaining the current value of the Debtors' estates.

81.    Additionally, the Debtors believe that all Prepetition Employee Obligations and Prepetition IC Obligations that exceed the priority cap or are otherwise non-priority, if any, have arisen in the ordinary course of the business of the Debtors and are reasonable in relation to the value of the services rendered.

82.    I have also been advised that it is critical that the Debtors be permitted to continue their Workers' Compensation programs and to pay outstanding prepetition claims, taxes, charges, assessments, premiums and third party administrator fees in the ordinary course of business because alternative arrangements for Workers' Compensation coverage would most certainly be more costly, and the failure to provide coverage may, in some states, subject the Debtors and/or their officers to severe penalties.

83.    The Debtors' ability to preserve their businesses is dependent on the

continued enthusiasm, service and expertise of their Employees and Independent Contractors. Due to the disruption and uncertainty that typically accompanies a chapter 11 filing, the Debtors believe that the morale and, thus, the performance of their Employees and Independent Contractors may be adversely affected.

84.     In addition, if the Debtors fail to pay the Prepetition Employee Obligations and the Prepetition IC Obligations in the ordinary course, their Employees and Independent Contractors will suffer extreme personal hardship and, in some cases, may be unable to pay their basic living expenses.  Such a result would have a highly negative impact on workforce morale and likely would result in unmanageable performance issues or turnover, thereby resulting in immediate and irreparable harm to the Debtors and their estates.  In addition, the Debtors have determined that continuation of the Employee Programs is vital to preserving and rebuilding Employee morale during the pendency of these Chapter 11 Cases and to reducing the level of Employee attrition that might otherwise occur.

85.     In sum, the Employees' and Independent Contractors' skills and their knowledge and understanding of the Debtors' infrastructure and operations are essential to the continued operation of the Debtors' business.  Without the continued services of the Employees and Independent Contractors, a successful outcome of these Chapter 11 Cases will not be possible.

86.     Accordingly, the Debtors submit, and I agree, that the Wage Motion should be approved.

E.    **Motion of Debtors for Order Under 11 U.S.C. §§ 105(a) and 366 (i) Prohibiting Utility Companies From Altering or Discontinuing Service on Account of Prepetition Invoices, (II) Approving Deposit as Adequate Assurance of Payment, and (III) Establishing Procedures for Resolving Requests by Utility Companies for Additional Assurance of Payment ("Utility Motion")**

87.    By the Utility Motion, the Debtors seek entry of interim and final orders approving procedures that would provide adequate assurance of payment to their utility service providers (the "Utility Companies")[10] under section 366 of the Bankruptcy Code, while allowing the Debtors to avoid the threat of imminent termination of electricity, water, natural gas, waste removal, telephone, telecommunications and similar utility services (collectively, the "Utility Services") from those Utility Companies.

88.    Specifically, the Debtors request entry of interim and final orders (i) approving the Debtors' deposit of $56,097 (which is approximately 50% of the estimated monthly cost of the Utility Services, based on historical averages) into a newly-created segregated, interest-bearing account, as adequate assurance of postpetition payment to the Utility Companies pursuant to section 366(b) of the Bankruptcy Code, (ii) approving the additional adequate assurance procedures described in the Utility Motion as the method for resolving disputes regarding adequate assurance of payment to Utility Companies and (iii) prohibiting the Utility Companies from altering, refusing or discontinuing services to the Debtors except as may be permitted by the proposed procedures.

89.    The Utility Companies service the Debtors' corporate office and the

---

[10]    The Utility Companies known and identified by the Debtors to date are listed on Exhibit A to the Utility Motion. While the Debtors have used their best efforts to list all of their Utility Companies on Exhibit A, it is possible that certain Utility Companies may have been inadvertently omitted from this list. Accordingly, the Debtors reserve the right, under the terms and conditions of the Utility Motion and without further order of the Court, to amend Exhibit A to add any Utility Companies that were omitted therefrom and to request that the relief requested in the Utility Motion apply to all such entities as well. In addition, the Debtors reserve the right to argue that any of the entities now or hereafter listed on Exhibit A is not a "utility" within the meaning of section 366(a) of the Bankruptcy Code.

53032/0001-10694568v4

locations associated with the Amedcos.  On average, prior to the Petition Date, the Debtors spent

approximately $112,194 each month on utility costs and had a history of timely payment of

utility costs.[11]  As of the filing date, the Debtors are substantially current on payments to Utility

Companies.  However, because of the timing of the filings in relationship to the Utility

Companies' billing cycles, there may be utility costs that have been invoiced to the Debtors for

which payment is not yet due and utility costs for services provided since the end of the last

billing cycle that have not been invoiced to the Debtors.

