# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:                                          :        Chapter 11
                                                :
MACKEYSER HOLDINGS, LLC, et al.,                :        Case No. 14-11550 (CSS)
                                                :
          Debtors.[1]                           :        Joint Administration Requested
                                                :
-------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR (A) ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-PETITION SECURED FINANCING PURSUANT TO 11 U.S.C. §§ 362, 364(c) AND 364(d), (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO THE DIP LENDER PURSUANT TO 11 U.S.C. §§ 364 AND 507, (III) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364 AND 507, AND (B) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001 AND LOCAL BANKRUPTCY RULE 4001-2**

The debtors and debtors-in-possession in the above-captioned chapter 11 cases

(the "Debtors") hereby submit this motion (the "Motion") for the entry of an interim order (the

"Interim DIP Order"), substantially in the form attached hereto as Exhibit 1,[2] and a final order

(the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"):

    (a)    authorizing MacKeyser Holdings, LLC ("MacKeyser") to obtain
            secured postpetition financing (the "DIP Facility") from Health
            Evolution Partners Fund I, L.P., a Delaware limited partnership,
            and Series F of Health Evolution Partners Co-Invest, LLC, a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: MacKeyser Holdings, LLC (5620); American Optical Services, Inc. (5707); Exela Hearing Services, LLC (6175); Optical Management Systems, Inc. (8300); Riverfront Hearing, Inc. (9220); AOS-OMS, LLC (4445); American Optical Services, LLC (4879); EHS-Riverfront, LLC (4530); 926 N. Wilcrest, LLC (2497); Epic Management Group, LLC (3385); Eyeglasses Etc., Inc. (7753); Eyes On You Eyecare, Inc. (2091); Genesis Billing Systems, LLC (1548); Genesis Eye Center, PLLC (8427); J. Richard Susi, D.O., P.A. (1936); Joseph D. Udvari, Jr., O.D., P.C. (0856); Joseph Kurstin, M.D., P.A. (7339); Lakewood Eye Clinic, P.C. (2251); Larry R. Moorman, M.D., P.C. (5458); Philip H. Clark, O.D., P.A. (6411); Steven T. Olkowski, M.D., P.C. (1813); Thomas Retinal Eye Specialists, P.C. (0492); Thomas G. Abell, M.D., P.S.C. (1810). The corporate headquarters and the mailing address for each entity listed above is 8076 West Sahara Avenue, Las Vegas, NV 89117.

[2] All capitalized terms used but not otherwise defined in this Motion shall have the meanings set forth in the DIP Term Sheet (as defined herein) or the Interim DIP Order, as applicable.

Delaware limited liability company (together with Health Evolution Partners Fund I, L.P., the "DIP Lender") pursuant to the terms and conditions of that certain Debtor-in-Possession Financing Term Sheet dated as of June 22, 2014 and attached hereto as Exhibit 2 (as amended, supplemented, restated or otherwise modified from time to time in accordance therewith, the "DIP Term Sheet" and, together with the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lender (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Loan Documents"), by and among MacKeyser, as borrower, the DIP Lender, as postpetition lender, and American Optical Services, Inc. ("AOS, Inc.") and each of MacKeyser's direct and indirect, existing subsidiaries that are listed on Schedule A to the DIP Term Sheet, as guarantors (collectively, the "Guarantors");

(b)    authorizing the Debtors to execute the DIP Loan Documents, and to perform such other acts as may be necessary or desirable in connection therewith;

(c)    granting to the DIP Lender, subject to the Carve-Out (as defined below): valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages (collectively, the "DIP Liens") upon all DIP Collateral (as defined below), which shall (i) pursuant to Bankruptcy Code section 364(c)(2), constitute first-priority security interests in and Liens upon all DIP Collateral (as defined below) that, subject to (ii) below, is not otherwise subject to any valid, enforceable, and non-avoidable Liens, which Liens are not subject to subordination, in existence on the Petition Date and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code (collectively, the "Permitted Senior Liens"), (ii) pursuant to Bankruptcy Code section 364(d)(1) be senior to and prime the HEP Prepetition Liens (as defined below) on HEP Prepetition Collateral  (as defined below), (iii)  pursuant to Bankruptcy Code section 364(d)(1), be senior to and prime all Adequate Protection Liens (as defined below), and (iv)  pursuant to Bankruptcy Code section 364(c)(2), be subordinate to the Carve Out (as defined below) and the Permitted Senior Liens, to secure the obligations of the Debtors under the DIP Facility (the "DIP Obligations") in accordance with the terms of the DIP Term Sheet;

(d)    granting an allowed superpriority administrative expense claim to the DIP Lender (the "DIP Superpriority Claim");

(e) authorizing the Debtors to use Cash Collateral (as defined below) (together with the DIP Facility, the "Postpetition Financing Arrangement");

(f) authorizing the Debtors to grant adequate protection to the Adequate Protection Parties (as defined below); and

(g) scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to consider entry of the Final Order, *inter alia*, approving and authorizing the Postpetition Financing Arrangement (including, without limitation, the advance of the financing pursuant to the Interim Order) on a final basis pursuant to the DIP Loan Documents.

In support of this Motion, the Debtors rely upon and incorporate by reference the Declaration of Thomas J. Allison in Support of Chapter 11 Petitions and First Day Pleadings (the "Allison Declaration") and the Declaration of Thomas M. Barry In Support of Debtors' Motion For Approval of Debtor-in-Possession Financing (the "Barry Declaration"), both filed with the Court. In further support of the Motion, the Debtors, by and through their undersigned counsel, respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief sought herein are sections 105, 361, 362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 4001-2.

## BACKGROUND

**A.     The Chapter 11 Cases**

2.      On June 20, 2014 (the "Petition Date"), the Debtors filed voluntary petitions in this Court commencing cases for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the Allison Declaration, filed on the Petition Date and fully incorporated herein by reference.

3.      The Debtors continue to manage and operate their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107 and 1108.  No trustee or examiner has been requested in the Chapter 11 Cases, and no committees have yet been appointed.

**B.     The Debtors' Corporate Structure**

4.      MacKeyser is a holding company and the ultimate parent of the other Debtors in these cases, and has five direct subsidiaries: American Optical Services, Inc. ("AOS, Inc."), AOS-OMS, LLC, American Optical Services, LLC ("AOS, LLC"), EHS-Riverfront, LLC ("EHS-Riverfront") and Exela Hearing Services, LLC ("Exela").  AOS, Inc. and Exela each have a single subsidiary, while AOS, LLC has 15 wholly-owned subsidiaries.

5.      The ownership interests of MacKeyser includes preferred units and series A and B common units.  Health Evolution Partners Growth (AIV I), LP and Series F and G of Health Evolution Partners Co-Invest, LLC collectively are the majority equity owner of MacKeyser, holding 75.58% of the outstanding capital units.  The other capital units are held by: (i) PKO, LLC, an entity owned and controlled by Pierre Keyser, the Debtors' former Chief Executive Officer (19.34%); (ii) Essilor of America, Inc., one of the Debtors' vendors (3.83%); and (iii) Erica Perreira, the Debtors' former Chief Operating Officer (1.24%).

**C.**    **The Debtors' Prepetition Debt Structure**

6.    The Debtors are borrowers, guarantors and/or obligors under various credit agreements, promissory notes and other financial arrangements.  As of the Petition Date, the Debtors' secured and unsecured debt obligations totaled approximately $58 million.

**(i)**    **Secured Debt**

7.    As of the Petition Date, the Debtors had aggregate outstanding secured debt totaling approximately $23 million arising in connection with various loans and equipment financings, as described in more detail below.

a.    HEP

8.    MacKeyser executed a Secured Promissory Note dated as of May 29, 2014 (the "HEP Secured Note") in favor of the HEP Prepetition Secured Lender in the amount of up to $4,617,000.  The HEP Secured Note accrues interest at 7.0% per annum, which is added to the principal balance quarterly.  The note is due and payable upon demand of the HEP Prepetition Secured Lender.