90.    The Debtors intend to pay in a timely manner all postpetition obligations

owed to the Utility Companies related to medical practices that remain open and continue to be

managed by the Debtors.  Nevertheless, to provide additional assurance of payment for future

services to the Utility Companies, the Debtors will deposit $56,097 (equal to approximately 50%

of the estimated monthly cost of the Utility Services) into a newly created, segregated, interest-

bearing account, within twenty (20) days of the Petition Date (the "Adequate Assurance

Deposit").  The Adequate Assurance Deposit will be maintained during the Chapter 11 Cases

with a minimum balance equal to 50% of the Debtors' estimated monthly cost of Utility Services,

which may be adjusted by the Debtors to account for the termination of Utility Services by the

Debtors or other arrangements with respect to adequate assurance of payment reached with

individual Utility Companies.

91.    The Debtors submit that the Adequate Assurance Deposit, in conjunction

with the Debtors' ability to pay for future Utility Services in the ordinary course of business,

constitutes sufficient adequate assurance to the Utility Companies.  If any Utility Company

believes that additional assurance is required, they may request such assurance pursuant to the

---

[11]    This estimate covers the corporate office and Debtor managed medical practices that were not closed by the
Petition Date.

53032/0001-10694568v4

Additional Adequate Assurance Procedures described in the Utility Motion.

92.    By making the Adequate Assurance Deposit and establishing the Additional Adequate Assurance Procedures, the Debtors seek to provide adequate assurance and to implement an orderly process to determine any challenges to the adequacy of that adequate assurance.  Without the Additional Adequate Assurance Procedures, the Debtors could be forced to address numerous requests by Utility Companies in an unorganized manner at a critical period in these Chapter 11 Cases.  The orderly process contemplated by the Additional Adequate Assurance Procedures, therefore, is necessary for a smooth transition by the Debtors into chapter 11.

93.    The Utility Services are crucial to the continued operations of the Debtors.  If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

94.    Accordingly, on behalf of the Debtors, I respectfully submit that the Utility Motion should be approved.

**F.    Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 506(a), 507(a)(8), and 541 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Taxes and Fees ("Tax Motion")**

95.    By the Tax Motion, the Debtors seek entry of an order authorizing them to pay, in their discretion, any prepetition tax and fee obligations including, without limitation, sales and use taxes; business taxes; real and personal property taxes; business and occupation taxes or fees; and any other types of taxes, fees or charges; and any penalty, interest or similar charges (collectively, the "Taxes and Fees") owing to certain federal, state and local governmental entities (the "Taxing Authorities") that will become due during the pendency of

the Debtors' Chapter 11 Cases.

96.     The Debtors seek the relief requested in the event and to the extent that:
(a) the various taxes, regulatory fees and related obligations that accrued prior to the Petition
Date: (i) were not paid prepetition, (ii) were not processed prepetition or (iii) were paid in an
amount that was less than is actually owed, including amounts subsequently determined upon
any audit or otherwise to be owed for periods prior to the Petition Date; (b) any payments made
prepetition were rejected, lost or otherwise not received in full by any taxing authority; or (c) any
taxes and related obligations that were accrued or incurred prepetition and will become due
during the pendency of these cases in the ordinary course of business.  On an interim basis, the
Debtors only seek authorization to pay certain prepetition taxes that are currently due or will
become due within 30 days of the Petition Date (the "Upcoming Taxes"), in an aggregate amount
not to exceed $60,000.  The Debtors further request that the Court schedule a final hearing within
approximately twenty-five (25) days of the Petition Date to consider approval of this Motion on
a final basis and, if no objections are filed, request that the order become final without further
order of the Court.  The Debtors estimate that during the pendency of these cases the amount of
such prepetition taxes will not exceed $130,000.

97.     The continued payment of the Taxes and Fees on their normal due dates
will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects
for a successful chapter 11 process.  I have been advised that if such obligations are not timely
paid, the Debtors will be required to expend time and incur attorneys' fees and other costs to
resolve a multitude of issues related to such obligations, each turning on the particular terms of
each Taxing Authority's applicable laws, including whether (a) the obligations are priority,
secured or unsecured in nature, (b) they are proratable or fully prepetition or postpetition and

(c) penalties, interest, attorneys' fees and costs can continue to accrue on a postpetition basis, and, if so, whether such penalties, interest, attorneys' fees and costs are priority, secured or unsecured in nature.