9.    The HEP Secured Note is jointly and severally guaranteed by the other Debtors in these Chapter 11 Cases (the "Debtor Guarantors"), and such guarantees are secured by a first priority lien on substantially all assets of the Debtor Guarantors (the "HEP Prepetition Secured Collateral") pursuant to that certain security agreement dated as of May 29, 2014 (the "HEP Security Agreement" and, together with the HEP Secured Note, the "HEP Prepetition Loan Agreement").  As of the Petition Date, the HEP Prepetition Secured Lender had advanced $3,461,681.96 under the HEP Secured Note.

     b.      <u>Essilor of America, Inc.</u>

10.     MacKeyser executed a Senior Secured Promissory Note dated January 11, 2013 (the "<u>Essilor Note</u>") in favor of Essilor of America, Inc. ("<u>Essilor</u>") in the amount of $4,000,000.  The Essilor Note earns interest at 5.0% per annum.

11.     The Essilor Note is jointly and severally guaranteed by certain direct and indirect subsidiaries of MacKeyser, including AOS, LLC.  In accordance with that certain security agreement dated January 11, 2013 (the "<u>Essilor Security Agreement</u>"), AOS, LLC's guaranty obligations are secured by a first priority lien in that portion of its assets owned or used exclusively in the operation of the optometric practice and optical eye care retailing business commonly known as "The Eye Gallery," including, but not limited to, all of the AOS, LLC's cash on hand, deposit on accounts, receivables, inventory, fixtures, equipment, other intangibles and the proceeds therefrom relating to these practices (the "<u>Essilor Secured Collateral</u>").

12.     As of the Petition Date, the Debtors estimate that the amount outstanding under the Essilor Note is approximately $3.7 million.

     c.      <u>Audiology Holding Company, LLC</u>

13.     On December 15, 2010, MacKeyser executed (i) a Secured Note Purchase Agreement with Audiology Holding Company, LLC ("<u>Audiology Holding</u>"), and (ii) a Secured Promissory Note in the amount of $5 million (the "<u>Audiology Holding Note</u>").  The Audiology Holding Note accrues interest at the greater of (x) prime plus two percent (2.0%) or (y) four and one-half percent (4.5%).  The unpaid balance as of the second anniversary of the Audiology Holding Note is due and payable in eighty-four (84) equal consecutive monthly installments in an amount sufficient to amortize the unpaid balance in full.

14.      No recorded UCC financing statements appear as of record against MacKeyser in connection with the Audiology Holding Note.  MacKeyser's obligations under the Audiology Holding Note, however, are purportedly secured by a pledge of all of its equity in Exela and AOS, Inc. (the "Audiology Holding Pledged Interests") pursuant to pledge agreements dated December 15, 2010 (the "Audiology Holding Pledge Agreements").  Under the Audiology Holding Pledge Agreements, the collateral includes, among other things, all rights, benefits, distributions, premiums, profits, dividends, interest, cash, instruments, documents of title, accounts, contract rights, inventory, equipment, general intangibles, payment intangibles, deposit accounts, chattel paper, and other property from time to time received, receivable, or otherwise distributed in respect of or in exchange for, or as a replacement of or a substitution for, any of respective Audiology Holding Pledged Interests or proceeds thereof (including any cash, equity interests, or other securities or instruments issued after any recapitalization, readjustment, reclassification, merger or consolidation with respect to Exela) (the "Audiology Holding Secured Collateral").

15.      The obligations of MacKeyser under the Audiology Holding Note also are guaranteed by Exela and AOS, Inc., pursuant to guaranties dated December 15, 2010.  However, Audiology Holding has filed a UCC-1 financing statement only against Exela (and not against AOS, Inc.).

16.      As of the Petition Date, MacKeyser estimates that the amount outstanding under the Audiology Holding Note is $5 million.

d.      The Meyers Family Agreement of Trust

17.      Exela and The Meyers Family Agreement of Trust dated October 14, 1996 (the "Meyers Trust") entered into that certain Stock Purchase Agreement (the "Riverfront Stock

Purchase Agreement") dated November 1, 2010 under which Exela purchased from the Meyers Trust one hundred percent (100%) of the issued and outstanding stock of Riverfront Hearing, Inc. ("Riverfront"). As part of the purchase, Exela executed a secured promissory note in favor of the Meyers Trust in the amount of $1 million (the "Meyers Note"). The Meyers Note accrues interest at 1.72% per year and is payable in twenty (20) equal quarterly installments of $52,291.50 commencing on February 1, 2011 and continuing until November 1, 2015, at which time the entire unpaid balance together with interest on the Meyers Note is payable in full.

18.      The Meyers Note is secured by (i) a Stock Pledge Agreement dated November 1, 2010, among Exela, the Meyers Trust and Sklar Williams LLP (as escrow agent) pursuant to which Exela pledged its interest in Riverfront; (ii) a Security Agreement dated November 1, 2010, by Riverfront in favor of the Meyers Trust pursuant to which Riverfront granted a lien on substantially all of its assets; and (iii) a Guaranty dated November 1, 2010, by Pierre Keyser to the Meyers Trust.

19.      As of the Petition Date, the Debtors estimate that the amount outstanding under the Meyers Note is approximately $360,000.

e.      Starkey Laboratories, Inc.

20.      Exela entered into a revolving credit agreement and promissory note dated December 4, 2013 with Starkey Laboratories, Inc. ("Starkey"), pursuant to which Starkey agreed to make loans to Exela for business purposes in an amount not to exceed $2 million. Interest on the line of credit accrues at the rate of prime plus one percent (1%) and becomes payable, together with principal, nine months after the date of the line of credit on a monthly basis.

21.      The Starkey line of credit is secured by, among other things, a security interest in all "Accounts," "General Intangibles," "Equipment," "Fixtures" and "Inventory" (as

those terms are defined in the Minnesota Uniform Commercial Code) of Exela pursuant to that certain Security Agreement dated December 4, 2013 (the "Starkey Secured Collateral").

22.    As of the Petition Date, the Debtors estimate that the amount outstanding on the Starkey line of credit is $1 million. Starkey filed a UCC-1 financing statement with respect to the Starkey line of credit on May 20, 2014.

f.    Keilson and Segall

23.    Since February 22, 2010, AOS, LLC has acquired the non-medical assets of 33 ophthalmology and optometry practices. Stemming from these acquisition transactions, there remain 26 outstanding promissory notes issued by AOS, LLC to the sellers in consideration for the sale of their respective practices. Notwithstanding AOS, LLC's execution of security agreements in connection with most of these transactions, only Drs. Louis Keilson and Morris Segall ("Keilson and Segall" and, together with HEP Prepetition Secured Lender, Essilor, Audiology Holding and Starkey shall be referred to herein collectively as, the "Prepetition Secured Lenders") filed UCC-1 financing statements to purportedly perfect their liens on AOS, LLC's assets.

24.    Keilson and Segall purportedly are secured parties pursuant to separate security agreements dated November 12, 2012 in connection with seller notes issued to each of them in the original principal amount of $5 million (for a total of $10 million). Under the security agreements, Keilson and Segall purportedly were granted liens on substantially all of AOS, LLC's assets at the locations owned by South Florida Eye Associates, P.A. and Eye Care Services of America, Inc., to the extent obtained by AOS, LLC as part of a stock purchase agreement involving Amedco SF, LLC (the "Keilson and Segall Secured Collateral" and, together with the HEP Prepetition Secured Collateral, Essilor Secured Collateral, Audiology

Holding Secured Collateral and Starkey Secured Collateral shall be referred to herein collectively as, the "Prepetition Secured Collateral").

25.    As of the Petition Date, the Debtors' books and records reflected a potential liability to Keilson and Segall of approximately $9.7 million, although such amount is the subject of litigation and is in dispute.

### g.    Lease Financing

26.    AOS, LLC has incurred debt in connection with its acquisition or lease of certain equipment used in the ordinary course of its operations (the "Equipment Lease Obligations"), and a number of equipment lessors and lease financing companies have filed UCC-1 financing statements against AOS, LLC.  As of the Petition Date, the Debtors estimate that the Equipment Lease Obligations total approximately $650,000.