98.      Nonpayment or delayed payment of Taxes and Fees may also subject the Debtors to efforts by certain Taxing Authorities, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a postpetition or post-confirmation basis.  Moreover, certain of the Taxes and Fees may be considered to be trust funds that are not included in property of the Debtors' estates and/or taxes as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, collection efforts by the Taxing Authorities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

99.      Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**G.    Motion of the Debtors for Order Authorizing the Debtors to Continue Pre-Petition Customer Programs and Practices in the Ordinary Course of Business ("Customer Programs Motion")**

100.      By this Motion, the Debtors request the entry of an order granting the Debtors authority to (i) perform their prepetition obligations related to the Customer Programs (as defined in the Customer Program Motion), up to and including $25,000 (the "Customer Programs Cap") and (ii) continue, renew, replace, modify and/or terminate any of the Customer Programs, as the Debtors determine advisable, in the ordinary course of business and without further application to this Court.

34

101.    In connection with the Debtors' business, including dispensing hearing products, the Debtors serve customers throughout the country.  The Debtors' Customer Programs include Customer Deposits, Medical Service Reimbursements and Customer Satisfaction (each as defined and discussed in more detail in the Customer Program Motion and, collectively, the "Customer Programs"), and such programs are administered for the benefit of the Debtors' customers and patients of the Amedcos.  The goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtors, thereby retaining current customers, attracting new ones and ultimately enhancing the Debtors' revenue and profitability.

102.    The success and viability of the Debtors' business is dependent upon the development and maintenance of customer loyalty.  The commencement of the Chapter 11 Cases will no doubt create apprehension on the part of customers or potential customers regarding their willingness to continue or to commence doing business with the Debtors.  The Debtors believe that without the requested relief, the stability of the Debtors' business may be undermined, and otherwise loyal customers may explore other alternatives.  To preserve the value of the Debtors' businesses, the Debtors must be permitted, in their sole discretion, to continue honoring or paying all Customer Programs without interruption or modification.

103.    To preserve the value of the Debtors' business, the Debtors must be permitted, in their sole discretion, to continue honoring or paying all Customer Programs without interruption or modification.  The Debtors believe that continuing the Customer Programs in the ordinary course of business during these Chapter 11 Cases is essential to maximizing the value of their estates for the benefit of all stakeholders.  Given the relatively low cost to the Debtors to maintain the Customer Programs, the relief requested in this Motion is particularly appropriate in

35

these cases. Accordingly, the Debtors hereby seek the authority to continue the Customer

Programs on a post-petition basis in the ordinary course of business.

104.    Accordingly, on behalf of the Debtors, I respectfully submit that the

Customer Programs Motion should be approved.

**H.    Motion of Debtors for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Enforcing Protections of 11 U.S.C. §§ 362, 365(e)(1), and 525 ("Stay Motion")**

105.    By the Stay Motion, the Debtors request entry of an order (i) enforcing the

protections of sections 362, 365(e)(1) and 525 of Bankruptcy Code and (ii) approving notice to

customers, patients, contract parties and other stakeholders of the Amedcos.

106.    To aid in the administration of the Debtors' Chapter 11 Cases, the Debtors

seek an order that confirms the application of two key protections provided by the Bankruptcy

Court: the automatic stay provisions of section 362 and the anti-discrimination provisions of

section 525. The Debtors' business involves practice management for the Amedcos. The fact

that none of the Amedco entities are filing for bankruptcy likely will create confusion for many

of the Debtors' creditors, customers and those parties with whom the Debtors do business (many

of who may be unfamiliar with the protections afforded Chapter 11 Debtors under Sections 362

and 525 of the Bankruptcy Code) requiring that an order implementing these protections be

entered by this Court.

107.    In addition, to alleviate confusion that likely will arise concerning the non-

filing Amedcos, the Debtors seek approval from this Court of a notice (the "Notice") to patients,

customers and other stakeholders of the Amedcos (to the extent known) clarifying that the

Amedcos are not included in these Chapter 11 Cases. Such relief should minimize the risk of

interference with the Debtors' business operations.

53032/0001-10694568v4

108.    I have been advised that, notwithstanding the self-executing and global nature of section 362 of the Bankruptcy Code, not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of the automatic stay, its far-reaching implications, or its significance and impact.  Therefore, the Debtors believe, and I agree, it is prudent to advise those certain customers, creditors, parties with whom the Debtors do business with and other parties of the existence and effect of section 362 of the Bankruptcy Code through an order of the Bankruptcy Court that restates this important provision.