### h.    Secured Debt of AOS, LLC Subsidiary Debtors

27.    UCC-1 financing statements have been filed against six of AOS, LLC's Debtor subsidiaries: (i) Steven T. Olkowski, M.D., P.C., (ii) Joseph D. Udvari, Jr., O.D., P.C., (iii) Eyes On You Eye Care, Inc., (iv) Joseph Kurstin, M.D., P.A., (v) Thomas G. Abell, M.D., P.S.C., and (vi) Philip H. Clark, OD, PA.  However, the Debtors believe that these Debtor entities either have shuttered their businesses or have no assets.

### (ii)    Unsecured Debt

28.    As set forth in more detail below, as of the Petition Date the Debtors had aggregate outstanding unsecured debt of approximately $35 million arising in connection with (i) notes issued in connection with practice acquisitions (approximately $14.3 million), (ii) other loan transactions (approximately $5.6 million), and (iii) accounts payable, accrued liabilities and other liabilities (approximately $15.1 million).

a.      Seller Notes

29.      As discussed above, despite the Debtors' execution of security agreements

in connection with most physician practice acquisition transactions, none of the notes issued in

these transactions, except for those held by Keilson and Segall, are subject to filed UCC-1

financing statements.  As such, any purported liens relating to such notes are avoidable and

unsecured as against the Debtors' estates.  The balance owed on these notes according to the

Debtors' books and records is approximately $14.3 million.

b.      Exela, LLC

30.      MacKeyser executed an unsecured promissory note (undated) in favor of

Exela, LLC in the amount of $1.6 million (the "Exela Note") in connection with the buyout of

the equity of the former president of MacKeyser, Stephen J. McCormack, Ph.D., pursuant to that

certain Membership Interest Purchase Agreement dated April 30, 2012 by and among Exela,

LLC, Stephen J. McCormack, Ph.D. and MacKeyser.  The Exela Note does not accrue interest.

31.      The Exela Note is guaranteed by AOS, LLC pursuant to that certain

guaranty dated April 30, 2012 (the "Exela Guaranty") by and between Exela, LLC and AOS,

LLC.  Pursuant to the Exela Guaranty, AOS, LLC unconditionally and absolutely guaranteed to

Exela, LLC the full and prompt payment by MacKeyser of all sums due under the Exela Note.

32.      As of the Petition Date, the Debtors estimate that the amount outstanding

under the Exela Note is approximately $1.1 million.

c.      HEP

33.      MacKeyser executed an unsecured Promissory Note dated February 4,

2014 in favor of Health Evolution Partners Fund I, L.P., a Delaware limited partnership, and

Series F of Health Evolution Partners Co-Invest, LLC (the "HEP Unsecured Lenders") in the

amount of $4,000,000 (the "HEP Initial Unsecured Note"). The HEP Initial Unsecured Note earns interest at 7.0% per annum, and matured and became due and payable on February 18, 2014.

34.    As of April 1, 2014, MacKeyser executed an unsecured Promissory Note in favor of the HEP Unsecured Lenders in the amount of $500,000 (the "HEP Subsequent Unsecured Note"). The HEP Subsequent Unsecured Note earns interest at 7.0% per annum, and is payable on demand.

d.    Other Unsecured Debt

35.    In addition to the unsecured seller obligations, Exela Note and HEP Unsecured Note, the Debtors had incurred approximately $15 million in other unsecured debt in the ordinary course of their business in the form of accounts payable, accrued liabilities and other liabilities as of the Petition Date.

## NEED FOR THE POSTPETITION FINANCING ARRANGEMENT

36.    As set forth in the Barry Declaration, the Debtors have an immediate and critical need to obtain postpetition financing under the DIP Facility and to use Cash Collateral to continue in business and run an expedited and orderly sale process under section 363 of the Bankruptcy Code. Without access to the Postpetition Financing Arrangement, the Debtors and their estates would suffer immediate and irreparable harm because they could not effectuate a sale of their assets or continue to operate. The use of Cash Collateral alone would be insufficient to meet the Debtors' postpetition liquidity needs.

37.    As further set forth in the Barry Declaration, the Debtors were unable obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. See 11 U.S.C. § 364(c). The Debtors, however, pursuant to the DIP

Facility, were able to secure credit and incur debt under sections 364(c)(1), (c)(2), (c)(3) and (d)(1). Further, as set forth in the Barry Declaration, the Debtors were unable to obtain postpetition financing on terms more favorable than the terms of the DIP Facility. The only source of secured credit available to the Debtors, other than the use of Cash Collateral, is the DIP Facility. The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral to satisfy their postpetition liquidity needs. The Debtors believe that the DIP Facility will allow them to continue their operations in the ordinary course, maintain prudent cash balances, and meet their liquidity needs through the closing of the planned asset sales.

38.     The DIP Lender has indicated a willingness to provide the Debtors with certain financing commitments, but solely on the terms and conditions set forth in the DIP Term Sheet and the Interim DIP Order. The Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Lender pursuant to the terms of the DIP Term Sheet and the Interim DIP Order represent the best financing presently available to the Debtors.

39.     The Debtors have negotiated the Postpetition Financing Arrangement and the DIP Term Sheet in good faith and at arm's-length with the DIP Lender. The Debtors believe that the terms of the Postpetition Financing Arrangement are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

## SUMMARY OF DIP FINANCING TERMS

40.     In accordance with Bankruptcy Rules 4001(c) and (d), summarized below are the significant terms of the DIP Loan Documents and Interim DIP Order. Included in this

summary is a description of each of the provisions required to be highlighted by Bankruptcy

Rule 4001(c) and Local Rule 4001-2.[3]

| | |
|---|---|
| <u>Borrower:</u> | MacKeyser Holdings, LLC |
| <u>Guarantor(s):</u> | American Optical Services, Inc. and each of the MacKeyser's direct and indirect, existing subsidiaries that are set forth on Schedule A to the DIP Term Sheet. |
| <u>DIP Lender:</u> | Health Evolution Partners Fund I, L.P., a Delaware limited partnership, and Series F of Health Evolution Partners Co-Invest, LLC, a Delaware limited liability company. |
| <u>Commitment and Availability:</u> | The DIP Facility will be in an aggregate principal amount not to exceed $1,052,105 plus all capitalized interest thereon pursuant to the terms of the DIP Term Sheet and will be made available to MacKeyser in accordance with the Budget (as defined below) until the Maturity Date (as defined below).  Upon the entry of the Interim DIP Order, MacKeyser shall be permitted to borrow an amount not to exceed the full amount of the DIP Facility. |
| <u>Interest Rate:</u> | Shall be equal to the Base Rate of 8%. |
| <u>Default Interest Rate:</u> | Shall be equal to the Base Rate of 8%, <u>plus</u> 2.0%. |
| <u>Maturity Date:</u> | Unless accelerated by an Event of Default (as defined below), the DIP Facility shall be paid in full in cash on the date (the "<u>Maturity Date</u>") which is the earliest of (a) 365 days from the Petition Date; (b) the effective date of a plan of reorganization or liquidation; (c) the consummation of a sale(s) of all or substantially all of the assets of the Debtors; (d) the occurrence of an Event of Default (as defined herein); (e) the entry of an order by the Court approving an alternative DIP Facility; and (f) such later date as the DIP Lender in its sole discretion may agree to in writing with the Debtors.  The Maturity Date shall be accelerated upon the occurrence of an Event of Default (as defined below), subject to the Default Notice Period (as discussed herein). |
| <u>Purpose:</u> | All advances under the DIP Facility shall be used by the Debtors solely to fund the Debtors' operations and conduct and pursue a sale and liquidation process as set forth in the DIP Loan Documents, in accordance with the budget approved by the DIP Lender (the "<u>Budget</u>"), as such Budget may be modified with the DIP Lender's written consent and without further order of the Court.  Compliance with the Budget will be measured every two weeks (after the first two weeks of the case) on a trailing four week |

---

[3]    The descriptions of the terms of the proposed Interim DIP Order provided in this Motion are intended only a summary.  In the event of any inconsistency between the descriptions set forth herein and the terms of the Interim DIP Order, the terms of the Interim DIP Order shall govern.  All capitalized terms used but not otherwise defined herein shall have the same meanings ascribed to them in the DIP Term Sheet.  Local Rule 4001-2 requires the Debtors to highlight certain provisions in the Motion.  Sections that must be highlighted for the Court under either Bankruptcy Rule 4001(c) or Local Rule 4001-2 are in bold and references to the DIP Term Sheet and Interim DIP Order are provided.

basis.