109.    I have been further advised that, notwithstanding the self-executing and global nature of section 365(e)(1) of the Bankruptcy Code, not all parties affected or potentially affected by the commencement of a chapter 11 case are aware of this provision.  Neither are all parties cognizant of its significance and impact.  Therefore, the Debtors believe, and I agree, it is prudent to advise those certain customers, creditors, parties with whom the Debtors do business with and other parties of the existence and effect of section 365(e)(1) of the Bankruptcy Code through an order of the Bankruptcy Code that restates this important provision.

110.    The Debtors possess licenses or other grants or permits from governmental units that permit the Debtors to conduct their businesses.  Some of these governmental units may not be cognizant of the protections afforded to the Debtors by section 525 of the Bankruptcy Code and, therefore, inadvertently may contravene its provisions.  To insure that governmental units do not hamper the Debtors' operations in contravention of section 525, the Debtors seek to inform such governmental entities of the existence and implications of section 525 of the Bankruptcy Code.

111.    Accordingly, granting the relief requested herein will facilitate a smooth and orderly transition of the Debtors' operations into chapter 11 and minimize the disruption of

their business affairs, without violating either the policies of chapter 11 or the rules of this Court. The Debtors, therefore, request that this Court grant the requested relief.

**I.    Motion of the Debtors for (A) Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Post Petition Secured Financing Pursuant to 11 U.S.C. §§ 362, 364(c) and 364(d), (II) Granting Liens and Superpriority Claims to the DIP Lender Pursuant to 11 U.S.C. §§ 364 and 507, (III) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363, and (IV) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, 364 and 507, and (B) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-2 ("DIP Financing Motion")**

112.    As set forth in the Declaration of Thomas M. Barry In Support of Debtors' Motion For Approval of Debtor-in-Possession Financing (the "Barry Declaration"), filed concurrently with the DIP Financing Motion, the Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use cash collateral (collectively, the "Postpetition Financing Arrangement") to continue in business and run an expedited and orderly sale process under section 363 of the Bankruptcy Code. Without access to the Postpetition Financing Arrangement, the Debtors and their estates would suffer immediate and irreparable harm because they could not effectuate a sale of their assets or continue to operate. The use of cash collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.

113.    As further set forth in the Barry Declaration, the Debtors were unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors, however, pursuant to the DIP Facility, were able to secure credit and incur debt under sections 364(c)(1), (c)(2), (c)(3) and (d)(1) of the Bankruptcy Code. Further, as set forth in the Barry Declaration, the Debtors were unable to obtain postpetition financing on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtors, other than the use of cash collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued

use of cash collateral to satisfy their post petition liquidity needs.  The Debtors believe that the DIP Facility will allow them to continue their operations in the ordinary course, maintain prudent cash balances, and meet their liquidity needs through the closing of the planned asset sales.

114.    Health Evolution Partners Fund I, L.P. and Series F of Health Evolution Partners Co-Invest, LLC (collectively, the "DIP Lender") has indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the Interim DIP Order and DIP Term Sheet attached as Exhibits 1 and 2 to the DIP Financing Motion, respectively.  The Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Term Sheet and the Interim DIP Order represent the best financing presently available to the Debtors.

115.    The Debtors have negotiated the Postpetition Financing Arrangement in good faith and at arm's-length with the DIP Lender.  Moreover, with respect to the Debtors' board consideration and approval of the DIP Facility, those directors and/or members of boards of managers affiliated with the DIP Lender recused themselves from deliberation and approval of the DIP Facility and, therefore, the board review of the DIP Facility was appropriate.  The Debtors believe that the terms of the Postpetition Financing Arrangement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

## CONCLUSION

The Debtors' ultimate goal in these Chapter 11 Cases is to achieve a sale, or multiple sales, of their businesses that maximize the value of the Debtors' estates for the benefit of all the Debtors' creditors. In the immediate term, however, in order to minimize any loss of value of their businesses during the Chapter 11 Cases, the Debtors most pressing objective is to minimize the disruption to the Debtors' operations to the greatest extent possible as they enter chapter 11. The Debtors believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving this objective and, in turn, their overriding goal in these Chapter 11 Cases, will be substantially increased.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 21, 2014

Thomas J. Allison
Chief Executive Officer

40