Upon entry of the Interim DIP Order and funding of the DIP Facility, the funding of an amount of $481,000 from the proceeds of the DIP Facility shall be placed into established escrow accounts of the Debtors with Corporation Service Company (the "Escrow Accounts"). The proceeds held in the Escrow Accounts shall be used solely for the payment or other funding of the Debtors' payroll and sales tax obligations (the "Escrow Funds"), which Escrow Funds may not be used for any other purpose unless agreed to by the DIP Lender.

For the avoidance of doubt, (A) the Borrower may amend the Budget with the written consent of the DIP Lender; provided, that the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by the Interim DIP Order or the Final DIP Order, as applicable; and (B) at any given time, the Debtors' actual cash disbursements may, on a cumulative basis, vary from the Budget by no more than 10% (the "Permitted Variance"). As further set forth below, after the first two weeks of the Chapter 11 Cases, the Debtors shall provide the DIP Lender with weekly and cumulative variance reporting on a line item basis, which reporting shall (1) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget, and (2) provide an explanation of any per line item variance greater than 5% (the "Variance Report").

| Liens, Security and Priority: | A grant of priority or a lien on property of the estate under section 364(c) or (d). Bankruptcy Rule 4001(c)(1)(B)(i). See DIP Term Sheet, pp. 8-9, Interim DIP Order, ¶¶ 12-14. The granting of a lien on avoidance actions. Bankruptcy Rule 4001(c)(1)(B)(xi); Local Rule 4001-2(a)(i)(D). See DIP Term Sheet, p. 8, Interim DIP Order, ¶ 12(b). |

The DIP Obligations (i) pursuant to section 364(c)(1) of the Bankruptcy Code, shall constitute allowed superpriority administrative expense claims, (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, shall be secured by first priority, perfected liens on and security interests in all the DIP Collateral (as defined below), including all property of their respective estates in the Chapter 11 Cases, whether now owned or hereafter acquired and all proceeds thereof, in each case, other than assets subject to (x) the HEP Prepetition Liens or (y) the Permitted Senior Liens, (iii) pursuant to section 364(d)(1) of the Bankruptcy Code, shall be secured by first priority, perfected priming liens on and security interests in the HEP Prepetition Secured Collateral in which the HEP Prepetition Secured Lender maintained the HEP Prepetition Liens, (iv) shall be senior to and prime all Adequate Protection Liens, and (v) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be subordinate to the Permitted Senior Liens and the Carve-Out.

The property of the Debtors that is subject to the aforesaid perfected liens and/or security interests in favor of the DIP Lender shall include, but not be limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever

located (all of which being hereafter collectively referred to as the "DIP Collateral"): all assets and property of each Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, general intangibles, instruments, equipment, accounts (including, without limitation, all Health-Care-Insurance Receivables), and documents, all goods, inventory and fixtures, all documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames and other intellectual property, all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtors, and all other collateral pledged under the DIP Financing Documents (as defined in the Interim DIP Order), the Escrow Account and the Escrow Funds, any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (the "Avoidance Actions") (provided that the DIP Lender shall receive perfected security interests in and a lien on Avoidance Actions only upon entry of the Final DIP Orders), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)).

| | |
|---|---|
| Guaranty: | Each Guarantor hereby jointly and severally and unconditionally guarantees to DIP Lender the due, full, and punctual payment of all DIP Obligations to the fullest extent permitted under law and agrees to execute the Guaranty in substantially the form attached as Schedule B to the DIP Term Sheet. |
| Borrowing Conditions: | Availability of the DIP Facility shall be subject to the following conditions precedent, all of which shall be for the benefit of the DIP Lender and must be satisfied on occasion of each drawdown under the DIP Facility, unless waived in writing in advance by the DIP Lender: |

Interim Advances

1.   The Court shall have issued an interim order, in form and substance acceptable to the DIP Lender and its counsel, on or before June 25, 2014, in substantially the form attached as Schedule C to the DIP Term Sheet.

2.   The Interim DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Lender, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Interim DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

3.     The DIP Lender shall be satisfied that it has been granted, and holds, a perfected first priority lien on, and security interest in, all of property of the Debtors and proceeds thereof, subject only to the Permitted Liens.

4.     All fees payable by the Debtors on or prior to the closing date of the DIP Facility (the "Closing Date") (including but not limited to the fees and expenses of legal counsel and financial advisors) to the DIP Lender shall have been paid in an aggregate amount not to exceed $100,000.

5.     All "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the DIP Lender.

6.     The DIP Lender shall have received and approved the Budget.

7.     All representations and warranties of the Debtors set forth in the DIP Term Sheet shall be accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the loans to be made under the DIP Facility on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty shall be true and correct as of such earlier date).

8.     No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

<u>Additional Advances</u>

1.     The Court shall have entered a final and nonappealable order, in form and substance acceptable to the DIP Lender and its counsel on or before July 25, 2014, in a form substantially similar in all material respects to the Interim DIP Order or such other form as may be agreed to by the DIP Lender, in relation to the, which order, inter alia, shall approve the DIP Facility on a final basis, including, without limitation, the grant of, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected DIP liens upon all DIP Collateral with the priority as set forth in the section entitled "Priority and Liens" in the DIP Term Sheet, to secure the DIP Obligations of the Debtors under the DIP Facility in accordance with the terms hereof, effective as of the granting of the Interim DIP Order, without the need for any further action on the part of the DIP Lender, the Debtors or any other person (including, without limitation, the execution or delivery of any further

documents or agreements or the recording, filing, indexing, entering or registering of any financing statements or other similar instruments or documents).

2. All of the funds available under Interim DIP Order shall have been borrowed and used in accordance with the Budget and any variations provided for herein or to which the Debtors and the DIP Lender agree in writing.

3. The DIP Lender shall be satisfied that it has been granted, and holds, a perfected first priority lien on, and security interest in, all of property of the Debtors and proceeds thereof, subject only to Permitted Liens.

4. All fees payable by the Debtors on or prior to the Closing Date (including but not limited to the fees and expenses of legal counsel and financial advisors) to the DIP Lender shall have been paid in an aggregate amount not to exceed $100,000.

5. All "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and any related "final orders" subsequently entered by the Bankruptcy Court shall be reasonably satisfactory in form and substance to the DIP Lender.

6. The DIP Lender shall have received and approved the Budget and the Debtors shall be in compliance with the Budget subject to the Permitted Variances.

7. All representations and warranties of the Debtors set forth in the DIP Term Sheet shall be accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the DIP loans to be made on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty shall be true and correct as of such earlier date).

8. The Final DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Lender, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Final DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

9. No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

| | |
|---|---|
| <u>Adequate Protection:</u> | **Adequate protection on account of prepetition claim. Bankruptcy Rule 4001(c)(1)(B)(ii). <u>See</u> DIP Term Sheet, p. 10, Interim DIP Order, ¶ 19.** |

**Solely to the extent of any diminution of value, any secured creditor of the Debtors with a valid, perfected, enforceable, continuing and non-avoidable prepetition Lien on property of the Debtors (the "<u>Prepetition Secured Parties</u>") holding valid, perfected, enforceable, continuing and non-avoidable prepetition security interests and Liens upon the DIP Collateral (including Cash Collateral) (collectively, the "<u>Adequate Protection Parties</u>") shall have pursuant to sections 361, 362(d), 363(c), 363(e), and 364(d) of the Bankruptcy Code, replacement security interests in and liens upon all of the DIP Collateral (the "<u>Adequate Protection Liens</u>"), which Adequate Protection Liens shall be junior and subject in all respects to the DIP Liens and to the Carve Out, but shall be senior to all Permitted Senior Liens and the HEP Prepetition Liens.**

**Solely to the extent of any diminution of value, the Adequate Protection Parties shall have, an allowed superpriority administrative expense claim (the "<u>Adequate Protection Superpriority Claim</u>"), as provided for in section 507(b) of the Bankruptcy Code, in each of the Chapter 11 Cases and any successor case of the Debtors, which shall be junior and subject in all respects to the DIP Superpriority Claim and the Carve Out. The Adequate Protection Superpriority Claims have priority in the applicable Chapter 11 Case and any successor case of the Debtors over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, but are subordinate and junior in all respects to the DIP Superpriority Claim and the Carve Out, it being understood that the Adequate Protection Parties shall not receive or retain any payments, property, or other amounts in respect of their Adequate Protection Superpriority Claims, or granted hereunder or under any Adequate Protection Parties' existing prepetition agreements, unless and until all DIP Obligations and Carve Out related expenses are indefeasibly paid in full and in cash in accordance with the terms of the respective DIP Documents.**

| | |
|---|---|
| <u>Events of Default:</u> | The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, being herein referred to as an "<u>Event of Default</u>") shall constitute a default under the DIP Term Sheet: |

1.    The failure by the Debtors to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in the DIP Term Sheet, the Interim DIP Order or Final DIP Order, on its part to be performed or complied with where any such failure to perform or comply shall not be remedied within

three (3) business days from notice of default.

2. The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Court to be null and void or the validity or enforceability the DIP Facility being contested by the Debtors or the Debtors denying in writing that it has any further liability or obligation under the DIP Facility or the DIP Lender ceasing to have the benefit of the Liens granted by the Interim DIP Order or Final DIP Order.

3. The use of Escrow Funds for any purpose other than   for the payment or other funding of the Debtors' payroll and payroll tax obligations unless otherwise agreed by the DIP Lender.

4. Except as permitted in the Interim DIP Order or Final DIP Order, the entry of any order of the Court granting to any third party a superpriority claim or lien pari passu with or senior to that granted to the DIP Lender hereunder.

5. The Debtors shall make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Obligations under the DIP Facility or other than in accordance with the Budget approved by the DIP Lender.

6. If, as of any Reporting Date, the Debtors cumulative cash disbursements from the period from the Petition Date through the end of any calendar month exceeds 15% from the amount included in the Budget (i.e., exceeds scheduled disbursements by more than 15%).

7. The entry of an order converting the Debtors' Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief.

8. The entry of an order dismissing the Debtors' Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief, unless consented to by the DIP Lender.

9. The entry of any order in the Debtors' Chapter 11 Cases or any successor cases, which order constitutes the stay, modification, appeal or reversal of the Interim DIP Order or Final DIP Order or which otherwise affects the effectiveness of the Interim DIP Order or Final DIP Order.

10. The entry of an order in the Debtors' Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtors' business.

11. The entry of an order in the Debtors' Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property, including the collateral

pledged pursuant to the DIP Facility and the HEP Prepetition Liens, of the Debtors or to commence or continue any prepetition litigation against the Debtors involving potential liability not covered by insurance, in excess of $500,000 in the aggregate.

12. Any judgment or order as to postpetition liability or debt for the payment of money in excess of $500,000 shall be rendered against one or more of the Debtors individually or in the aggregate, and the enforcement thereof shall not have been stayed.

13. Any non-monetary judgment or order with respect to a postpetition event shall be rendered against the Debtors which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors or (ii) have a material adverse effect on the rights and remedies of the DIP Lender hereunder, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

14. The Interim DIP Order or Final DIP Order being amended or modified without the consent of the DIP Lender.

Remedies:          If any Event of Default occurs and is continuing, the DIP Lender may take any or all of the following actions:

1. Declare the commitment of the DIP Lender to make loans under the DIP Facility (the "DIP Loans") to be terminated, whereupon such commitment shall be terminated;

2. Declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Facility, the DIP Term Sheet, Interim DIP Order or the Final DIP Order to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by MacKeyser;

3. Declare interest on the DIP Obligations to accrue at the default rate set forth in the DIP Term Sheet, whereupon the interest on the DIP Obligations shall automatically accrue at the default rate;

4. Subject to the Default Notice Period (as defined in the DIP Term Sheet), (i) enter upon any premises on or in which any of the DIP Collateral may be located and take possession of the DIP Collateral or complete processing, manufacturing and repair of all or any portion of the DIP Collateral, (ii) collect, foreclose, receive, appropriate, setoff and realize upon any and all DIP Collateral, (iii) remove any DIP Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose,

(iv) exercise its unqualified right to credit bid up to the full amount of the outstanding DIP Obligations (including any accrued interest) in any sale of the DIP Collateral (or any part thereof), which credit bid may incorporate a credit bid of the HEP Prepetition Indebtedness (as defined in the Interim DIP Order) (including any accrued interest), without the need for further Bankruptcy Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 726 of the Bankruptcy Code, or otherwise and (v) take whatever other action the DIP Lender may deem necessary or desirable for the protection of its interests; and/or

5.      exercise all rights and remedies available to it (whether as a secured creditor or otherwise) under the DIP Facility, the DIP Term Sheet, the Interim DIP Order, the Final DIP Order or applicable law (including in respect of the DIP Collateral).

Carve Out:       **Disparate treatment for the professionals retained by the creditors' committee from those professionals retained by the debtor with respect to a professional fee carve out. Local Rule 4001-2(a)(i)(F). See DIP Term Sheet, pp. 9-10, Interim DIP Order, ¶ 15.**

**As more fully set forth in the DIP Orders, the liens on and security interests in the DIP Collateral and the superiority administrative expenses claims shall be subordinate to the "Carve Out." For purposes hereof, the "Carve Out" means: (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $25,000, (iii) after the occurrence and during the continuance of an Event of Default (as defined below), all allowed and unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Chapter 11 Cases (each, a "Committee"), that remain unpaid subsequent to the payment, _pro rata_ with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in an aggregate amount not exceeding $75,000 for the payment of the Debtors' professionals and $25,000 for payment of the Committee's professionals, which amount may be used subject to the terms of the DIP Term Sheet and the Interim DIP Order (the "Permitted Professional Fees"), and (iv) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors and any Committees at any time when no Event of Default is continuing, that remain unpaid or unfunded subsequent to an Event of Default, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent professional fee budget (the "Professional Fee Budget") delivered to and approved by the DIP Lender prior to any**

Event of Default that is then continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Court at any time; provided, however, that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above.

| | |
|---|---|
| Default Notice Period: | The Interim DIP Order shall contain a Default Notice Period as set forth in the DIP Term Sheet. |
| 506(c) Waiver: | **506(c) Waiver. Bankruptcy Rule 4001(c)(1)(B)(x); Local Rule 4001-2(a)(i)(C). See Interim DIP Order, ¶ 21.** |

**Subject only to and effective upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases or any successor cases at any time shall be charged against or recovered from the DIP Collateral, the HEP Prepetition Collateral, against any DIP Lender or the HEP Prepetition Secured Lender, or any of their respective claims, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.**

| | |
|---|---|
| Releases and Waiver: | **Waiver of ability to challenge validity, enforceability, priority or amount of prepetition claim. Bankruptcy Rule 4001(c)(1)(B)(iii); Local Rule 4001-2(a)(i)(B). See DIP Term Sheet, pp. 18-19, Interim DIP Order, ¶ 6. Release, waiver and limitation on claims and causes of action. Bankruptcy Rule 4001(c)(1)(B)(viii). See DIP Term Sheet, p. 19, Interim DIP Order, ¶ 25.** |

**The Interim DIP Order shall contain and approve the admissions, stipulations, and agreements of each Debtor, on behalf of and for itself, with regard to the HEP Prepetition Obligations, the HEP Prepetition Indebtedness, the HEP Collateral Documents, the HEP Prepetition Agreements, and the HEP Prepetition Liens (each as defined in the Interim DIP Order).**

**Upon the entry of the Interim DIP Order and subject to the closing of the DIP Facility, in consideration of (i) the DIP Lender's agreement to the making of postpetition loans, advances and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the DIP Term Sheet, the DIP Loan Documents and the Interim DIP Order, and (ii) the HEP Prepetition Secured Lenders' agreement to make loans, advances, providing credit and other financial accommodations to the Debtors pursuant to the provisions of the HEP Prepetition Loan Agreement and for the HEP Prepetition Liens to be primed by the DIP Liens, each Debtor, on behalf of and for itself (collectively, the "Releasors"), shall forever release, discharge and acquit the DIP Lender and the HEP Prepetition Secured Lenders and their respective participants, officers, directors, principals, agents, attorneys and predecessors-in-interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of**

every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Releasees as of the date hereof, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, in respect of events that occurred on or prior to the date hereof.  In addition, upon the repayment of all  DIP Obligations owed to the DIP Lender by the Debtors and termination of the rights and obligations arising under the DIP Loan Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender in such capacity shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Term Sheet, the DIP Loan Documents or the DIP Orders (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out), on terms and conditions acceptable to the DIP Lender.  Notwithstanding anything to the contrary herein, the Debtors' releases do not extend to the DIP Lender's obligations to make the advances and otherwise comply with the terms of the DIP Term Sheet and the DIP Orders.

| | |
|---|---|
| Expenses and Indemnification: | The indemnification of any entity.  Bankruptcy Rule 4001(c)(1)(B)(ix).  See DIP Term Sheet, p. 19, Interim DIP Order, ¶ 24. |

The DIP Lender (and its affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person.

| | |
|---|---|
| Governing Law and Jurisdiction | Delaware |

## RELIEF REQUESTED

41. The Debtors seek entry of the DIP Orders granting the following relief:

    a. authorizing the Debtors to execute and deliver the DIP Term Sheet and obtain up to $1,052,105 of secured postpetition loans, advances, and other financial accommodations pursuant to the DIP Orders;

    b. granting an allowed DIP Superpriority Claim to the DIP Lender pursuant to section 364(c)(1) of the Bankruptcy Code;

c.      granting to the DIP Lender security interests in, and liens on, all of the DIP Collateral pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code;

d.      approval of the form and manner of adequate protection to be provided to the Adequate Protection Parties pursuant to sections 361(a) and 363(c) of the Bankruptcy Code;

e.      authorizing the Debtors to use the Cash Collateral pursuant to sections 361 and 363 of the Bankruptcy Code;

f.      modifying the automatic stay to the extent necessary to effectuate the provisions of the DIP Orders; and

g.      scheduling a Final Hearing to consider entry of the Final Order.

### BASIS FOR RELIEF

42.      For the reasons set forth herein, the Debtors have an immediate need for adequate postpetition financing and use of Cash Collateral to continue operating their businesses in the ordinary course and preserve the value of their assets pending the sale of their assets.  As discussed above, the Debtors believe that an orderly asset sale process in chapter 11 is the best way to maximize the value of the Debtors' assets.

43.      Indeed, absent sufficient funds to support the Debtors' operations, the value of the Debtors' assets and operations will quickly erode and their ability to consummate the asset sale will be jeopardized, to the detriment of the Debtors' estates and stakeholders.  See In re Farmland Indus., Inc., 294 B.R. 855, 885 (Bankr. W.D. Mo. 2003) (approving postpetition financing that "gives the Debtors sufficient time to market and sell several of their major assets so as to pay down the debt to the DIP Lenders and then reorganize around their remaining core assets.  Without the continued financing, the Debtors would likely be forced into a chapter 7 or 11 liquidation, to the detriment of all creditors…").

44.    Thus, the Debtors submit that the DIP Facility is in the best interests of the Debtors' estates, creditors and all other stakeholders and, therefore, the Debtors should be granted the relief requested herein.

**A.    The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

45.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the Debtors seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(l) of [the Bankruptcy Code] as an administrative expense." See 11 U.S.C. § 364(c).  In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if --
>
> (A)    the [debtor] is unable to obtain credit otherwise; and
>
> (B)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(l).

46.    In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, the Debtors have the burden of proving that:

> (1)    They are unable to obtain unsecured credit per 11 U.S.C. § 364(b), i.e., by allowing a lender only an administrative claim per 11 U.S.C. § 503(b)(1)(A);
>
> (2)    The credit transaction is necessary to preserve the assets of the estate; and

(3)    The terms of the transaction are fair, reasonable,
and adequate, given the circumstances of the
debtor-borrower and the proposed lender.

In re Los Angeles Dodgers, LLC, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011); see also In re
Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); In re Aqua Assocs., 132 B.R. 192,
195-96 (Bankr. E.D. Pa. 1991).

47.    The Court "may not approve any credit transaction under subsection (c)

[of section 364] unless the debtor demonstrates that it has attempted, but failed, to obtain

unsecured credit under section 364(a) or (b)." In re Los Angeles Dodgers, LLC, 457 B.R. at 313

(citing In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)).  To satisfy the

requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a

good faith effort that credit was not available" to the debtor on an unsecured or administrative

expense basis.  See Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789

F.2d 1085, 1088 (4th Cir. 1986).  The statute imposes no duty to seek credit from "every possible

lender before concluding that such credit is unavailable."  See In re Reading Tube Indus., 72

B.R. 329, 332 (Bankr. E.D. Pa. 1987) (citing In re Snowshoe Co., 789 at 1088).  When few

lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be

unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for

financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom.,

Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); see also In

re Ames Dep't Stores, Inc., 115 B.R. at 40 (approving financing facility and holding that the

debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached

four lending institutions, was rejected by two, and selected the most favorable of the two offers it

received).

48.     For the reasons discussed below, the Debtors submit that they have

satisfied the standards required to access postpetition financing on a secured superpriority basis

under section 364(c) of the Bankruptcy Code.

**(i)     The Debtors Were Unable to Obtain Financing on More Favorable Terms**

49.     The Debtors have been unable to procure sufficient financing in the form

of unsecured credit allowable under sections 364(a) or (b) of the Bankruptcy Code.  The Debtors

face liquidity restraints and were forced to file these Chapter 11 Cases to preserve the value of

their assets.  Due to the liens and security interests granted under the Debtors' various prepetition

credit facilities, the Debtors do not believe they will be able to procure sufficient

debtor-in-possession financing in the form of unsecured credit allowable under section 503(b)(1)

of the Bankruptcy Code.  As it stands, the DIP Lender is the only party that offered to provide

the Debtors with postpetition financing and is only willing to lend to the Debtors on the terms

and conditions set forth in the DIP Loan Documents and Interim DIP Order.

50.     Without the agreement of the DIP Lender to provide the Debtors with

postpetition financing, the Debtors likely would be forced to shut down and liquidate their

business.  Instead, with the Postpetition Financing Arrangement, the Debtors intend to pursue the

sale of certain of their assets pursuant to section 363 of the Bankruptcy Code.

51.     The Debtors respectfully submit that its efforts to obtain postpetition

financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code.

See, e.g., In re Simasko Production Co., 47 B.R. 444, 448-49 (D. Colo. 1985) (authorizing

interim financing stipulation where debtor's best business judgment indicated financing was

necessary and reasonable for benefit of estates); In re Ames Dept. Stores, 115 B.R. at 38 (with

respect to postpetition credit, courts "permit debtor in possession to exercise their basic business

judgment consistent with their fiduciary duties"); In re Sky Valley, Inc., 100 B.R. at 113 (where

few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

### (ii)    The Postpetition Financing Arrangement Is Necessary to Preserve the Assets of the Debtors' Estates

52.    As debtors-in-possession, the Debtors have a fiduciary duty to protect and

maximize their estates' assets. See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325,

339 (3d Cir. 2004). As noted above, the Debtors require access to working capital in the form of

postpetition financing to continue in business and sell their assets. Absent additional working

capital, the Debtors would be forced to liquidate. Accordingly, the Postpetition Financing

Arrangement is necessary to preserve the Debtors' assets.

### (iii)    The Terms of the Postpetition Financing Arrangement Are Fair, Reasonable, and Appropriate Given the Circumstances

53.    In considering whether the terms of postpetition financing are fair and

reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

the potential lender. In re Farmland Indus., Inc., 294 B.R. at 886; see also Unsecured Creditors'

Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 65

B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire

funds).

54.    The Postpetition Financing Arrangement was negotiated in good faith and

at arm's-length between the Debtors and the DIP Lender, MacKeyser's majority equity owner,

resulting in an agreement designed to permit the Debtors to maximize the value of their assets

through an orderly sale process. See, e.g., In re Snowshoe Co., 789 F.2d at 1088 (stating that

section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender,

particularly when "time is of the essence to preserve a vulnerable seasonal enterprise"); In re Western Pacific Airlines, Inc., 223 B.R. 567, 573 (Bankr. D. Colo. 1997) (authorizing postpetition financing to preserve value of aircraft leaseholds where to hold otherwise would result in the elimination of its value and the "immediate collapse of the Debtor as a going concern").

55.     Accordingly, and as set forth in more detail herein, the terms and conditions of the DIP Facility are fair and reasonable.

   **(iv)     Entry Into the DIP Facility Reflects the Debtors' Sound Business Judgment**

56.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See, e.g., Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 38 (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

57.     Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. See, e.g., In re AMR Corp., 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("[i]n determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment); In re DB Capital Holdings, LLC, 454 B.R. 804, 822-23 (Bankr. D. Colo 2011) (must demonstrate, among other things, that the proposed financing is an exercise of sound and reasonable business judgment); In re Yellowstone Mountain Club, LLC, No. 08–61570–11, 2008 WL 5875547, at **7-8 (Bankr. D. Mont. Dec. 17, 2008) (same). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors'

30

business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

58.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. See In re Curlew Valley Assocs., 14 B.R. 506, 514, n. 11(a) (Bankr. D. Utah 1981). Generally, a court will not second-guess a debtor in possession's business decisions as long as, as a whole, the decisions are within the debtor's sound business judgment. See In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990); cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al., 115 B.R. 34, 37–38 (Bankr. S.D.N.Y. 1990) (courts, in passing upon arrangements for postpetition financing under section 364(b)–(d), consider, *inter alia,* whether the terms would tilt the conduct of the bankruptcy case in a manner inconsistent with Chapter 11, or merely reflect a debtor's business judgment).

59.     As described above, the Debtors have exercised sound business judgment in determining the appropriateness of the DIP Facility and submit they have satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Facility. Moreover, with respect to the Debtors' board consideration and approval of the DIP Facility, those directors and/or members of boards of managers affiliated with the DIP Lender recused themselves from deliberation and approval of the DIP Facility, and therefore, the board review of the DIP Facility was appropriate. The Debtors believe that the DIP Facility contains terms that are the best available under the circumstances. The funds provided by the DIP Facility are essential to enable the Debtors to avoid irreparable harm to the Debtors' assets and business and enable the

Debtors to market their assets in an orderly manner pursuant to section 363 of the Bankruptcy

Code.

### (v)    Approval of the Priming Lien Is Appropriate

60.    If a debtor is unable to obtain credit under the provisions of section 364(c) of

the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on the property

of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C.

§ 364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition

debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing,

authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on

property of the estate that is subject to a lien only if (a) the trustee is unable to obtain credit

otherwise; and (b) there is adequate protection of the interest of the holder of the lien on the

property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C.

§ 364(d).

61.    Consent by a secured creditor to priming obviates the need to show adequate

protection.  See In re Sky Valley, Inc., 99 B.R. at 122 ("by tacitly consenting to the superpriority

lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were

adequately protected."); see also In re Metaldyne Corp., No. 09-13412 (MG), 2009 WL 2883045, at

*2 (Bankr. S.D.N.Y. June 23, 2009).  The HEP Prepetition Secured Lender has consented to being

primed by the DIP Lender with respect to the HEP Prepetition Secured Collateral in which the HEP

Prepetition Secured Lender maintained the HEP Prepetition Liens.

62.    Accordingly, pursuant to section 364(c) and 364(d)(1) of the Bankruptcy

Code, the Debtors respectfully submit that it should be granted authority to enter into the DIP

Facility and obtain funds from the DIP Lender on the secured and administrative

superpriority basis.

**B.**     **The Debtors' Request to Use Cash Collateral and the Proposed Adequate Protection Being Provided to the Adequate Protection Parties Is Appropriate and Meets the Required Standard**

63.     A chapter 11 debtor-in-possession has the statutory right to use cash

collateral to operate its business.  Section 363 of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under
> section … 1108 … of this title and unless the court orders
> otherwise, the trustee may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
> estate in the ordinary course of business without notice or a
> hearing.

11 U.S.C. § 363(c)(1).

64.     Section 363(c)(2) of the Bankruptcy Code, however, provides an

exception with respect to "cash collateral" to the general grant of authority to use property of the

estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Spefically:

> The trustee [or debtor-in-possession] may not use, sell, or lease
> cash collateral under paragraph 1 of this subsection, unless -
>
> (A)     each entity that has an interest in such cash collateral
>          consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use,
>          sale, or lease in accordance with the provisions of this
>          section.

11 U.S.C. § 363(c)(2).

65.     The "provisions of this section" referenced in section 363(c)(2) include

section 363(e), which provides:

> Notwithstanding any other provision of this section, at any time, on
> request of an entity that has an interest in property used, sold, or
> leased, or proposed to be used, sold, or leased, by the trustee, the

> court, with or without a hearing, shall prohibit or condition such
> use, sale or lease as is necessary to provide adequate protection of
> such interest.

11 U.S.C. § 363(e).

**(i)      The Debtors Are Authorized to Use Cash Collateral**

66.      In addition to the need for the DIP Facility, the Debtors have a critical need for the immediate use of Cash Collateral.  In particular, the Debtors require use of the Cash Collateral to pay present operating expenses in order to sustain their operations while they pursue an orderly sale process.

67.      Under Section 363(c)(2) of the Bankruptcy Code, the Debtors may not use Cash Collateral without the consent of the Adequate Protection Parties or authority granted by the Court.  The HEP Prepetition Secured Lender consents to the use of Cash Collateral on the terms and conditions set forth herein.  With respect to other Adequate Protection Parties, the Debtors respectfully submit that the Court should order the relief requested herein under section 363(c)(2)(B) of the Bankruptcy Code given the adequate protection being provided under sections 361 and 363(e) of the Bankruptcy Code, as set forth herein.

**(ii)      The Adequate Protection Parties' Interests Are Adequately Protected**

68.      The Debtors request that the Court approve and authorize the Debtors' proposed adequate protection of the Adequate Protection Parties' interest, in respect of and as consideration for, (a) the use of Cash Collateral, (b) the granting of the DIP Liens and the DIP Superpriority Claim, (c) the subordination of the prepetition obligations owed to Adequate Protection Parties to the Carve Out, (d) any other diminution in the value of the Prepetition Collateral, and (e) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

69.    In exchange for the consideration provided by the Adequate Protection Parties, the Interim DIP Order provides adequate protection of the interests of the Adequate Protection Parties in the Prepetition Collateral in the form of valid, binding, enforceable, non-avoidable and automatically perfected replacement security liens on the Debtors' postpetition assets in the same extent, validity and priority that existed as of the Petition Date.

70.    Section 361(2) of the Bankruptcy Code provides that adequate protection may be provided by granting a replacement lien in postpetition assets to protect the secured creditor from diminution of its collateral during the bankruptcy proceeding.  Courts have utilized that provision of section 361 in fashioning adequate protection and permitting a debtor to use cash collateral under similar circumstances.  See In re Mt. Olive Hospitality, LLC, Civil No. 13-3395 (RBK), 2014 WL 1309953, at *3, n. 6 (D.N.J. March 31, 2014); see also In re Airport Inn Assocs., Ltd., 132 B.R. 951, 960 (Bankr. D. Col. 1990) ("The court could order a lien in postpetition accounts receivable as adequate protection if that relief was requested...."); In re Int'l Design & Display Group, Inc., 154 B.R. 362, 364 (Bankr. S.D. Fla. 1993) (court authorized debtor to use cash collateral and, as adequate protection, granted secured creditor replacement lien on all postpetition accounts receivable, inventory and contracts to the extent the creditor's collateral was depleted).

71.    The Debtors also will grant the Adequate Protection Parties as set forth in the Interim DIP Order, a superpriority adequate protection claim to the extent the Debtors' use of Cash Collateral results in a diminution of the Prepetition Collateral, which shall be junior in all respects to the DIP Superpriority Claim and the Carve Out.

72.    The Debtors believe that such adequate protection is fair and reasonable. Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize

the Debtors to provide the above-described adequate protection to the Adequate Protection

Parties in accordance with the terms set forth in the DIP Orders and DIP Facility.

**C.    The Section 506(c) Waiver Should be Approved**

73.    The Court should approve the Debtors' waiver of any right to surcharge

under section 506(c).  Such waivers and provisions are standard and customary under financings

between sophisticated parties.  As one court noted in discussing the later enforceability of such

waivers, "the Trustee and Debtors-In-Possession in this case had significant interests in asserting

claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by

waiving them in exchange for concessions to the estates (including a substantial carve-out for the

benefit of administrative creditors)."  In re Molten Metal Technology, Inc., 244 B.R. 515, 527

(Bankr. D. Mass. 2000), vacated and remanded on other grounds, 2001 WL 36381917 (1st Cir.

BAP March 11, 2001); see also In re Nutri/System of Florida Assocs., 178 B.R. 645, 650 (E.D. Pa.

1985) (noting that the debtor had waiver section 506(c) rights in obtaining debtor-in-possession

financing).

74.    The waiver of surcharge rights is particularly appropriate where, as here, it

is tied to the benefit to be received from both the postpetition financing and the Carve Out.  In

particular, the Debtors have waived the uncertainty of surcharge rights in exchange for

immediate and necessary liquidity from the DIP Lender and the valuable and predictable rights

granted to the Debtors' estate professionals under the Carve Out.  See In re Lunan Family

Restaurants Ltd., P'Ship, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any

proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the

expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the

party primarily benefited by the expenditure]"). For these reasons, the section 506(c) waiver is appropriate.

**D.     Modification of the Automatic Stay Is Warranted**

75.     The proposed Interim DIP Order provides certain circumstances under which the automatic stay could be vacated without further order of the Court. Specifically, the proposed Interim DIP Order provides that upon the occurrence of an Event of Default or upon a default of the terms of the Interim DIP Order, but subject to five (5) business days prior written notice, the automatic stay is modified or vacated to allow the DIP Lender to terminate the commitments under the DIP Term Sheet, declare all DIP Obligations immediate due and payable and/or take any actions necessary to foreclose or otherwise enforce its security interests in or liens on any or all of the DIP Collateral.

76.     The Debtors submit that such stay modification is in the best interests of the Debtors and their estates and is the best attainable under the circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Postpetition Financing Arrangement and the proposed DIP Orders.

**E.     Interim Approval of Borrowings Should Be Granted**

77.     It is essential that the Debtors immediately stabilize their operations and cash flow, which will maximize the potential for a successful sale of their assets. Accordingly, the Debtors are seeking interim approval to access the full amount of the DIP Facility to meet their working capital needs, including making payments to employees, pending a final hearing.

78.     The Debtors submit that this Court also should grant the Debtors' request for immediate authority to use the Cash Collateral to prevent immediate and irreparable harm to

the Debtors' estate pending a final hearing on the Motion pursuant to Bankruptcy Rule 4001(c).

The ability of the Debtors to finance their operations and the availability to the Debtors of

sufficient working capital and liquidity through the use of the Cash Collateral is vital to the

preservation and maintenance of the value of the Debtors' estates.  The Debtors, therefore, seek

authority to use the Cash Collateral.

79.    Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining

authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for
> authority to obtain credit no earlier than 14 days after
> service of the motion.  If the motion so requests, the court
> may conduct a hearing before such 14-day period
> expires, but the court may authorize the obtaining of
> credit only to the extent necessary to avoid immediate and
> irreparable harm to the estate pending a final hearing.

80.    In examining requests for interim relief under this rule, courts apply the

same business judgment standard applicable to other business decisions.  See, e.g., Ames Dep't

Stores, 115 B.R. at 36; Simasko, 47 B.R. at 449.  Under this standard, the Debtors' requests for

entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is

appropriate.  Moreover, courts in this jurisdiction have granted similar relief in other chapter 11

cases.  See, e.g., In re Brookstone Holdings Corp., et al., Case No. 14-10752 (BLS), Docket No.

85 (Bankr. D. Del. April 4, 2014) (authorizing debtor to borrow $91.25 million on an interim

basis of the total $96.25 million DIP facility); In re Ablest Inc., et al., Case No. 14-10717 (KJC),

Docket No. 47 (Bankr. D. Del. April 2, 2014) (authorizing the debtor, on an interim basis, to

borrow up to an aggregate principal amount not to exceed $20 million of the total $50 million

DIP facility); In re The Dolan Company, et al., Case No. 14-10614 (BLS), Docket No. 97

(Bankr. D. Del. March 26, 2014) (authorizing each debtor, on an interim basis, to borrow up to

an aggregate principal amount not to exceed $4.5 million of the total $10 million DIP facility); In re Exide Technologies, Case No. 13-11482 (KJC), Docket No. 79 (Bankr. D. Del. June 11, 2013) (allowing immediate access to $395 million under the DIP facilities).

81.    The Debtors believe that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the use of Cash Collateral and the approval of the proposed adequate protection.

**F.    Request for Final Hearing**

82.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event earlier than seven (7) days following the organizational meeting of the creditors' committee contemplated by section 1102 of the Bankruptcy Code and consistent with Local Rule 4001-2(c), and fix the time and date prior to the final hearing for parties to file objections to the Motion.

**G.    Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

83.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**H.    No Prior Request**

84.    No prior motion for the relief requested herein has been made to this or any other court.

**NOTICE**

85.    Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Internal

Revenue Service; (iv) the Office of the United States Attorney for the District of Delaware; (v) those entities or individuals listed on the Debtors' consolidated list of 30 largest unsecured creditors; and (vi) all other known parties asserting a lien against the Debtors' assets.  Because of the nature of the relief requested, the Debtors respectfully submit that no other or further notice of the relief requested in this Motion need be given.

WHEREFORE, the Debtors respectfully request entry of the Interim DIP Order, substantially in the form attached hereto as Exhibit 1 (a) authorizing the Debtors to obtain secured postpetition financing, (b) authorizing the Debtors' use of Cash Collateral, (c) granting adequate protection to the prepetition secured lenders for use of Cash Collateral, (d) setting the final hearing on the Motion, and (e) granting such other and further relief as the Court deems appropriate.

Dated: Wilmington, Delaware
        June 22, 2014

        COLE, SCHOTZ, MEISEL,
        FORMAN & LEONARD, P.A.

        /s/ David R. Hurst
        David R. Hurst (I.D. No. 3743)
        Marion M. Quirk (I.D. No. 4136)
        Therese A. Scheuer (I.D. No. 5699)
        500 Delaware Avenue, Suite 1410
        Wilmington, DE 19801
        Telephone: (302) 652-3131
        Facsimile: (302) 652-3117

        *Proposed Counsel for Debtors and
        Debtors-in-Possession*