## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

In re:                :     Chapter 11

                        :

MACKEYSER HOLDINGS, LLC, et al.,    :     Case No. 14-11550 (CSS)

                        :

         Debtors.[1]          .     Jointly Administered

-------------------------------------------------------------x

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364, (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS PURSUANT TO 11 U.S.C. §§ 364 AND 507, (III) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (IV) PROVIDING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364, AND 507, AND (V) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND (C) AND LOCAL BANKRUPTCY RULE 4001-2**

Upon the motion (the "Motion"), dated June 22, 2014, of MacKeyser Holdings, LLC (the "Borrower") and certain of its affiliates, each as a debtor and debtor in possession (collectively, the "Debtors") in the above-captioned cases (the "Cases"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each entity's federal tax identification number, are: MacKeyser Holdings, LLC (5620); American Optical Services, Inc. (5707); Exela Hearing Services, LLC (6175); Optical Management Systems, Inc. (8300); Riverfront Hearing, Inc. (9220); AOS-OMS, LLC (4445); American Optical Services, LLC (4879); EHS-Riverfront, LLC (4530); 926 N. Wilcrest, LLC (2497); Epic Management Group, LLC (3385); Eyeglasses Etc., Inc. (7753); Eyes On You Eyecare, Inc. (2091); Genesis Billing Systems, LLC (1548); Genesis Eye Center, PLLC (8427); J. Richard Susi, D.O., P.A. (1936); Joseph D. Udvari, Jr., O.D., P.C. (0856); Joseph Kurstin, M.D., P.A. (7339); Lakewood Eye Clinic, P.C. (2251); Larry R. Moorman, M.D., P.C. (5458); Philip H. Clark, O.D., P.A. (6411); Steven T. Olkowski, M.D., P.C. (1813); Thomas Retinal Eye Specialists, P.C. (0492); Thomas G. Abell, M.D., P.S.C. (1810). The corporate headquarters and the mailing address for each entity listed above is 8076 West Sahara Avenue, Las Vegas, NV 89117.

States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking, among other things, entry of an interim order (this "Interim Order") and a final order (the "Final Order"):

(a)     authorizing the Borrower to obtain postpetition financing (the "DIP Financing"), and for the Guarantors (as defined below) to guaranty certain of the Borrower's obligations in connection with the DIP Financing, consisting of a first-lien superpriority term loan multi-draw facility in an aggregate principal amount of up to $1,052,105 (the "DIP Facility"), with Health Evolution Partners Fund I, L.P., a Delaware limited partnership and Series F of Health Evolution Partners Co-Invest, LLC, a Delaware limited liability company (together, the "DIP Lenders").

(b)     authorizing the Debtors to execute and deliver, and incur all liabilities and obligations under

   (i)    that certain Debtor-In-Possession Term Sheet, dated as of June 20, 2014, as amended, modified, restated, or supplemented in accordance with the terms thereof or hereof, (the "DIP Term Sheet," the collateral documents (including but not limited to one or more control agreements, pledge agreements and security agreements to the extent applicable), the Guaranty, the Budget (as defined below), the Professional Fee Budget (as defined below), all such instruments, financing statements and documents as may be executed and delivered in connection with or relating to the DIP Facility, together with this Interim Order and the Final Order (subject to entry by the Court thereof) and any certificate or other document made or delivered pursuant hereto or thereto, the "DIP Documents"), and perform all such other and further acts as may be required in connection with the respective DIP Documents; and

   (ii)   all other agreements, documents, notes, or instruments as may be required, necessary, or desirable (including all collateral documents) and which are executed or delivered in connection with the DIP Term Sheet, including the budget attached hereto as Exhibit 1 (the "Budget");

(c)     authorizing the Borrower to (i) use proceeds of the DIP Facility solely as expressly permitted in the DIP Documents, including the use solely to fund the Debtors' operations and conduct and pursue a sale and liquidation process and the

2

funding of the Escrow Account (as defined below) (with such proceeds in the
Escrow Account used solely for payroll and sales tax obligations as set forth
herein and in the DIP Term Sheet);

(d)     granting automatically perfected security interests in and liens on all of the DIP
        Collateral (as defined below) to the DIP Lenders, and granting superpriority
        administrative expense status to the DIP Obligations (as defined below), in each
        case on the terms and subject to the relative priorities set forth in the DIP
        Documents;

(e)     granting adequate protection to any secured parties whose existing liens on or
        security interests in the DIP Collateral (as defined below) are being primed by the
        DIP Liens (as defined below) or whose collateral is being used (including Cash
        Collateral) by the Debtors pursuant to the DIP Term Sheet and this Interim Order
        to the extent of any diminution in value of their interests in the DIP Collateral (as
        defined below) and subject in all respects to the Carve Out (as defined herein);

(f)     authorizing the Borrower and the Guarantors under the DIP Documents to use,
        subject to the DIP Documents, any Cash Collateral (as defined below) in which
        the secured parties under the Existing Agreements (as defined below) may have
        an interest, and the granting of adequate protection to parties holding valid,
        unavoidable, and perfected liens on such Cash Collateral with respect to, inter
        alia, such use of their Cash Collateral to the extent of any diminution in value of
        their interests in such Cash Collateral;

(g)     authorizing the Borrower to pay the principal, interest, fees, expenses,
        disbursements, and other amounts payable under the DIP Documents as such
        amounts become due and payable;

3

(h)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the other DIP Documents;

(i)     scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and in connection therewith, approving the form and manner of notice of the Final Hearing; and

(j)     granting the Debtors such other and further relief as is just and proper;

and the Court having considered the Motion, the exhibits attached thereto, the First Day Declaration of Thomas J. Allison in Support of Chapter 11 Petitions and First Day Pleadings, sworn to as of June 21, 2014 (the "First Day Declaration"), and the Declaration of Thomas M. Barry In Support of Debtors' Motion For Approval of Debtor-in-Possession Financing, sworn to as of June 20, 2014 (the "Barry Declaration"); and a hearing to consider entry of this Interim Order having been held before the Court on June 24, 2014 (the "Interim Hearing"); and upon all of the pleadings filed with the Court, all evidence presented in support of this Interim Order, the arguments of counsel stated on the record of the Interim Hearing, and all of the proceedings held before the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, ORDERED, AND ADJUDGED, that:[2]**

1.     **Motion Granted.** The Motion is GRANTED on the terms and conditions set forth herein.

---

[2]     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

4

2.     **Commencement of the Cases.**  On June 20, 2014 (the "Petition Date"), the Debtors commenced the Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Cases.

3.     **Jurisdiction and Venue.**  This Court has jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.     **Committee Formation**.  As of the date hereof, the Office of the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in the Cases.

5.     **Notice.**  Notice of the relief sought by the Motion and the Interim Hearing was served via facsimile, electronic mail, and/or overnight delivery on the following parties: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the Office of the United States Attorney for the District of Delaware; (v) those entities or individuals listed on the Debtors' consolidated list of 30 largest unsecured creditors; and (vi) all other known parties asserting a lien against the Debtors' assets.

6.     **Debtors' Stipulations.**  Subject to paragraph 23 of this Interim Order, the Debtors admit, stipulate, and agree that:

(a)     Prior to the commencement of the Cases, one or more of the Debtors entered into that certain Secured Promissory Note (the "HEP Prepetition Loan Agreement"), dated as of May 29, 2014 among MacKeyser Holdings, LLC, as borrower, and Health Evolution

5

Partners Fund I, L.P., a Delaware limited partnership, and Series F of Health Evolution Partners Co-Invest, LLC, a Delaware limited liability company (together, the "HEP Prepetition Lenders").

(b)  The HEP Prepetition Loan Agreement is a valid and binding agreement and an obligation of the Debtors who are parties thereto. The Debtors' indebtedness under the HEP Prepetition Loan Agreement as of the Petition Date (the "HEP Prepetition Indebtedness") includes any and all principal amounts owing or outstanding under the HEP Prepetition Loan Agreement, interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable fees and expenses of attorneys, accountants, and financial advisors to the extent chargeable or reimbursable pursuant to the HEP Prepetition Loan Agreement or related agreements).

(c)  Pursuant to the HEP Prepetition Loan Agreement, the Debtors were, as of the Petition Date, indebted to the HEP Prepetition Lenders under the HEP Prepetition Loan Agreement in the aggregate principal amount of approximately \$3,461,681.96 plus accrued interest.  The HEP Prepetition Indebtedness, including the amounts specified in this subparagraph 6(c), constitutes the legal, valid, and binding obligations of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), without objection, offset, defense, or counterclaim of any kind or nature to the HEP Prepetition Indebtedness. None of the Debtors, either collectively or individually, have or shall assert any claim, counterclaim, setoff, or defense of any kind, nature, or description that would in any way affect the validity, enforceability, and non-avoidability of any of the HEP Prepetition Indebtedness. The HEP Prepetition Indebtedness and any amounts previously paid to any lender pursuant to the terms of the HEP Prepetition Loan Agreement on account thereof or with respect thereto are not subject to avoidance, reduction, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code

6

or applicable non-bankruptcy law, except as provided in this Interim Order, or the other DIP Documents.

      (d)     To secure the HEP Prepetition Indebtedness under the HEP Prepetition Loan Agreement, the Debtors entered into the following prepetition collateral documents (the "HEP Collateral Documents", and together with the HEP Prepetition Loan Agreement, the "HEP Prepetition Agreements"):

           (i)     that certain Security Agreement (the "HEP Security Agreement"), dated as of May 29, 2014, by and among the HEP Prepetition Lenders, MacKeyser Holdings, LLC and the guarantor parties listed therein; and

           (ii)    that certain Guaranty Agreement, dated as of May 29, 2014, by and among the HEP Prepetition Lenders and the guarantor parties listed therein.

      (e)     Pursuant to the HEP Collateral Documents, the Debtors party thereto granted security interests in, and continuing liens on (collectively, the "HEP Prepetition Liens"), certain assets of such Debtors (with respect to the assets of a Debtor, the "HEP Prepetition Collateral,") to and/or for the HEP Prepetition Lenders under the HEP Collateral Documents. The HEP Prepetition Collateral includes collateral in or upon which a lien or other security interest has been granted in favor or for the benefit of the HEP Prepetition Lenders in connection with, pursuant to, or under the HEP Prepetition Agreements that existed as of the Petition Date and, subject to section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents, and profits, as set forth on Annex A hereto.

      (f)     The HEP Collateral Documents are valid and binding agreements and obligations of the Debtors, and the HEP Prepetition Liens constitute valid, binding, enforceable, and perfected security interests and "Liens", as that term is defined Bankruptcy Code Section 101(37) ("Liens"), which are not subject to avoidance, recharacterization, recovery, reduction,

7

disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, except as provided in this Interim Order or the other DIP Documents.

(g)     To the extent provided in the HEP Collateral Documents or related agreements, the HEP Prepetition Lenders have taken all reasonable steps to properly perfect their security interests and Liens in and on the HEP Prepetition Collateral by taking possession of, or obtaining control over, certain assets and by the filing of UCC-1 financing statements, mortgages, and other required documents against the Debtors and such HEP Prepetition Collateral with the proper state and county offices for the perfection of such security interests and Liens.

(h)     Without the requirement or need to file any proof of claim with respect thereto, (i) the HEP Prepetition Indebtedness under the HEP Prepetition Agreements shall constitute allowed, secured prepetition claims for all purposes in the Cases and any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceeding if any of the Cases are converted to a case under chapter 7 of the Bankruptcy Code or in any proceedings related to any of the foregoing (a "Successor Case"), (ii) the HEP Prepetition Liens shall be deemed legal, valid, binding, enforceable, perfected, not subject to subordination (except as provided in this Interim Order or the other DIP Documents) or avoidance for all purposes in these Cases and any Successor Case, and (iii) the HEP Prepetition Indebtedness, the HEP Prepetition Liens, and prior payments on account of or with respect to the HEP Prepetition Indebtedness shall not be subject to any other or further claim, cause of action, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of any Debtor, except as provided in this Interim Order or the other DIP Documents.

8

7.   **Findings Regarding the DIP Financing.**

(a)     An immediate and critical need exists for the Borrower to obtain postpetition financing and use cash collateral to continue the operation of its businesses. However, the use of cash, that is property of the Debtors and that constitutes "cash collateral" as defined by section 363(a) of the Bankruptcy Code, including any and all prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds of any collateral pledged pursuant to the Liens and security interests granted to the Prepetition Secured Parties (as defined below) (the "Prepetition Liens" and the collateral pledged pursuant to such Prepetition Liens, together with the HEP Prepetition Collateral, the "Prepetition Collateral") that is property of the Debtors ("Cash Collateral") alone would be insufficient to meet the Borrower's immediate postpetition liquidity needs.

(b)     As discussed in the First Day Declaration and the Barry Declaration, the Borrower is unable to obtain the required funds (i) in the forms of (1) unsecured credit or debt allowable under section 503(b)(1) of the Bankruptcy Code, (2) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (3) unsecured debt having the priority afforded by section 364(c)(l) of the Bankruptcy Code, or (4) debt secured only as described in section 364(c)(2) or (3) of the Bankruptcy Code, or (ii) on terms more favorable than those embodied in the DIP Term Sheet and the other DIP Documents. The DIP Lenders are prepared to enter into the DIP Financing solely on the terms set forth in the DIP Term Sheet, the proposed form of Interim Order submitted with the Motion, and the other DIP Documents.

(c)     The terms of the DIP Financing are fair, just, and reasonable under the circumstances, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms of the DIP Financing have been negotiated in good faith and at arm's length by and

9

among the Borrower, the Guarantors (as defined below), and the DIP Lenders.   Any credit

extended or other indebtedness or liabilities arising under, in respect of, or in connection with the

DIP Financing, the DIP Term Sheet, this Interim Order, or any other DIP Financing Document,

shall be deemed to have been extended in "good faith" by the DIP Lenders as that term is used in

section 364(e) of the Bankruptcy Code, and in express reliance upon the protections afforded by

section 364(e) of the Bankruptcy Code, and the DIP Lenders' claims, the DIP Superpriority

Claims (as defined below), the DIP Liens (as defined below), and other protections granted

pursuant to this Interim Order (and, subject to entry by the Court, the Final Order), and the other

DIP Documents, shall be entitled to the full protection of section 364(e) of the Bankruptcy Code

in the event that this Interim Order or any portion hereof is vacated, reversed, amended, or

modified, on appeal or otherwise.

(d)     The relief requested in the Motion is necessary, essential, and appropriate

for the management and preservation of the Debtors' assets and properties, and is in the best

interests of the Debtors, their estates, and their creditors.  Absent the relief granted herein, the

Debtors' estates will be immediately and irreparably harmed.  Accordingly, good, adequate, and

sufficient cause has been shown to justify the relief granted herein and the immediate entry and

effectiveness of this Interim Order pursuant to Bankruptcy Rules 4001(b) and (c), and Local

Rule 4001-2.

8.     **Authorization of the DIP Financing.**

(a)     The DIP Documents, including the DIP Term Sheet attached hereto as

Exhibit 3, the Budget and the Professional Fee Budget, are approved, and the Borrower and the

other Debtors are hereby authorized to execute and enter into, deliver, and perform all

obligations under, the DIP Documents.  This Interim Order and the other DIP Documents shall

10

govern the respective financial and credit accommodations to be provided to the Borrower by the DIP Lenders in connection with the DIP Financing.

(b)     The Borrower is hereby immediately authorized to borrow money pursuant to the DIP Documents up to the full amount of the DIP Facility; which shall be used solely as expressly provided in this Interim Order and the other applicable DIP Documents, including the Budget and the Professional Fee Budget. The "Guarantors" (as defined in the DIP Term Sheet, and collectively, the "Guarantors") are hereby authorized to unconditionally guaranty (on a joint and several basis) the foregoing borrowings and extensions of credit, and the Borrower's and each other Guarantor's other obligations and liabilities under the DIP Documents, including, without limitation, costs, fees, and other expenses and amounts provided for in the DIP Documents, in accordance with the terms of the DIP Documents. The Debtors are authorized to pay and perform all "DIP Obligations" as that term is defined below.

(c)     Notwithstanding the Budget, so long as no Termination Event (as defined below) has occurred, the Debtors shall be authorized to use the proceeds of the DIP Loans in accordance with the Budget and the other applicable DIP Documents in an amount that would not cause the Debtors to use Cash Collateral or proceeds of the DIP Loans in an aggregate amount greater than, at any given time, 110% of the Budget (a "Permitted Variance"). If the aggregate amount of any proceeds of the DIP Loans or any Cash Collateral actually used by the Debtors, measured once every two weeks, is less than the aggregate amount of proceeds of the DIP Facility and Cash Collateral available for use by the Debtors in the Budget during such period, then the Debtors may carry over any such unused amount to the future periods in the Budget.

(d)     In furtherance of the foregoing and without further approval of this Court, the Borrower and the other Debtors are hereby authorized to perform all acts, to make, execute

11

and deliver all instruments and documents, and to pay all related fees, that may be required or necessary for the Debtors' performance of their obligations under the DIP Financing, including, without limitation:

     (i)    the execution, delivery, and performance of the respective DIP Documents, and any guarantees, security and pledge agreements, financing statements, and mortgages contemplated by the DIP Documents;

     (ii)    the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the respective DIP Documents, in each case in such form as the Debtors, and the DIP Lenders may agree;

     (iii)    the non-refundable payment of principal and interest under, and any fees referred to in, the respective DIP Documents, and such costs and expenses as may be due in accordance with the respective DIP Documents; and

     (iv)    the performance of all other acts required under, or in connection with, the DIP Documents.

     (e)    All of the DIP Liens and the Adequate Protection Liens (each as defined below) shall be effective and perfected as of the date of entry of this Interim Order without the necessity of the execution, recording, or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements or instruments.

     (f)    The DIP Term Sheet and the DIP Obligations (as defined below) constitute valid, binding, and non-avoidable obligations of the Debtors enforceable against each of them, and each of their successors and assigns, and each person or entity party to the DIP Documents in accordance with the respective terms of this Interim Order, the Final Order (subject to entry by the Court thereof), and the other DIP Documents, and shall survive the dismissal of any of the Cases or the conversion of any of the Cases to a Successor Case.

     (g)    No obligation, payment, transfer, or grant of security under this Interim Order, the Final Order (subject to entry by the Court thereof), or the other DIP Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under

any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity, except as provided in this Interim Order or the other DIP Documents.

(h)     For purposes of this Interim Order, the term "DIP Obligations" shall mean all loans made to the Debtors pursuant to the DIP Term Sheet (the "DIP Loans"), all other "DIP Obligations" (as defined in the DIP Term Sheet), all interest thereon and all fees, costs, expenses, indemnification obligations, and other liabilities, owing by the Debtors to the DIP Lenders in accordance with and relating to this Interim Order, the Final Order (subject to entry thereof by the Court), or the other DIP Documents relating to the DIP Facility.

(i)     The DIP Loans shall (i) be evidenced by the books and records of the DIP Lenders and, upon the request of any DIP Lender, a note executed and delivered to such DIP Lender by the Borrower in accordance with the terms of the DIP Documents, which note shall evidence such DIP Lender's DIP Loans in addition to such accounts and records, (ii) bear interest and incur fees at the rates set forth in the DIP Term Sheet, (iii) be secured in the manner specified below and under the applicable DIP Documents, (iv) be payable in accordance with the applicable DIP Documents, and (v) otherwise be governed by the terms set forth in this Interim Order and the other DIP Documents.

(j)     The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application, or order of the Court to the extent necessary to permit the DIP Lenders, subject in all respects to the DIP Documents, to perform any act authorized or permitted under or by virtue of this Interim Order or any of the other DIP Documents, including,

13

without limitation, (i) to implement the DIP Financing authorized by this Interim Order and pursuant to the terms of the DIP Documents, (ii) to take any act to create, validate, evidence, attach, or perfect any Lien, security interest, right, or claim in the DIP Collateral, and (iii) to assess, charge, collect, advance, deduct, and receive payments with respect to the respective DIP Obligations, including, without limitation, all principal, interest, fees, costs, and expenses permitted under the DIP Documents, and apply such payments to the respective DIP Obligations pursuant to this Interim Order and the other DIP Documents.

9.      **Conditions Precedent.** The DIP Lenders shall have no obligation to make any DIP Loans or any other financial accommodation under the respective DIP Documents unless the conditions precedent to make such extensions of credit under the respective DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

10.     **Use of DIP Facility Proceeds.** The Debtors shall use the proceeds of the DIP Facility solely to fund the Debtors' operations, conduct and pursue a sale and liquidation process and, upon entry of this Interim Order and funding of the DIP Facility, the funding of an amount of $481,000 from the proceeds of the DIP Facility into those certain previously established escrow accounts of the Debtors established by Corporation Service Company (the "Escrow Accounts") with such proceeds held in the Escrow Accounts to be used solely for the payment or other funding of the Debtors' payroll and sales tax obligations (the "Escrow Funds"), which Escrow Funds may not be used for any other purpose unless agreed to by the DIP Lenders.

11.     **DIP Superpriority Claims.** Subject in all respects to paragraph 12 below:

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations constitute (without the need to file a proof of claim) joint and several superpriority claims (the "DIP Superpriority Claims") against each Debtor, with priority over any and all administrative expenses of the Debtors, whether now existing or hereafter arising or incurred, of any kind

14

whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (following entry of the Final Order), 507, 546(c), 552(b) (following entry of the Final Order), 726, 1113, 1114, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, whether now in existence or hereafter incurred by the Debtors, and shall at all times be senior to the rights of any Debtor, any Debtor's estate, and any successor trustee, estate representative, or any creditor, in any of the Cases or any Successor Case. The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition assets of the Debtors, including, but not limited to, the DIP Collateral and the Prepetition Collateral.

12. **DIP Liens.**

(a) As security for the full and timely payment of the DIP Obligations, the DIP Lenders are hereby granted, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages (collectively, the "DIP Liens") upon all DIP Collateral (as defined below), which shall (i) constitute first-priority security interests in and Liens upon all DIP Collateral (as defined below) that, subject to (ii) below, is not otherwise subject to any valid, enforceable, and non-avoidable Liens, which Liens are not subject to subordination, in existence on the Petition Date and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code (collectively, the "Permitted Senior Liens"), (ii) be senior to and prime the HEP Prepetition Liens on HEP Prepetition Collateral, (iii) be senior to and prime all Adequate Protection Liens (as defined below) except for Adequate Protection Liens granted to holders of Permitted Senior Liens on such holder's Prepetition Collateral,(the "Senior Adequate Protection Liens") and (iv) be subordinate to the Carve Out (as

15

defined below), the Permitted Senior Liens, and the Senior Adequate Protection Liens. Notwithstanding the foregoing, the DIP Lenders shall receive perfected security interests in and a Lien on the proceeds of Avoidance Actions (as defined below) only upon entry of the Final Order.

      (b)    As used herein, "DIP Collateral" shall mean all assets and property of each Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, general intangibles, instruments, equipment, accounts (including, without limitation, all Health-Care-Insurance Receivables), and documents, all goods, inventory and fixtures, all documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames and other intellectual property, all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtors, and all other collateral pledged under the DIP Financing Documents, the Escrow Account and the Escrow Funds, upon entry of the Final Order any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (the "Avoidance Actions"), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)).

(c)     The DIP Liens shall be effective immediately upon entry of this Interim Order; provided, however that with respect to Avoidance Actions, the DIP Liens shall not be effective until immediately upon entry of the Final Order.

13.     **Priority of Liens.**

(a)     The DIP Liens and the DIP Superpriority Claims are and shall be at all times senior and prior in all respects to the Adequate Protection Liens (as defined below) and the HEP Prepetition Liens on the DIP Collateral, except with respect to the Senior Adequate Protection Liens.

(b)     The DIP Liens shall constitute valid, enforceable, non-avoidable, and duly perfected first-priority security interests in and Liens upon the DIP Collateral, junior and subject only to any Permitted Senior Liens (but only with respect to property that was encumbered by Permitted Senior Liens on the Petition Date or as otherwise permitted pursuant to section 552(b) of the Bankruptcy Code) and Senior Adequate Protection Liens.

(c)     The DIP Liens shall not be (i) subject to any Lien that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) except as to the Permitted Senior Liens (but only with respect to property that was encumbered by Permitted Senior Liens on the Petition Date), subordinated to or made pari passu with any other Lien under section 364(d) of the Bankruptcy Code or otherwise, including by any order heretofore or hereafter entered in the Cases or any Successor Case. Except as expressly permitted in the respective DIP Documents and absent full payment and satisfaction of all obligations of the Debtors under the DIP Facility, the Borrower and the other Debtors shall not (i) grant or impose any Liens on the DIP Collateral or (ii) except as permitted in the respective DIP Documents, prime or seek to prime the DIP Liens and shall not offer any other parties any Lien on the DIP Collateral. In addition, the Borrower and the other Debtors shall not incur,

17

create, assume, become, or be liable in any manner with respect to, or permit to exist, any secured indebtedness, except as expressly permitted under the DIP Documents and the Budget.

14.  **Validity of Liens.**

(a)  In no event shall (i) any Lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code, or (ii) any person or entity who pays (or through the extension of credit to the Debtors, causes to be paid) any of the respective DIP Obligations, be subrogated, in whole or in part, to any rights, remedies, claims, privileges, Liens or security interests granted in favor of, or conferred upon the DIP Lenders by the terms of this Interim Order, the Final Order (subject to entry by the Court thereof), or any of the respective DIP Documents, until all of the DIP Obligations are paid in full in cash in accordance with this Interim Order, the Final Order (subject to entry by the Court thereof), or any of the respective DIP Documents.

(b)  The DIP Liens and the DIP Superpriority Claims shall continue in any Successor Case for the Debtors under any chapter of the Bankruptcy Code, and all Liens, security interests, and claims shall maintain their priority as provided in this Interim Order. If an order dismissing any of the Cases, pursuant to section 1112 of the Bankruptcy Code or otherwise, is at any time entered, such order shall provide that the DIP Liens and the DIP Superpriority Claims shall continue in full force and effect, shall remain binding on all parties in interest in the Case, and shall maintain their priorities as provided in this Interim Order, until all DIP Obligations under the DIP Documents have been paid and satisfied in full and in cash. Notwithstanding the dismissal of any Case, this Court shall retain jurisdiction with respect to enforcing the DIP Liens and the DIP Superpriority Claims.

15.  **Carve Out.**  Notwithstanding anything in this Interim Order, any other DIP Documents, or any other order of this Court to the contrary (but subject to paragraph 17 of this

18

Interim Order), the HEP Prepetition Liens and all claims and Liens granted hereunder to or for the benefit of the DIP Lenders, including the DIP Superpriority Claims and the DIP Liens, and to the Adequate Protection Parties (as defined below), including the Adequate Protection Liens and any Adequate Protection Superpriority Claims (as defined below), shall be subject to payment of the Carve Out. As used in this Interim Order, the "Carve Out" means: (i) all unpaid fees required to be paid (a) to the Clerk of the Bankruptcy Court and (b) to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code in such amounts as determined in agreement with the United States Trustee or by final order of the Court, (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (iii) after the occurrence and during the continuance of an Event of Default (as defined below), all allowed and unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Chapter 11 Cases (each, a "Committee"), that remain unpaid subsequent to the payment, pro rata with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in an aggregate amount not exceeding $75,000 for the payment of the Debtors' professionals and $25,000 for payment of the Committee's professionals (subject to entry of the Final Order), which amount may be used subject to the terms of this Term Sheet and the Interim DIP Order (the "Permitted Professional Fees"), and (iv) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors and any Committees at any time when no Event of Default is continuing, that remain unpaid subsequent to an Event of Default, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent professional fee budget (the "Professional Fee Budget") delivered to and approved by the DIP Lenders prior to any Event of Default that is then

19

continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Court at any time; provided, however, that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above. An initial 13-week Professional Fee Budget is attached hereto as Exhibit 2.

### 16.   **Use of Cash Collateral.**

(a)     Subject to the terms and conditions set forth in this Interim Order, including paragraph 17 hereof, and the Budget, and effective immediately upon entry of the Interim Order, the Debtors are authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use Cash Collateral (i) in the ordinary course of the Debtors' businesses, (ii) to pay reasonable professional fees, expenses, and disbursements related to services provided in connection with the Cases, including, without limitation, to the retained professionals under Bankruptcy Code sections 327, 328, and 330 and pursuant to paragraph 22 below, and (iii) to pay all fees required to be paid to the Clerk of this Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), provided, however, that the Debtors' authorization to use Cash Collateral shall immediately terminate upon the occurrence of a Termination Event (as defined below).

### 17.   **Restriction on Use of Funds.**   Notwithstanding anything in this Interim Order, any other DIP Documents, or any other order by this Court to the contrary, no proceeds of the DIP Financing, Cash Collateral, Prepetition Collateral, or DIP Collateral, and no portion of the Carve Out, may be used in the Cases or any other proceeding of any kind, or in any jurisdiction, directly or indirectly by any Debtor, or any other person or entity, to (i) object to, contest, or raise any defense to, or assert any Challenge (as defined below) to, the validity, perfection, priority, extent, or enforceability of any amounts due under, the DIP Financing, the DIP

Documents, the DIP Collateral, the HEP Prepetition Indebtedness, the HEP Prepetition Agreements, or the HEP Prepetition Collateral, or the liens or claims granted under the HEP Prepetition Agreements, this Interim Order, or any other DIP Documents, including the DIP Liens and the DIP Superpriority Claims, (ii) investigate, assert, or prosecute any claims, defenses, or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) or any Challenge against the DIP Lenders, the HEP Prepetition Lenders, or their respective agents, affiliates, representatives, attorneys, or advisors, except as set forth in paragraphs 23, 27 and 30(b), (iii) prevent, hinder or otherwise delay the DIP Lenders', or the HEP Prepetition Lenders' assertion, enforcement, or realization against or upon Cash Collateral or the DIP Collateral, in accordance with this Interim Order, the other DIP Documents, and the HEP Prepetition Agreements, except as set forth in paragraphs 23, 27 and 30(b), (iv) seek to modify any of the rights granted to the DIP Lenders or the HEP Prepetition Lenders hereunder or under the DIP Documents or the HEP Prepetition Agreements, or (v) take any other action prohibited by the respective DIP Term Sheet; provided, however, that, subject to entry of the Final Order, not more than $20,000 in the aggregate may be used to pay any allowed fees of a Committee and professionals retained by such Committee incurred in connection with pursuing a Challenge (as defined in paragraph 23 below) (the "Investigation Budget").

18.    **Termination of DIP Financing and Cash Collateral.** The Debtors' authorization to use the DIP Financing and Cash Collateral shall immediately terminate upon the occurrence of a "Termination Event", which shall mean the earliest to occur of (a) 30 days after the entry of this Interim Order (unless a Final Order approved by the DIP Lenders has been entered as of such date), (b) the expiration of five (5) business days (the "Default Notice Period") following the provision of written notice to the Debtors (with a copy of such notice provided to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee) upon the occurrence

21

of an Event of Default, (c) the occurrence of a Maturity Date as that term is defined in the DIP

Term Sheet, and (d) the date on which neither this Interim Order nor the Final Order is in full

force and effect.

19.    **Adequate Protection.**

(a)    As adequate protection for the interests of any secured creditor of the

Debtors with a valid, perfected, enforceable, continuing and non-avoidable prepetition Lien on

property of the Debtors (the "Prepetition Secured Parties") holding valid, perfected, enforceable,

continuing and non-avoidable prepetition security interests and Liens upon the DIP Collateral

(including Cash Collateral) (collectively, the "Adequate Protection Parties"), in an aggregate

amount equal to any diminution in value (the "Diminution of Value") of such interests from and

after the Petition Date, whether or not resulting from the depreciation, physical deterioration, loss

or decline in market value, use, sale or lease by the Debtors of the DIP Collateral (including

Cash Collateral), the granting of the DIP Liens, the subordination of their Prepetition Liens

thereto and to the Carve Out, the imposition or enforcement of the automatic stay of section

362(a), or otherwise, the Adequate Protection Parties shall receive adequate protection as

follows:

(i)    Adequate Protection Liens.  Solely to the extent of any such Diminution of
Value, the Adequate Protection Parties shall have pursuant to sections 361,
362(d), 363(c), 363(e), and 364(d) of the Bankruptcy Code, replacement
security interests in and Liens upon all of the DIP Collateral (the
"Adequate Protection Liens"), which Adequate Protection Liens shall be
junior and subject in all respects to the DIP Liens (except with respect to
the Senior Adequate Protection Liens, which shall be senior to the DIP
Liens) and to the Carve Out, but shall be senior to such Adequate
Protection Party's Permitted Senior Liens on such party's Prepetition
Collateral.  For the avoidance of doubt, the Adequate Protection Liens
(including, without limitation the Senior Adequate Protection Liens) are
and shall be subject to disgorgement in the event the corresponding

22

Prepetition Liens are avoided or otherwise successfully challenged. For the further avoidance of doubt, Adequate Protection Liens granted to an Adequate Protection Party do not prime the Permitted Senior Liens granted to another Adequate Protection Party.

(ii)     Adequate Protection Superpriority Claims. Solely to the extent of any such Diminution of Value, the Adequate Protection Parties shall have, an allowed superpriority administrative expense claim (the "Adequate Protection Superpriority Claim"), as provided for in section 507(b) of the Bankruptcy Code, in each of the Cases and any Successor Case of the Debtors, which shall be junior and subject in all respects to the DIP Superpriority Claims and the Carve Out.     The Adequate Protection Superpriority Claims have priority in the applicable Case or Successor Case of the Debtors over all administrative expenses of the kind specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final Order), 507, 546(c), 552(b) (following entry of the Final Order), 726, 1113, or 1114 of the Bankruptcy Code, but are subordinate and junior in all respects to the DIP Superpriority Claims (except with respect to the claims underlying the Senior Adequate Protection Liens, which shall be senior to the DIP Superpriority Claims) and the Carve Out, it being understood that, subject to paragraph 28 of this Interim Order, the Adequate Protection Parties shall not receive or retain any payments, property, or other amounts in respect of their Adequate Protection Superpriority Claims, or granted hereunder or under any Prepetition Secured Party's existing prepetition agreements with the Debtors including without limitation the HEP Prepetition Agreements     (the "Existing Agreements"), unless and until all DIP Obligations and Carve Out related expenses are indefeasibly paid in full and in cash in accordance with the terms of the respective DIP Documents.

(b)     Notwithstanding anything to the contrary in this Interim Order or in any other order of the Court, in determining the relative priorities and rights of the Adequate Protection Parties (including, without limitation, the relative priorities and rights of the Adequate Protection Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall be governed by this Interim Order, the Existing Agreements, and any other valid agreements by and among the Adequate Protection Parties, and the adequate protection rights granted hereunder to each Adequate Protection Party shall have the same relative seniority vis-à-vis the adequate protection rights granted to each other Adequate

23

Protection Party as the prepetition claims of such Adequate Protection Party have relative to the prepetition claims of such other Adequate Protection Party (taking into consideration the entity against which such claims are held or not held). For the avoidance of doubt, nothing in this Interim Order grants any Adequate Protection Party any Adequate Protection Superpriority Claim in a Case or Successor Case of any entity that is not a Borrower or Guarantor under the DIP Documents.

20.     **Perfection of Liens.** This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens, and the Adequate Protection Liens, without the necessity of executing, filing, or recording any mortgage, security agreement, pledge agreement, financing statement, or other instrument or document, or the taking of any other act that otherwise may be required under state or federal law, rule, or regulation of any jurisdiction to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lenders or the Prepetition Secured Parties to the priorities granted herein. The Borrower or another Debtor may execute, and the DIP Lenders and the Prepetition Secured Parties are hereby authorized to execute, file, and/or record mortgages, security agreements, pledge agreements, financing statements, and/or other instruments or documents to evidence the DIP Liens, and the Adequate Protection Liens, respectively, and the Debtors are hereby authorized, promptly upon a demand by a DIP Lender or a Prepetition Secured Party made in accordance with the terms of the DIP Documents or Prepetition Agreements, as applicable, to execute, file, and/or record any such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents as the respective DIP Lender or Prepetition Secured Party may request; provided, however, that no such execution, filing, or recordation shall be necessary or required in order to create or perfect the DIP Liens or Adequate Protection Liens, and further,

if a DIP Lender or a Prepetition Secured Party, in its sole discretion, shall choose to execute, file, and/or record such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, or otherwise confirm perfection of such Liens, all such instruments and documents shall be deemed to have been filed or recorded as of the Petition Date. A copy of this Interim Order may, in the discretion of any DIP Lender or Prepetition Secured Party, be filed with or recorded in any filing or recording office in addition to or in lieu of such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, and each and every federal, state, and local governmental agency, department, or office is hereby directed to accept a copy of this Interim Order and any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Interim Order and the other DIP Documents, for filing and recording, and to deem this Interim Order to be in proper form for filing and recording. Notwithstanding the foregoing, pursuant to any applicable law, the DIP Lenders and the Prepetition Secured Parties are hereby authorized (but not required) to file or record financing statements and other filing or recording documents or instruments with respect to the DIP Collateral and DIP Liens and the Adequate Protection Liens, as applicable, without the signature of any Debtor in such form and in such offices as the DIP Lenders and the Prepetition Secured Parties, as applicable, determine appropriate to perfect the security interests of the DIP Lenders and the Prepetition Secured Parties, as applicable, under DIP Documents and this Interim Order; and DIP Lenders and the Prepetition Secured Parties are authorized to use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", words of similar import or any other description DIP Lenders and/or the Prepetition Secured Parties, each in their sole discretion, so chooses in any such financing statements.

25

21.     **Section 506(c).**  Subject only to and effective upon entry of the Final Order, except to the extent of the Carve Out, no costs or expenses of administration which have been or may be incurred in the Cases or any Successor Case at any time shall be charged against or recovered from the DIP Collateral, the HEP Prepetition Collateral, against any DIP Lender or HEP Prepetition Lender, or any of their respective claims, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

22.     **Fees.**  All fees paid and payable, and costs and expenses reimbursed or reimbursable by the Borrower and the other Debtors to the DIP Lenders under the DIP Documents are hereby approved.  The Debtors shall promptly pay all such fees, costs, and expenses payable under the DIP Documents in accordance with the DIP Documents, without the necessity of any further application with the Court for approval or payment of such fees, costs, or expenses, in an amount not to exceed $100,000.  Professionals for the DIP Lenders shall not be required to file fee applications, provided that invoices (subject in all respects to applicable privilege and work product doctrines) shall be provided to counsel for the Debtors, the Committee and the U.S. Trustee, which parties shall have fourteen (14) days to object to such invoices.

23.     **Effect of Stipulations on Third Parties.**  The stipulations and admissions contained in this Interim Order with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor shall be binding on the Debtors' estates and all parties in interest, including, without limitation, any Committee, unless any Committee or another party in interest (other than any of the Debtors or other Debtors), in each case with standing and requisite authority, has timely commenced a contested matter or adversary proceeding (subject to the limitations set forth in paragraph 17 hereof, including, for the avoidance of doubt, the Investigation Budget), challenging the amount, validity

26

or enforceability of the HEP Prepetition Indebtedness or the perfection or priority of the HEP Prepetition Liens, or otherwise asserting any objections, claims, or causes of action on behalf of the Debtors' estates against the HEP Prepetition Lenders relating to the HEP Prepetition Indebtedness or the HEP Prepetition Liens (such adversary proceeding or contested matter, a "Challenge"), on or before (a) as to the Committee, the sixtieth (60th) calendar day after the date of appointment of such Committee by the U.S. Trustee, or (b) as to any party in interest other than the Committee, the seventy-fifth (75th) calendar day after the date of entry of this Interim Order. If no such Challenge is timely commenced as of such date then, without further order of the Court, (x) the claims, Liens, and security interests of the HEP Prepetition Lender shall, without further order of the Court, be deemed to be finally allowed for all purposes in the Cases and any Successor Case and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount, or otherwise, and (y) without further order of the Court, the Debtors and their estates shall be deemed to have relinquished, released, and waived any and all claims or causes of action against the HEP Prepetition Lender with respect to the HEP Prepetition Agreements or any related transactions. Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the stipulations contained in paragraph 6 of this Interim Order with respect to the validity, perfection or amount of the HEP Prepetition Liens or the waiver of claims against the HEP Prepetition Lenders shall be binding on the Debtors' estates, any Committee, and all parties in interest. If a Challenge is timely commenced, the stipulations contained in paragraph 6 of this Interim Order shall be binding on the Debtors' estates and all parties in interest except to the extent such stipulations are specifically challenged in such Challenge, as and when originally filed (ignoring any relation back principles); provided, that if and to the extent a Challenge is withdrawn, denied, or overruled,

27

the stipulations specifically challenged in such Challenge also shall be binding on the Debtors' estates and all parties in interest.

24.    **Indemnity.** The DIP Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) shall be and hereby are indemnified and held harmless by the Debtors in respect of any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person. No exception or defense in contract, law, or equity exists as to any obligation set forth in this paragraph 24 or in the DIP Documents to indemnify and/or hold harmless the DIP Lenders.

25.    **Release.** Subject to the rights of any Committee or other party in interest provided in paragraph 23 of this Interim Order and to the closing of the DIP Facility, in consideration of (i) the DIP Lenders' agreement to the making of postpetition loans, advances and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the Term Sheet, the DIP Documents and this Interim Order, and (ii) the HEP Prepetition Lender's agreement to make loans, advances, providing credit and other financial accommodations to the Debtors pursuant to the provisions of the HEP Prepetition Agreements and for the HEP Prepetition Liens to be primed by the DIP Liens, each Debtor, on behalf of and for itself (collectively, the "Releasors"), and subject to entry of the Final Order, shall forever release, discharge and acquit the DIP Lender and the HEP Prepetition Lenders and their respective participants, officers, directors, principals, agents, attorneys and predecessors-in-interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or

28

defenses, that Releasors had, have or hereafter can or may have against Releasees as of the date hereof, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, in respect of events that occurred on or prior to the date hereof. In addition, upon the repayment of all DIP Obligations owed to the DIP Lender by the Debtors and termination of the rights and obligations arising under the Term Sheet, the DIP Documents, the Interim DIP Order or the Final DIP Order (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender in such capacity shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action, except to the extent it is found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct, arising or occurring in connection with or related to the Term Sheet, the DIP Documents or the Interim DIP Order or Final DIP Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out Expenses), on terms and conditions acceptable to the DIP Lender. Notwithstanding anything to the contrary herein, the Debtors' releases do not extend to the DIP Lender's obligations to make the advances and otherwise comply with the terms of this Term Sheet and the Interim DIP Order and Final DIP Order.

26.     **Limitation of Liability.** ⌐Subject to entry of the Final Order, In determining to extend credit under the DIP Documents, or in exercising any rights or remedies pursuant to this Interim Order and the other DIP Documents, the DIP Lenders shall not be deemed to be in control of the operations of any Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any Debtor (as such terms, or any similar terms, are used in the

29

United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

27.     **Debtors' Waivers.** At all times during the Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have (a) to challenge the application of any payments authorized by this Interim Order pursuant to section 506(b) of the Bankruptcy Code, (b) to seek authority to grant liens on the DIP Collateral, or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to, or pari passu with, the DIP Liens, the DIP Superpriority Claims, or any other liens or claims granted to the DIP Lenders, unless the DIP Obligations are first repaid in full in cash and the DIP Facility is terminated, or (c) to seek authority to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than from the DIP Lenders, or as may be otherwise expressly permitted under the DIP Documents, unless the Debtors use the proceeds of such postpetition loans or other financial accommodations to pay in full in cash all DIP Obligations.  Following entry of the Final Order, in any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors hereby waive their right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lenders, as set forth in this Interim Order or the other DIP Documents, other than to contest whether an Event of Default has occurred or is continuing.

28.     **Disposition of Collateral.**     The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral in any way inconsistent with the terms and conditions of the DIP Documents without the prior written consent of the DIP

30

Lenders and an order of this Court, except for (i) sales in the ordinary course of the Debtors' businesses and (ii) sales to the DIP Lenders. In the absence of express prior written consent, no consent to a sale, transfer, lease, encumbrance, or other disposition of any portion of the DIP Collateral shall be implied from any action, inaction, or acquiescence by the DIP Lenders. Subject to entry of a Final Order, until all DIP Obligations are paid and satisfied in full and in cash in accordance with the terms of the DIP Documents on terms and conditions acceptable to the DIP Lenders, the proceeds of any sale of the DIP Collateral (other than sales in the ordinary course of business) shall be applied in the following order: (i) to pay or fund an escrow account or a restricted account maintained by counsel for the Debtors in the amount of (x) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors and any Committees at any time on or prior to the date of the closing of the sale in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the Professional Fee Budget plus (y) accrued administrative expenses of the types included in the Carve Out, (ii) to the extent such DIP Collateral is subject to a Permitted Senior Lien, to fund a segregated account with proceeds of the sale of such collateral sufficient to satisfy such Permitted Senior Liens, (iii) to pay the fees and expenses of the DIP Lender, (iv) to pay any interest which is then due and payable, (v) to pay any interest with respect to the principal amount being repaid which has accrued but is not yet due and payable and (vi) to pay the principal amount of DIP Loans.

29.    **Collateral Rights.** Except as expressly permitted in this Interim Order and the other DIP Documents, in the event that any person or entity that holds a Lien or security interest in DIP Collateral that is junior or subordinate to the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral, or receives any other payment with respect thereto from any other source, prior to payment in full and in cash and the complete satisfaction of all

DIP Obligations, such junior or subordinate Lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the applicable DIP Lenders, and shall immediately turnover such proceeds to the DIP Lenders for application in accordance with this Interim Order and the other DIP Documents.

30. **Modification of Stay; Rights and Remedies Upon Termination.**

(a) Subject to paragraph 18 of this Interim Order, upon the occurrence of a Termination Event, the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the respective DIP Lenders to exercise all rights and remedies provided in this Interim Order and the other DIP Documents, as applicable, and to take any or all of the following actions without further order of or application to this Court: (i) immediately terminate the Debtors' use of Cash Collateral and cease making any DIP Loans to the Borrower; (ii) immediately declare all DIP Obligations to be immediately due and payable; (iii) immediately terminate the DIP Facilities and the availability of any DIP Loans thereunder; (iv) immediately set off any and all amounts held on account of or owed to the Debtors against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of, or subject to a lien in favor of the DIP Lenders for application towards the DIP Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order and the other DIP Documents or applicable law to effect the repayment of the DIP Financing; provided that notwithstanding anything herein to the contrary, none of the DIP Lenders shall enforce any DIP Liens against the DIP Collateral or exercise any other remedies prior to the expiration of the Default Notice Period.

(b) The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified as provided in paragraph 30(a) above, effective following the expiration of the Default Notice Period, unless the Court has determined that an Event of

32

Default has not occurred and/or is not continuing. Unless otherwise ordered by the Court, any party in interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default. During the Default Notice Period, the Debtors shall (x) have no right to request extensions of credit under the DIP Facility, other than with the consent of the DIP Lenders, and (y) be entitled to an emergency hearing before the Court, with proper notice to the DIP Lenders, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing. The rights and remedies of the DIP Lenders specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lenders may respectively have under the DIP Documents, or otherwise. The Debtors shall cooperate fully with the DIP Lenders in any permitted exercise of rights and remedies, whether against the DIP Collateral or otherwise.

31.    **Survival of Order.** The provisions of this Interim Order and any actions taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any chapter 11 plan in any of the Cases, (ii) converting any of the Cases to a Successor Case, or (iii) dismissing any of the Cases, and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, Liens, and security interests granted pursuant to this Interim Order shall maintain their priority as provided by this Interim Order until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the DIP Documents. The applicable DIP Obligations shall not be discharged by the entry of any order confirming any chapter 11 plan in any of the Cases that does not provide for payment in full of the DIP Obligations, and, only upon the entry of any such order, the Debtors shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

32.     **No Waiver.**  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lenders may have to bring or be heard on any matter brought before this Court.

33.     **Reservation of Rights.**  The terms, conditions, and provisions of this Interim Order are in addition to and without prejudice to the rights of the DIP Lenders to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Documents, or any other applicable agreement or law, including, without limitation, rights (a) to seek relief from the automatic stay, (b) to seek an injunction, (c) to oppose any future request for use of Cash Collateral or for the granting of any interest in the DIP Collateral, or of priority in favor of any other party, (d) to object to any sale of assets, or (e) to object to applications for allowance or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtors' estates.

34.     **No Consent.**  No action, inaction, or acquiescence by the DIP Lenders, including funding the Debtors' operations and the conduct and pursuit of a sale and liquidation process under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lenders to a charge against the DIP Collateral pursuant to sections 506(c), 552(b), or 105(a) of the Bankruptcy Code.  The DIP Lenders shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.  The DIP Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code and, subject to entry of the Final Order, the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the HEP Prepetition Lenders with respect to the HEP Prepetition Agreements or the HEP Prepetition Collateral.

35.     **Binding Effect; Successors and Assigns**.  Except as otherwise provided in the DIP Documents, the provisions of this Interim Order shall be binding upon and inure to the

benefit of each DIP Lender, the HEP Prepetition Lenders, the Adequate Protection Parties, each of the Debtors, and their respective successors and assigns (including any trustee or fiduciary hereafter appointed or elected as a legal representative of any of the Debtors, their estates, or with respect to the property of any of their estates) whether in these Cases, in any Successor Case, or upon dismissal of any Case or Successor Case; provided, however, that the DIP Lenders shall have no obligation to extend any financing to, or permit the use of Cash Collateral or DIP Collateral by, any chapter 7 or chapter 11 trustee or similar representative person appointed for the Debtors' estates.

36. **Proofs of Claim.** Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court:

(a) The DIP Lenders shall not be required to file proofs of claim in the Cases or any Successor Case in order to maintain their respective claims with respect to the DIP Obligations, all of which shall be due and payable in accordance with this Interim Order, the Final Order (subject to entry by the Court thereof), and the other DIP Documents, without the necessity of filing any such proof of claim; the statements of claim in respect of the respective DIP Obligations set forth in this Interim Order, together with the evidence accompanying the Motion, and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(b) The HEP Prepetition Lenders shall not be required to file any proof of claim with respect to any of the HEP Prepetition Indebtedness, all of which shall be due and payable in accordance with the HEP Prepetition Agreements and this Interim Order, as applicable, without the necessity of filing any such proof of claim, and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the HEP Prepetition Agreements, this Interim Order, or the HEP Prepetition Indebtedness, or any other obligations

35

hereunder, or prejudice or otherwise adversely affect the rights, remedies, powers, or privileges of the HEP Prepetition Lender under the HEP Prepetition Agreements; provided, further, that, for the avoidance of doubt, the filing of any proof of claim by the HEP Prepetition Lenders shall not in any way prejudice or otherwise adversely affect such parties' rights, remedies, powers, or privileges under the HEP Prepetition Agreements and this Interim Order.

37. **Order Effective Immediately.** Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

38. **Interim Order Governs.** In the event of any inconsistency or conflict between any of the terms and provisions of this Interim Order and the DIP Documents, the terms and provisions of this Interim Order shall govern.

39. **Monitoring of Collateral.** The DIP Lenders, and their consultants and advisors, shall be given reasonable access to the Debtors' books, records, assets, and properties.

40. **Financial Reporting.** The Debtors shall provide the DIP Lenders with the monthly financial reporting given to the U.S. Trustee and all of the financial reporting as required under and in all instances consistent with the DIP Documents.

41. **Cash Management.** The Debtors' cash management system shall at all times be maintained (a) in accordance with any order of this Court approving the maintenance of the Debtors' cash management system, and (b) in a manner which is otherwise reasonably satisfactory to the DIP Lenders. The DIP Lenders shall be deemed to have "control" over all such accounts for all purposes of perfection under the Uniform Commercial Code.

36

42.    **Credit Bidding.**  Following entry of the Final Order, the DIP Lenders and the HEP Prepetition Lender shall each have the unqualified right to credit bid up to the full amount of the applicable outstanding DIP Obligations and the HEP Prepetition Indebtedness (as applicable), in each case including any accrued interest, in any sale of the DIP Collateral (or any part thereof) or the HEP Prepetition Collateral (or any part thereof), as applicable, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

43.    **No Third Party Rights.**  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any party, creditor, equity holder, or other entity other than the DIP Lenders, the HEP Prepetition Lenders, the Adequate Protection Parties, and the Debtors, and their respective successors and assigns.

44.    **Headings.**  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

45.    **Retention of Jurisdiction.**    This Court retains jurisdiction to interpret, implement, and enforce the provisions of this Interim Order and the other DIP Documents.

46.    **Subsequent Reversal or Modification.**    This Interim Order is entered pursuant to, inter alia, section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting the DIP Lenders, the HEP Prepetition Lenders, and the Adequate Protection Parties all protections afforded by section 364(e) of the Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (a) the validity of any obligation, indebtedness, or liability incurred hereunder by the Borrower or any of the other Debtors to the DIP Lenders, the HEP Prepetition Lenders or the Adequate Protection Parties prior to the date of receipt by the DIP Lenders of written notice of

37

the effective date of such action, (b) the payment of any fees required under this Interim Order or the other DIP Documents, or (c) the validity and enforceability of any lien, claim, obligation, or priority authorized or created under this Interim Order or pursuant to the other DIP Documents or the HEP Prepetition Agreements as of such date. Notwithstanding any such reversal, stay, modification, or vacatur, any postpetition indebtedness, obligation, or liability incurred by the Borrower or any of the other Debtors to any DIP Lender, the HEP Prepetition Lenders or any Adequate Protection Party, prior to written notice being delivered to DIP Lenders, the HEP Prepetition Lenders or any Adequate Protection Party of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender or Adequate Protection Party, as applicable shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Documents with respect to all such indebtedness, obligations, or liability.

47. **Notice of Final Hearing.** The Debtors shall promptly serve by United States mail, first class postage prepaid, copies of this Interim Order and a notice of the Final Hearing (the "Final Hearing Notice") to be held on July 16, 2014 at 9:30 a.m. to consider entry of the Final Order on the following: (i) the Office of the United States Trustee; (ii) the United States Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the Office of the United States Attorney for the District of Delaware; (v) those entities or individuals listed on the Debtors' consolidated list of 30 largest unsecured creditors; (vi) all other known parties asserting a lien against the Debtors' assets; and (vii) counsel to any Committee, to the extent appointed. Copies of the Motion, this Interim Order, and the Final Hearing Notice also shall be served upon all persons requesting service of papers pursuant to Bankruptcy Rule 2002 by United States mail, first class postage prepaid promptly following the receipt of such request. The Final Hearing Notice shall state that any party in interest objecting to the entry of the Final Order shall file

38

written objections with the Court no later than July 9, 2014 at 4:00 p.m. (ET), which objections shall be served so that the same are received on or before such date and time by: (a) MacKeyser Holdings, LLC, 8076 West Sahara Avenue, Las Vegas, NV  89117 (Attn: Cathryn Kennedy), (b) Cole, Schotz, Meisel, Forman & Leonard, P.A., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801 (Attn: David R. Hurst), (c) counsel to the DIP Lenders, Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, 920 N. King Street, Wilmington, DE 19801

(Attn: Sarah E. Pierce), (d) counsel to the official committee of unsecured creditors, if one is appointed, and (e) the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Benjamin Hackman).

Dated:     June 24, 2014
           Wilmington, Delaware

                                          United States Bankruptcy Judge

## ANNEX A TO INTERIM ORDER

### HEP Prepetition Collateral

"HEP Prepetition Collateral" shall mean all property, assets and rights of each Debtor, wherever located, and whether now owned or hereafter acquired or created, including, without limitation, all of the following:

**1.1** All cash on hand and on deposit in accounts, and all deposit accounts now owned or existing, as well as any and all that may hereafter arise or be acquired, and all the proceeds and products thereof, expressly including, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any such accounts, or other proceeds of any sale or other disposition of inventory;

**1.2** All inventory, including all goods, merchandise, raw materials, goods in process, finished goods and other tangible personal property, wheresoever located, now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts for service or used or consumed in each Debtor's business and all additions and accessions thereto and contracts with respect thereto and all documents of title evidencing or representing any part thereof, and all products and proceeds thereof;

**1.3** All fixtures and appurtenances thereto, and such other goods, chattels, fixtures, equipment and personal property affixed or in any manner attached to the real estate and/or building(s) or structure(s), including all additions and accessions thereto and replacements thereof and articles in substitution therefor, howsoever attached or affixed;

**1.4** All equipment of every nature and description whatsoever now owned or hereafter acquired including all appurtenances and additions thereto and substitutions therefor, wheresoever located, including all tools, parts and accessories used in connection therewith;

**1.5** All accounts, general intangibles, goods, investment property, letter-of-credit rights and other personal property now owned or hereafter acquired;

**1.6** All chattel paper, lease agreements and other instruments or documents, whether now existing or owned or hereafter arising or acquired, evidencing both a debt and security interest in or lease of specific goods;

**1.7** All securities now or hereafter owned, together with all instruments and general intangibles related thereto and all monies, income, proceeds and benefits attributable or accruing to said property, including, but not limited to, all stock rights, options, rights to subscribe, dividends, liquidating dividends, stock dividends, dividends paid in stock, new security or other properties or benefits to which each Debtor is or may hereafter become entitled to receive on account of said property;

**1.8** All interest in and to any certificates of deposit and instruments related thereto, and all renewals or substitutions therefor, together with all monies, income, interest, proceeds and benefits attributable or accruing to said property or to which Debtor is or may hereafter be entitled to receive on account of said property;

**1.9** All now owned or existing as well as hereafter acquired or arising instruments and documents;

**1.10** All patents, patent rights, inventions, processes, formulae, licenses, trade secrets, knowhow and other proprietary rights and data, engineering calculations, technical plans, drawings and data, software, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, copyrights, technical information (including information regarding other persons' products and technology), and all other intellectual property rights and all applications to acquire any such rights, in each case, whether now owned or hereafter created, acquired or issued (collectively, the "Technology");

**1.11** All licenses, sublicenses, franchises, and other contract rights and all governmental and regulatory permits and approvals, whether now owned or hereafter acquired, granted in any of the Technology, including, without limitation, any present or future right to receive royalties or other payments from those to whom licenses, sublicenses or franchises have been or will be granted; and

**1.12** All Proceeds and supporting obligations of the foregoing HEP Prepetition Collateral. For purposes of the HEP Security Agreement, the term "Proceeds" includes whatever is receivable or received when HEP Prepetition Collateral or proceeds is sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, all rights to payment, including return premiums, with respect to any insurance relating thereto.

Notwithstanding the foregoing, no lien shall attach to any asset of any Debtor if such lien either (i) would be prohibited by law or (ii) violate any agreement to which Debtor is a party or by which the assets of such Debtor are bound, in each case to the extent that any of the prohibitions or circumstances described in clauses (i) and (ii) would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (as defined below) (or any successor provision or provisions) or other applicable laws or principles of equity; provided, that in the event of termination, elimination or lapse of any such prohibition or circumstance to the extent sufficient to permit such property to become HEP Prepetition Collateral under the HEP Security Agreement, or upon the granting of consent or waiver of prohibition necessary, such property shall become HEP Prepetition Collateral under the HEP Security Agreement and the security interest granted under the HEP Security Agreement shall attach to such property.

**1.13** DEFINITIONS. Unless otherwise defined herein, all terms defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (the "UCC") shall have the meanings assigned to such terms in the UCC (and if defined in more than one Article of the UCC shall have the meaning specified in Article 9 thereof).

2

## EXHIBIT 1 TO INTERIM ORDER

Budget

# MacKeyser Holdings, LLC
13-Week Cash Flow Projection

| Week Beginning Date | Projected 6/23/14 | Projected 6/30/14 | Projected 7/7/14 | Projected 7/14/14 | Projected 7/21/14 | Projected 7/28/14 | Projected 8/4/14 | Projected 8/11/14 | Projected 8/18/14 | Projected 8/25/14 | Projected 9/1/14 | Projected 9/8/14 | Projected 9/15/14 | Projected 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Post - Petition Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **CASH FLOW** | | | | | | | | | | | | | | |
| Beginning Available Cash Balance | 830,060 | 657,199 | 308,605 | 265,889 | 502,628 | 410,453 | 507,785 | 52,289 | 201,793 | 392,418 | 644,143 | 548,331 | 107,019 | 830,060 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Collections | 772,000 | 671,070 | 709,070 | 659,600 | 610,130 | 610,130 | 604,995 | 604,995 | 535,505 | 536,505 | 419,375 | 419,375 | 343,125 | 7,496,875 |
| Secured Loan | | | | | | | | | | | | | | |
| DIP Financing Draws | 1,051,000 | | | | | | | | | | | | | 1,051,000 |
| **Total Cash Receipts** | 1,823,000 | 671,070 | 709,070 | 659,600 | 610,130 | 610,130 | 604,995 | 604,995 | 535,505 | 536,505 | 419,375 | 419,375 | 343,125 | 8,547,875 |
| **Total Available Cash** | 2,653,060 | 1,328,269 | 1,017,675 | 925,489 | 1,112,958 | 1,020,583 | 1,112,780 | 657,284 | 738,298 | 928,923 | 1,063,518 | 967,706 | 450,144 | 9,377,935 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Inventory/COGS | 144,200 | 138,200 | 138,200 | 136,200 | 136,200 | 138,200 | 81,750 | 81,750 | 81,750 | 81,750 | 59,000 | 59,000 | 59,000 | 1,328,200 |
| Medical Supplies | 12,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 628 | 628 | 628 | 628 | 685 | 685 | 685 | 31,567 |
| Payroll, Payroll Taxes, and Employee Benefits | 1,121,500 | 225,000 | 372,846 | 105,000 | 322,846 | 250,000 | 322,846 | 85,000 | 112,238 | 128,000 | 143,738 | 76,000 | 112,238 | 3,374,652 |
| Amedco Payroll, Payroll Taxes, and Benefits | 658,000 | - | 107,154 | - | 127,354 | - | 127,354 | - | 62,762 | - | 62,762 | - | 62,762 | 1,208,148 |
| Rent | | 538,000 | | | | | 147,000 | 165,000 | | | 147,000 | | | 997,000 |
| Telephone/Utilities/Facilities | | 16,000 | 16,000 | 16,000 | 16,000 | 16,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 122,000 |
| Equipment Lease Payments | | 4,000 | 4,000 | | | | 6,000 | 2,000 | | | | | | 16,000 |
| Insurance | | 15,000 | | 65,000 | | | 55,000 | | | | 25,000 | 27,000 | 10,000 | 197,000 |
| Marketing Expense | | 15,000 | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 70,000 |
| Taxes - Sales and Other | 30,000 | 10,000 | 10,000 | 10,000 | 20,000 | 20,000 | 10,000 | 10,000 | 5,000 | 20,000 | 5,000 | 5,000 | | 155,000 |
| General and Administrative / Other | 30,161 | 71,464 | 72,786 | 21,384 | 88,305 | 57,123 | 48,113 | 22,113 | 55,502 | 40,402 | 61,002 | 15,002 | 32,284 | 583,621 |
| Capital Expenditures | | 5,000 | | | 5,000 | 5,000 | | 5,000 | | 5,000 | | | | 25,000 |
| Professional Fees (Ordinary Course) | | 5,000 | | 10,000 | | | 10,000 | 20,000 | 10,000 | | 5,000 | 5,000 | 10,000 | 75,000 |
| **Total Operating Disbursements** | 1,995,861 | 1,019,664 | 751,786 | 366,584 | 702,505 | 492,323 | 750,491 | 455,491 | 345,880 | 284,780 | 515,187 | 220,687 | 292,969 | 8,194,186 |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | |
| Post-Petition Deposits | | | | 56,097 | | | | | | | | | | 56,097 |
| Adequate Protection Payments | | | | | | | | | | | | | | |
| Professional Fees (Restructuring) | | | | | | | 310,000 | | | | | 640,000 | | 950,000 |
| US Trustee Fees | | | | | | 20,475 | | | | | | | | 20,475 |
| DIP Interest | | | | | | | | | | | | | | |
| **Total Non-Operating Disbursements** | | | | 56,097 | | 20,475 | 310,000 | | | | | 640,000 | | 1,026,572 |
| **Total Disbursements** | 1,995,861 | 1,019,664 | 751,786 | 422,681 | 702,505 | 512,798 | 1,060,491 | 455,491 | 345,880 | 284,780 | 515,187 | 860,687 | 292,969 | 9,220,760 |
| **Net Cash Flows - Total** | (172,861) | (348,594) | (42,718) | 236,939 | (92,375) | 97,332 | (455,496) | 149,504 | 190,625 | 251,725 | (95,812) | (441,312) | 50,156 | 157,175 |
| **Ending Available Cash Balance** | 657,199 | 308,605 | 265,889 | 502,628 | 410,453 | 507,785 | 52,289 | 201,793 | 392,418 | 644,143 | 548,331 | 107,019 | 157,175 | 157,175 |

Professional Fees

## MacKeyser Holdings, LLC
### 13-Week Cash Flow Projection

| Professional Fee Budget | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning Date | 6/23/14 | 6/30/14 | 7/7/14 | 7/14/14 | 7/21/14 | 7/28/14 | 8/4/14 | 8/11/14 | 8/18/14 | 8/25/14 | 9/1/14 | 9/8/14 | 9/15/14 | 13-Week Total |
| Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Professional Fees (Restructuring)** | | | | | | | | | | | | | | |
| Post-Petition Legal | | | | | | | | | | | | | | |
| Debtors' Counsel - BK | | | | | | | 175,000 | | | | | 350,000 | | 525,000 |
| Creditors' Committee Counsel & FA | | | | | | | - | | | | | 100,000 | | 100,000 |
| | | | | | | | - | | | | | - | | - |
| Post-Petition Consulting | | | | | | | | | | | | | | |
| CFO | | | | | | | 10,000 | | | | | 20,000 | | 30,000 |
| Financial Advisor - Debtor | | | | | | | 100,000 | | | | | 100,000 | | 200,000 |
| HDC | | | | | | | - | | | | | 50,000 | | 50,000 |
| Claims and Noticing | | | | | | | 15,000 | | | | | 20,000 | | 35,000 |
| Communications | | | | | | | 10,000 | | | | | - | | 10,000 |
| **Total Professional Fees (Restructuring)** | - | - | - | - | - | - | 310,000 | - | - | - | - | 640,000 | - | 950,000 |

Page 1 of 1

## EXHIBIT 2 TO INTERIM ORDER

### Professional Fee Budget

## MacKeyser Holdings, LLC

13-Week Cash Flow Projection

Professional Fees Budget - Accrual

| | Projected 6/23/14 | Projected 6/30/14 | Projected 7/7/14 | Projected 7/14/14 | Projected 7/21/14 | Projected 7/28/14 | Projected 8/4/14 | Projected 8/11/14 | Projected 8/18/14 | Projected 8/25/14 | Projected 9/1/14 | Projected 9/8/14 | Projected 9/15/14 | Projected 13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning Date / Accounting Week | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **Professional Fees (Restructuring)** | | | | | | | | | | | | | | |
| **Post-Petition Legal** | | | | | | | | | | | | | | |
| Debtors' Counsel - BK | 100,000 | 75,000 | 87,500 | 87,500 | 87,500 | 87,500 | 68,750 | 68,750 | 68,750 | 68,750 | 68,750 | 68,750 | 68,750 | 1,006,250 |
| Creditors' Committee Counsel & FA | | | 25,000 | 25,000 | 25,000 | 25,000 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 187,500 |
| **Post-Petition Consulting** | | | | | | | | | | | | | | |
| CFO | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 65,000 |
| Financial Advisor - Debtor | 50,000 | 50,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 360,000 |
| HDC | | | | | | 50,000 | | | | | | | | 50,000 |
| Claims and Noticing | 10,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 63,000 |
| Communications | 5,000 | 5,000 | | | | | | | | | | | | 10,000 |
| **Accrued Professional Fees (Restructuring)** | 170,000 | 140,000 | 147,500 | 147,500 | 147,500 | 197,500 | 115,250 | 115,250 | 115,250 | 115,250 | 110,250 | 110,250 | 110,250 | 1,741,750 |

## EXHIBIT 3 TO INTERIM ORDER

### DIP Term Sheet

## MacKeyser Holdings, LLC

Terms of Debtor-in-Possession Financing

Borrower:                     MacKeyser Holdings, LLC a Delaware limited liability company
                              (the "Borrower"), as a debtor-in-possession in a case (the
                              "Borrower's Chapter 11 Case") to be filed under chapter 11 of title
                              11 of the United States Code (the "Bankruptcy Code") in the
                              United States Bankruptcy Court for the District of Delaware (the
                              "Court").

Guarantor:                    American Optical Services, Inc. and each of the Borrower's direct
                              and indirect, existing subsidiaries that are set forth on Schedule A
                              hereto, each as a debtor-in-possession in a case (together with the
                              Borrower's Chapter 11 Case, the "Chapter 11 Cases"; the date of
                              commencement of the Cases, the "Petition Date") to be filed under
                              chapter 11 of the Bankruptcy Code (collectively, the "Guarantors";
                              the Borrower and the Guarantors, collectively, the "Debtors").

Lender:                       Health Evolution Partners Fund I, L.P., a Delaware limited
                              partnership, and Series F of Health Evolution Partners Co-Invest,
                              LLC, a Delaware limited liability company (together, the "DIP
                              Lender")

Commitment/Availability:      The DIP Lender will make loans (the "DIP Loans") to the Debtors
                              under a debtor in possession term loan, multi-draw financing
                              facility (the "DIP Facility") in an aggregate principal amount not to
                              exceed in the aggregate $1,052,105 plus all capitalized interest
                              thereon pursuant to the terms herein (such amount, the "Principal
                              Amount") to be made available to the Borrower in accordance with
                              the Budget (as defined below) until the Maturity Date (as defined
                              below).   Upon the entry of the Interim DIP Order (as defined
                              below), the Borrower shall be permitted to borrow an amount not
                              to exceed the full amount of the DIP Facility, subject to the terms
                              and conditions set forth in this term sheet (the "Term Sheet") and
                              the Interim DIP Order (as defined below) in accordance with the
                              Budget (as defined below).

Obligations:                  As used in this Term Sheet, (any collateral documents, guaranties,
                              the Budget (as defined below)  and all such instruments and
                              documents as may be executed and delivered in connection with or
                              relating to the DIP Facility, the Interim DIP Order and the Final
                              DIP Order (each as defined below) and any certificate or other
                              document made or delivered pursuant hereto or thereto
                              (collectively, the "DIP Documents"),  the term "DIP Obligations"
                              means (a) the due and punctual payment by the Borrower (and each

of the Guarantors pursuant to the guaranty of the DIP Facility and the DIP Obligations by each such Guarantor (the "Guaranty")) in substantially the form annexed hereto as Schedule B of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the commencement of the Chapter 11 Cases or any case or proceeding by or against a Borrower or any Guarantor under any federal or state bankruptcy, insolvency, receivership or similar law, whether or not allowed in such case or proceeding) on the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of any Debtor to the DIP Lender under this Term Sheet, the other DIP Documents, the Interim DIP Order and the Final DIP Order (each as defined below), and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of any Debtor to the DIP Lender under or pursuant to this Term Sheet, the other DIP Documents, the Interim DIP Order and the Final DIP Order (each as defined below).

Use of Proceeds:

All advances under the DIP Facility shall be used by the Debtors solely to fund the Debtors' operations and conduct a sale and liquidation process as set forth herein, in accordance with the budget approved by the DIP Lender (the "Budget"), as such Budget may be modified with the DIP Lender's written consent and without further order of the Court. Compliance with the Budget will be measured every two weeks (after the first two weeks of the case) on a trailing four week basis.

The Debtors shall use the proceeds of the DIP Facility solely to fund the Debtors' operations, conduct and pursue a sale and liquidation process and, upon entry of the Interim DIP Order (as defined below) and funding of the DIP Facility, the funding of an amount of $481,000 from the proceeds of the DIP Facility into those certain previously established escrow accounts of the Debtors established by Corporation Service Company (the "Escrow Accounts") with such proceeds held in the Escrow Accounts to be used *solely* for the payment or other funding of the Debtors' payroll and sales tax obligations (the "Escrow Funds"), which Escrow Funds may not be used for any other purpose unless agreed to by the DIP Lender.

For the avoidance of doubt, (A) the Borrower may amend the

Budget with the written consent of the DIP Lender; provided, that the total amount of funding provided pursuant to the Budget shall not exceed the total amount of the DIP Facility authorized by the Interim DIP Order or the Final DIP Order, as applicable; and (B) at any given time, the Debtors' actual cash disbursements may, on a cumulative basis, vary from the Budget by no more than 10% (the "Permitted Variance"). As further set forth below, after the first two weeks of the Chapter 11 Cases, the Debtors shall provide the DIP Lender with weekly and cumulative variance reporting on a line item basis, which reporting shall (1) detail the variance, if any, of actual cash disbursements and actual cash receipts from the Budget and (2) provide an explanation of any per line item variance greater than 5% (the "Variance Report").

Interest Rate:

Interest on the DIP Loans made under the DIP Facility shall be equal to the Base Rate. On June 30, 2014, and quarterly thereafter on September 30, December 31, March 31 and the earlier of (i) June 30 or (ii) the Maturity Date (any such day being hereinafter referred to as an "Interest Calculation Date"), the amount of all interest accrued through such date and not previously capitalized shall be added to the Principal Amount. Any such amount so capitalized will thereafter accrue interest at Base Rate. Borrower may pay, but the DIP Lender shall have no right to demand, on any Interest Calculation Date, all or any portion of the accrued and unpaid interest under the DIP Facility in cash prior to the Maturity Date.

Base Rate:

8.00% per annum (the "Base Rate").

Default Interest:

Upon the occurrence and during the continuation of any Event of Default (including without limitation any default in payment of any obligations under the DIP Facility when such obligations are due), interest on all DIP Loans shall be payable at the Base Rate, plus 2.0%.

Maturity:

Unless accelerated by an Event of Default (as defined below), the DIP Facility shall be paid in full in cash on the date (the "Maturity Date") which is the earliest of (a) 365 days from the Petition Date; (b) the effective date of a plan of reorganization or liquidation; (c) the consummation of a sale(s) of all or substantially all of the assets of the Debtors; (d) the occurrence of an Event of Default (as defined herein); (e) the entry of an order by the Court approving an alternative DIP Facility; and (f) such later date as the DIP Lender in its sole discretion may agree to in writing with the Debtors. The Maturity Date shall be accelerated upon the occurrence of an Event of Default (as defined below), subject to the Remedies Notice

3

Period (as defined below).

Voluntary Prepayments:  The Borrower may prepay the DIP Facility in whole or in part at any time without premium or penalty. The Borrower may irrevocably cancel the unutilized portion of any commitment under the DIP Facility in excess of the outstanding DIP Loans in whole or in part.

Mandatory Prepayments:  The proceeds from any asset sales (other than sales in the ordinary course of business) shall be applied in the following order: (i) to pay or fund an escrow account or a restricted account maintained by counsel for the Debtors in the amount of (x) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors and any Committees at any time on or prior to the date of the closing of the sale in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the Professional Fee Budget (as defined below) plus (y) accrued administrative expenses of the types included in the Carve Out (as defined below), (ii) to pay the fees and expenses of the DIP Lender, (iii) to pay any interest which is then due and payable, (iv) to pay any interest with respect to the principal amount being repaid which has accrued but is not yet due and payable and (v) to pay the principal amount of DIP Loans.

Conditions Precedent to Funding:  Availability of the DIP Facility shall be subject to the following conditions precedent, all of which shall be for the benefit of the DIP Lender and must be satisfied on occasion of each drawdown under the DIP Facility, unless waived in writing in advance by the DIP Lender:

Interim Advances

1.  The Court shall have issued an interim order, in form and substance acceptable to the DIP Lender and its counsel, on or before June 25, 2014, in substantially the form annexed hereto as Schedule C or such other form as may be agreed to by the DIP Lender, in relation to the Debtors (the "Interim DIP Order") which order, inter alia, shall approve the DIP Facility on an interim basis, including, without limitation, the grant of, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages (collectively, the "DIP Liens") upon all DIP Collateral (as defined below), with the priority as set forth in the section entitled "Priority and Liens" below, to secure the DIP Obligations of the Debtors

4

under the DIP Facility in accordance with the terms hereof, effective immediately upon the granting of the Interim DIP Order, without the need for any further action on the part of the DIP Lender, the Debtors or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering or registering of any financing statements or other similar instruments or documents).

2.    The Interim DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Lender, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Interim DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

3.    The DIP Lender shall be satisfied that it has been granted, and holds, a perfected first priority lien on, and security interest in, all of property of the Debtors and proceeds thereof, subject only to the Permitted Senior Liens.

4.    All fees payable by the Debtors on or prior to the closing date of the DIP Facility (the "Closing Date") (including but not limited to the fees and expenses of legal counsel and financial advisors), to the DIP Lender shall have been paid in an aggregate amount not to exceed $100,000.

5.    All "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the DIP Lender.

6.    The DIP Lender shall have received and approved the Budget.

7.    All representations and warranties of the Debtors set forth in this Term Sheet shall be accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the DIP Loans to be made on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty

5

shall be true and correct as of such earlier date).

8.    No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

Additional Advances

1.    The Court shall have entered a final and nonappealable order, in form and substance acceptable to the DIP Lender and its counsel on or before July 25, 2014, in a form substantially similar in all material respects to the Interim DIP Order or such other form as may be agreed to by the DIP Lender, in relation to the Debtors (the "Final DIP Order")[1] which order, inter alia, shall approve the DIP Facility on a final basis, including, without limitation, the grant of pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected DIP Liens upon all DIP Collateral (as defined below) with the priority as set forth in the section entitled "Priority and Liens" below, to secure the DIP Obligations of the Debtors under the DIP Facility in accordance with the terms hereof, effective as of the granting of the Interim DIP Order, without the need for any further action on the part of the DIP Lender, the Debtors or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering or registering of any financing statements or other similar instruments or documents).

2.    All of the funds available under Interim DIP Order shall have been borrowed and used in accordance with the Budget and any variations provided for herein to which the Debtors and the DIP Lender agree in writing.

3.    The DIP Lender shall be satisfied that it has been granted, and holds, a perfected first priority lien on, and security interest in, all of property of the Debtors and proceeds thereof, subject only to Permitted Liens.

4.    All fees payable by the Debtors on or prior to the Closing

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms as set forth in the Interim DIP Order and/or Final DIP Order, as applicable.

6

Date (including but not limited to the fees and expenses of legal counsel and financial advisors), to the DIP Lender shall have been paid in an aggregate amount not to exceed $100,000.

5. All "first day orders" entered by the Bankruptcy Court at the time of the commencement of the Chapter 11 Cases and any related "final orders" subsequently entered by the Bankruptcy Court shall be reasonably satisfactory in form and substance to the DIP Lender.

6. The DIP Lender shall have received and approved the Budget and the Debtors shall be in compliance with the Budget subject to Permitted Variances.

7. All representations and warranties of the Debtors set forth in this Term Sheet shall be accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the DIP Loans to be made on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty shall be true and correct as of such earlier date).

8. The Final DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified or amended without the express written consent of the DIP Lender, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Final DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

9. No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

Guaranty:          Each Guarantor hereby jointly and severally and unconditionally guarantees to DIP Lender the due, full, and punctual payment of all DIP Obligations to the fullest extent permitted under law and agrees to execute the Guaranty in substantially the form annexed hereto as Schedule B.

Security:          Each Debtor hereby grants to the DIP Lender a security interest in

7

and continuing lien on all of such Debtor's right, title and interest in, to and under all assets of such Debtor, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "DIP Collateral"): all assets and property of each Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, general intangibles, instruments, equipment, accounts (including, without limitation, all Health-Care-Insurance Receivables), and documents, all goods, inventory and fixtures, all documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames and other intellectual property, all equity interests, all books and records relating to the foregoing, all other personal and real property of the Debtors, and all other collateral pledged under the DIP Financing Documents (as defined in the Interim DIP Order), the Escrow Account and the Escrow Funds, any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (the "Avoidance Actions") (provided that the DIP Lender shall receive perfected security interests in and a lien on Avoidance Actions only upon entry of the Final DIP Orders), and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of Delaware (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)).

Priority and Liens:    The DIP Obligations, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, (i) shall constitute allowed superpriority administrative expense claims, (ii) shall constitute first-priority security interests in and Liens upon all DIP Collateral that, subject to (iii) below, is not otherwise subject to any valid, enforceable, and non-avoidable Liens, which Liens are not subject to subordination, in existence on the Petition Date and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code (collectively, the "Permitted Senior Liens"), (iii) shall be senior to and prime the Liens granted under that certain Secured Promissory Note dated as of May 30, 2014 (the "HEP Prepetition Loan Agreement") and related Security

8

Agreement dated as of May 30, 2014 (the "HEP Security Agreement" and, together with the HEP Prepetition Loan Agreement, the "HEP Prepetition Agreements") with Health Evolution Partners Fund I, L.P., a Delaware limited partnership, and Series F of Health Evolution Partners Co-Invest, LLC, a Delaware limited liability company (together, the "HEP Prepetition Lenders") on the collateral pledged to the HEP Prepetition Lenders pursuant to the HEP Prepetition Agreements (the "HEP Prepetition Liens"), (iv) shall be senior to and prime all Adequate Protection Liens (as defined in the Interim DIP Order), and (v) shall be subordinate to the Carve Out and the Permitted Senior Liens.

Carve Out:                As more fully set forth in the Interim DIP Order and Final DIP Order, the liens on and security interests in the DIP Collateral and the superiority administrative expenses claims shall be subordinate to the "Carve Out". For purposes hereof, the "Carve Out" means: (i) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (iii) after the occurrence and during the continuance of an Event of Default (as defined below), all allowed and unpaid professional fees and disbursements incurred by the Debtors and any statutory committees appointed in the Chapter 11 Cases (each, a "Committee"), that remain unpaid subsequent to the payment, pro rata with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in an aggregate amount not exceeding $75,000 for the payment of the Debtors' professionals and $25,000 for payment of the Committee's professionals, which amount may be used subject to the terms of this Term Sheet and the Interim DIP Order (the "Permitted Professional Fees"), and (iv) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtors and any Committees at any time when no Event of Default is continuing, that remain unpaid subsequent to an Event of Default, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent professional fee budget (the "Professional Fee Budget") delivered to and approved by the DIP Lenders prior to any Event of Default that is then continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Court at any time; provided, however, that nothing herein shall be

9

construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above.

Adequate Protection:    Any secured creditor of the Debtors with a valid, perfected, enforceable, continuing and non-avoidable prepetition lien on or security interest in property of the Debtors shall be granted adequate protection for, and in equal amount to, the diminution in value of their valid, perfected, enforceable, continuing and non-avoidable prepetition security interests in the form of superpriority claims and replacement liens on all assets securing the DIP Facility (the "Adequate Protection Liens"), which claims and replacement liens shall be junior in priority and subject in all respects to the DIP Liens and to the Carve Out but senior to Permitted Senior Liens and the HEP Prepetition Liens.

Commitment and Other Fees:    None.

Expenses:    Upon entry of the Final Order, the Borrower shall reimburse the DIP Lender for the professional fees and expenses incurred by the DIP Lender in an amount not to exceed $100,000.

Representations and Warranties:    Each Debtor hereby represents and warrants as to itself that:

1.    The Debtor is duly organized, validly exists, in good standing and qualified to do business in the state of its respective organization.

2.    The Debtor has full power and authority to operate its business, conduct its business and to execute, deliver and perform this Term Sheet, associated documents and its obligations under the Interim DIP Order and the Final DIP Order.

3.    No part of the proceeds of any DIP Loan shall be used by the Debtor to purchase or carry publicly traded stocks, investment commodities (i.e., commodities not required and intended to be used as inventory in Debtor's routine business) or to extend credit to others (other than customers in the routine course of business).

Affirmative Covenants:

1.    The Debtors covenant and agree with the DIP Lender that, unless the DIP Lender otherwise consents in writing, so long as any amount payable hereunder is outstanding or the DIP Facility shall remain in place, it shall only use the

10

advances made under the DIP Facility for the purposes set out herein and identified in the Budget and shall not use such funds to commence any action against the DIP Lender, its affiliates, its employees, or its principals.

2.  As more fully set forth in the Interim DIP Order and Final DIP Order, the Debtors further covenant and agree that no Obligation under the DIP Facility shall be subject to setoff or recoupment or any such rights under Bankruptcy Code section 553 or otherwise with respect to any claim the Debtors may have against the DIP Lender arising on or before the Petition Date.

3.  The Debtors further covenant and agree that they shall use the Escrow Funds *solely* for the payment or other funding of the Debtors' payroll and payroll tax obligations, unless otherwise agreed to by the DIP Lender.

4.  The Debtors further covenant and agree that they shall:

    (a)  deliver to the DIP Lender (i) certifications upon submission of each borrowing request with respect to compliance with the Budget and any other information reasonably requested by the DIP Lender, (ii) every two (2) weeks (after the first two weeks of the Chapter 11 Cases) and no later than the fourth (4th) business day of each such week (the "Reporting Date"), the Variance Report, (iii) every two (2) weeks a revised rolling-13 week cash flow projection no later than the fourth (4th) business day of each such week, (iv) as soon as possible and in any event within three (3) business days after an officer or director of any Debtor obtains actual knowledge, or after due inquiry, would have obtained such knowledge by acting in good faith and in a prudent manner in the performance of his or her duties, of the occurrence of any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default (a "Default"), a statement of an officer or director of such Debtor setting forth details of such Default and the action which such Debtor has taken and proposes to take with respect thereto, and (v) as soon as possible and in any event within three (3) business days after an officer of any Debtor obtains actual knowledge, or after due inquiry, would have obtained such knowledge by acting in good faith

11

and in a prudent manner in the performance of his or her duties, of the occurrence of any material adverse development with respect to any loss, damage, investigation, claim, litigation, action, proceeding or controversy involving the Debtors, notice thereof and as soon as practicable thereafter, to the extent the DIP Lender requests, copies of all documentation relating thereto;

(b)    permit the DIP Lender and its representatives and designees to visit and inspect the properties, books and records of the Debtors upon reasonable notice at the Debtors' expense;

(c)    subject to the Budget, pay all taxes, assessments, contributions and other governmental charges imposed upon any Debtor or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Cases;

(d)    maintain in good working order all material properties used in the business of the Debtors, as and to the extent in good working order as of the Petition Date;

(e)    maintain insurance with respect to the business and properties of the Debtors against loss of the kind and in the amounts maintained by the Debtors as of the Petition Date;

(f)    comply in all material respects with the requirements of all applicable laws;

(g)    promptly upon request execute and deliver such documents and do such other acts as the DIP Lender may reasonably request in connection with the DIP Facility, and in accordance with the DIP Documents (including but not limited to execution of any additional security documents that may be required by the DIP Lender to secure the DIP Liens);

(h)    maintain compliance with the Budget (subject to any Permitted Variance) and all other provisions of the DIP Term Sheet;

(i)    include the DIP Lender and the HEP Prepetition Lenders (and their respective officers, directors,

12

employees, advisors and agents) as released and exculpated parties in the release and exculpation provisions of any plan pursued in the Chapter 11 Cases; and

(j)    perform all obligations of the Debtors under the DIP Facility, the DIP Documents and the Interim DIP Order and the Final DIP Order, as applicable.

Negative Covenants:

1.    The Debtors covenant and agree that they shall not, and shall not cause or permit their subsidiaries to:

(a)    except to the extent existing as of the Closing Date, incur any indebtedness (other than the borrowings under the DIP Facility and obligations permitted to be incurred under the Budget, any other indebtedness permitted to be incurred by the DIP Lender and the Court, and any unsecured obligations incurred in the ordinary course of business by the Debtors and permitted to be incurred by the DIP Budget);

(b)    except to the extent existing as of the Closing Date and other than the Carve Out expenses as permitted by the Term Sheet and the Adequate Protection Liens as set forth in the proposed form of Interim Order attached as Schedule C hereto, consent to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having priority senior or pari passu with the liens granted to the DIP Lender or otherwise incur any liens other than liens permitted in writing by the DIP Lender;

(c)    except to the extent existing as of the Closing Date, make any investments in any person or make any loan to any person (other than as permitted in writing by the DIP Lender);

(d)    engage in any business other than the businesses engaged in by the Debtors on the Closing Date except with the written consent of the DIP Lender;

(e)    terminate or agree to any modification to any organizational documents of any Debtor except with the written consent of the DIP Lender; or

13

(f)     make any payment of prepetition claims or payment of postpetition items except in accordance with the Budget.

Events of Default:

The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, being herein referred to as an "Event of Default") shall constitute a default under the Term Sheet:

1.     The failure by the Debtors to perform or comply with any term, condition, covenant or obligation (including a payment obligation) contained in this Term Sheet, the Interim DIP Order or Final DIP Order, on its part to be performed or complied with where any such failure to perform or comply shall not be remedied within three (3) business days from notice of default.

2.     The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Court to be null and void or the validity or enforceability the DIP Facility being contested by the Debtors or the Debtors denying in writing that it has any further liability or obligation under the DIP Facility or the DIP Lender ceasing to have the benefit of the Liens granted by the Interim DIP Order or Final DIP Order.

3.     The use of Escrow Funds for any purpose other than for the payment or other funding of the Debtors' payroll and payroll tax obligations unless otherwise agreed by the DIP Lender.

4.     Except as permitted in the Interim DIP Order or Final DIP Order, the entry of any order of the Court granting to any third party a superpriority claim or lien pari passu with or senior to that granted to the DIP Lender hereunder.

5.     The Debtors shall make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Obligations under the DIP Facility or other than in accordance with the Budget approved by the DIP Lender.

6.     If, as of any Reporting Date, the Debtors cumulative cash disbursements from the period from the Petition Date through the end of any calendar month exceeds 15% from the amount included in the Budget (i.e., exceeds scheduled disbursements by more than 15%).

14

7.    The entry of an order converting the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or the Debtors filing a motion or not opposing a motion seeking such relief.

8.    The entry of an order dismissing the Debtors' Chapter 11 Cases, or the Debtors filing a motion or not opposing a motion seeking such relief, unless consented to by the DIP Lender.

9.    The entry of any order in the Debtors' Chapter 11 Cases or any successor cases, which order constitutes the stay, modification, appeal or reversal of the Interim DIP Order or Final DIP Order or which otherwise affects the effectiveness of the Interim DIP Order or Final DIP Order.

10.   The entry of an order in the Debtors' Chapter 11 Cases appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtors' business.

11.   The entry of an order in the Debtors' Chapter 11 Cases granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property, including the collateral pledged pursuant to the DIP Facility and the HEP Prepetition Liens, of the Debtors or to commence or continue any prepetition litigation against the Debtors involving potential liability not covered by insurance, in excess of $500,000 in the aggregate.

12.   Any judgment or order as to postpetition liability or debt for the payment of money in excess of $500,000 shall be rendered against one or more of the Debtors individually or in the aggregate, and the enforcement thereof shall not have been stayed.

13.   Any non-monetary, judgment or order with respect to a postpetition event shall be rendered against the Debtors which does or would reasonably be expected to (i) cause a material adverse change in the financial condition, business, prospects, operations or assets of the Debtors or (ii) have a material adverse effect on the rights and remedies of the DIP Lender hereunder, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

14.   The Interim DIP Order or Final DIP Order being amended

15

or modified without the consent of the DIP Lender.

Remedies:                  If any Event of Default occurs and is continuing, the DIP Lender
                           may take any or all of the following actions:

1.    declare the commitment of the DIP Lender to make Loans
      to be terminated, whereupon such commitment shall be
      terminated;

2.    declare the unpaid principal amount of all outstanding
      Loans, all interest accrued and unpaid thereon, and all other
      amounts owing or payable under the DIP Facility, this Term
      Sheet, Interim DIP Order or the Final DIP Order to be
      immediately due and payable, without presentment,
      demand, protest or other notice of any kind, all of which are
      hereby expressly waived by the Borrower;

3.    declare interest on the DIP Obligations to accrue at the
      default rate set forth in this Term Sheet, whereupon the
      interest on the DIP Obligations shall automatically accrue at
      the default rate;

4.    subject to the Default Notice Period (as defined below), (i)
      enter upon any premises on or in which any of the DIP
      Collateral may be located and take possession of the DIP
      Collateral or complete processing, manufacturing and repair
      of all or any portion of the DIP Collateral, (ii) collect,
      foreclose, receive, appropriate, setoff and realize upon any
      and all DIP Collateral, (iii) remove any DIP Collateral from
      any premises on or in which the same may be located for
      the purpose of effecting the sale, foreclosure or other
      disposition thereof or for any other purpose, (iv) exercise its
      unqualified right to credit bid up to the full amount of the
      outstanding DIP Obligations in any sale of the DIP
      Collateral (or any part thereof), which credit bid may
      incorporate a credit bid of the HEP Prepetition Indebtedness
      (as defined in the Interim DIP Order in substantially the
      form annexed hereto as Schedule C), without the need for
      further Bankruptcy Court order authorizing the same, and
      whether such sale is effectuated through section 363 or
      1129 of the Bankruptcy Code, by a chapter 7 trustee under
      Section 726 of the Bankruptcy Code, or otherwise and (v)
      take whatever other action the DIP Lender may deem
      necessary or desirable for the protection of its interests;
      and/or

5.    exercise all rights and remedies available to it (whether as a

16

secured creditor or otherwise) under the DIP Facility, this Term Sheet, the Interim DIP Order, the Final DIP Order or applicable law (including in respect of the DIP Collateral).

All rights, remedies and powers granted to the DIP Lender under the DIP Documents or the Interim DIP Order or Final DIP Order, as applicable, are cumulative, not exclusive and enforceable, in the DIP Lender's discretion, alternatively, successively, or concurrently.

Default Notice Period:    The Interim DIP Order shall include, without limitation, provisions that upon the occurrence of a Termination Event,[2] the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided in this Interim Order and the other DIP Documents, as applicable, and to take any or all of the following actions without further order of or application to this Court, including without limitation: (i) immediately terminate the Debtors' use of Cash Collateral and cease making any DIP Loans to the Borrower; (ii) immediately declare all DIP Obligations to be immediately due and payable; (iii) immediately terminate the DIP Facilities and the availability of any DIP Loans thereunder; (iv) immediately set off any and all amounts held on account of or owed to the Debtors against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of, or subject to a lien in favor of the DIP Lender for application towards the DIP Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under this Interim Order and the other DIP Documents or applicable law to effect the repayment of the DIP Financing; provided that notwithstanding anything herein to the contrary, the DIP Lender shall not enforce any DIP Liens against the DIP Collateral or exercise any other remedies prior to the expiration of the Default Notice Period. The Interim DIP Order shall further provide that (a) the automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified, effective following the expiration of the Default Notice Period, unless the Court has determined that an Event of Default has not occurred and/or is not continuing, (b) any party in interest's sole recourse with respect to

---

[2]    "Termination Event", shall mean the earliest to occur of (a) 30 days after the entry of the Interim DIP Order (unless a Final Order approved by the DIP Lenders has been entered as of such date), (b) the expiration of five (5) business days (the "Default Notice Period") following the provision of written notice to the Debtors (with a copy of such notice provided to counsel for the Debtors, counsel for any Committee, and the U.S. Trustee) upon the occurrence of an Event of Default, (c) the occurrence of the Maturity Date, and (d) the date on which neither the Interim DIP Order nor the Final DIP Order is in full force and effect.

opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default, (c) during the Default Notice Period, the Debtors shall (x) have no right to request extensions of credit under the DIP Facility, other than with the consent of the DIP Lender, and (y) be entitled to an emergency hearing before the Court, with proper notice to the DIP Lender, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, (d) the rights and remedies of the DIP Lender specified in the Interim DIP Order are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under hereunder or otherwise, (e) the Debtors shall cooperate fully with the DIP Lender in any permitted exercise of rights and remedies, whether against the DIP Collateral or otherwise.

Release:

The Interim DIP Order shall contain and approve the admissions, stipulations, and agreements of each Debtor, on behalf of and for itself, with regard to the HEP Prepetition Obligations, the HEP Prepetition Indebtedness, the HEP Collateral Documents, the HEP Prepetition Agreements, and the HEP Prepetition Liens (each as defined in the Interim DIP Order in substantially the form annexed hereto as Schedule C).

Upon the entry of the Interim DIP Order and subject to the closing of the DIP Facility, in consideration of (i) the DIP Lender's agreement to the making of postpetition loans, advances and providing other credit and financial accommodations to the Debtors pursuant to the provisions of this Term Sheet, the DIP Documents and the Interim DIP Order, and (ii) the HEP Prepetition Lenders' agreement to make loans, advances, providing credit and other financial accommodations to the Debtors pursuant to the provisions of the HEP Prepetition Loan Agreement and for the HEP Prepetition Liens to be primed by the DIP Liens, each Debtor, on behalf of and for itself (collectively, the "Releasors"), shall forever release, discharge and acquit the DIP Lender and the HEP Prepetition Lenders and their respective participants, officers, directors, principals, agents, attorneys and predecessors-in-interest (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Releasees as of the date hereof, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, in respect of events that occurred on or prior to the date hereof. In addition, upon the

18

repayment of all DIP Obligations owed to the DIP Lender by the Debtors and termination of the rights and obligations arising under the DIP Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender in such capacity shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the Term Sheet, the DIP Documents or the Interim DIP Order or Final DIP Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out expenses), on terms and conditions acceptable to the DIP Lender.    Notwithstanding anything to the contrary herein, the Debtors' releases do not extend to the DIP Lender's obligations to make the advances and otherwise comply with the terms of this Term Sheet and the Interim DIP Order and Final DIP Order.

Expenses and
Indemnification:

The DIP Lender (and its affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person.

Governing Law:

Delaware

19

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be executed by their respective officers thereunto duly authorized, as of this 22nd day of June, 2014.

Borrower:

**MACKEYSER HOLDINGS, LLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**AMERICAN OPTICAL SERVICES, INC.**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**OPTICAL MANAGEMENT SYSTEMS, INC.**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**RIVERFRONT HEARING, INC.**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**AOS-OMS, LLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer


Guarantor:

**EHS-RIVERFRONT, LLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer


Guarantor:

**AMERICAN OPTICAL SERVICES, LLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer


Guarantor:

**EXELA HEARING SERVICES, LLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**THOMAS RETINAL EYE
SPECIALISTS, P.C.**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**STEVEN T. OLKOWSKI, M.D., P.C.**

By _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**JOSEPH D. UDVARI, JR., O.D., P.C.**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**LARRY R. MOORMAN, M.D., P.C.**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**PHILIP H. CLARK, O.D., P.A.**

By:
    Name: Thomas J. Allison
    Title: Chief Executive Officer


Guarantor:

**LAKEWOOD EYE CLINIC, P.C.**

By:
    Name: Thomas J. Allison
    Title: Chief Executive Officer


Guarantor:

**THOMAS G. ABELL, M.D., P.S.C.**

By:
    Name: Thomas J. Allison
    Title: Chief Executive Officer


Guarantor:

**EYES ON YOU EYECARE, INC.**

By:
    Name: Thomas J. Allison
    Title: Chief Executive Officer

Guarantor:

**EPIC MANAGEMENT GROUP, LLC**

By:
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**EYEGLASSES ETC., INC.**

By:
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**J. RICHARD SUSI, D.O., P.A.**

By:
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**JOSEPH KURSTIN, M.D., P.A.**

By:
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**GENESIS BILLING SYSTEMS, LLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**GENESIS EYE CENTER, PLLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**926 N. WILCREST, LLC**

By: _____
Name: Thomas J. Allison
Title: Chief Executive Officer

Lender:

**Health Evolution Partners Fund I, L.P.**
By:     Series B of Health Evolution
        Investments, LLC
Its:    General Partner

By:     Health Evolution Partners Principals
        I, LLC
Its:    Manager

By: _____
David Brailer
Managing Member

**SERIES F OF HEALTH EVOLUTION
PARTNERS CO-INVEST, LLC**

By:     Series B of Health Evolution
        Investments, LLC
Its:    General Partner

By:     Health Evolution Partners Principals
        I, LLC
Its:    Manager

By: _____
David Brailer
Managing Member

## SCHEDULE A TO DIP TERM SHEET

AMERICAN OPTICAL SERVICES, INC., a Delaware corporation

OPTICAL MANAGEMENT SYSTEMS, INC., a Michigan corporation

RIVERFRONT HEARING, INC., a Michigan corporation

AOS-OMS, LLC, a Delaware limited liability company

EHS-RIVERFRONT, LLC, a Delaware limited liability company

AMERICAN OPTICAL SERVICES, LLC, a Delaware limited liability company

EXELA HEARING SERVICES, LLC, a Delaware limited liability company

THOMAS RETINAL EYE SPECIALISTS, P.C., a Pennsylvania professional corporation

STEVEN T. OLKOWSKI, M.D., P.C., a Pennsylvania professional corporation

JOSEPH D. UDVARI, JR. O.D., P.C., a Pennsylvania professional corporation

LARRY R. MOORMAN, M.D., P.C., a Georgia professional corporation

PHILIP H. CLARK, O.D., P.A., an Arkansas professional association

LAKEWOOD EYE CLINIC, P.C., a Colorado professional corporation

THOMAS G. ABELL, M.D., P.S.C., a Kentucky professional services corporation

EYES ON YOU EYE CARE, INC., a Georgia corporation

EPIC MANAGEMENT GROUP, LLC, a California limited liability company

EYEGLASSES ETC., INC., a Florida corporation

J. RICHARD SUSI, D.O., P.A., a Florida professional association

JOSEPH KURSTIN, M.D., P.A., a Florida professional association

GENESIS BILLING SYSTEMS, LLC, a California limited liability company

GENESIS EYE CENTER, PLLC, a North Carolina professional limited liability company

926 N. WILCREST, LLC, a Texas limited liability company

## SCHEDULE B TO DIP TERM SHEET

### Guaranty

## GUARANTY

THIS GUARANTY (the "Guaranty") is made and executed, effective as of June 22, 2014, by each of the entities set forth in Schedule 1 hereto (each a "Guarantor") in favor of Health Evolution Partners Growth Fund I, L.P., a Delaware limited partnership, and Series F of Health Evolution Partners Co-Invest, LLC, a Delaware limited liability company (together with Health Evolution Partners Fund I, L.P., the "DIP Lender"), the aggregate principal amount of up to $1,052,105, with reference to the following facts:

### RECITALS:

A.    Each Guarantor is a wholly owned direct or indirect subsidiary of MacKeyser Holdings, LLC, a Delaware limited liability company ("Borrower").

B.    Borrower has requested that DIP Lender execute that certain Terms of Debtor-in-Possession Financing dated concurrently herewith (the "DIP Term Sheet") to provide a debtor in possession term loan, multi-draw financing facility (the "DIP Facility") in the aggregate principal amount of up to $1,052,105 (the "DIP Financing").

C.    DIP Lender has requested that each Guarantor execute this Guaranty to induce DIP Lender to make loans (the "DIP Loans") from the DIP Financing under the DIP Facility.

D.    This Agreement is the Guaranty referred to in the DIP Term Sheet.

FOR VALUABLE CONSIDERATION, each undersigned Guarantor, as an inducement to DIP Lender to make the DIP Loans from the DIP Financing and pursuant to the DIP Facility, and intending to be legally bound, does hereby agree as follows:

1.    GUARANTEE OF PAYMENT AND PERFORMANCE. Each Guarantor hereby jointly and severally and unconditionally guarantees to DIP Lender the due, full, and punctual payment of all DIP Obligations (as defined in the DIP Term Sheet) to the fullest extent permitted under law.

2.    PRIMARY LIABILITY. Guarantor further agrees that the liability of the undersigned under this Guaranty shall be primary, and that in any right of action which may accrue to DIP Lender, its successors or assigns, under the DIP Term Sheet or any other DIP Obligations or this Guaranty, DIP Lender and its successors or assigns, at their option may proceed directly against any Guarantor without having taken or commenced any action or obtained any judgment against Borrower or other Guarantor and without applying any payments or other property of Borrower or any other Person held as collateral security for the performance of the obligations of Borrower under the DIP Term Sheet or any other DIP Obligations or otherwise to the discharge of the obligations of the Borrower under the DIP Term Sheet or any other DIP Obligations.

3.    MODIFICATIONS. Guarantor acknowledges that the principals of Guarantor also are principals of Borrower and therefore agrees that the DIP Term Sheet or any other DIP

Obligations may be altered, expanded or extended by an agreement between the DIP Lender and the Borrower, including amendments extending the term of the DIP Facility or any other DIP Obligations or increasing the amount of principal advances under the DIP Facility pursuant to the DIP Term Sheet or any other DIP Obligations, and that this Guaranty shall continue in full force and effect following and with respect to any such alteration, expansion or extension without regard to whether Guarantor expressly approved or consented to such alteration, expansion or extension.

4.     Guarantor's Representations, Warranties, and Covenants. Each Guarantor hereby:

   4.1     REPRESENTATIONS AND WARRANTIES. Warrants and represents to DIP Lender that: (a) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (b) this Guaranty is executed at the request of Borrower and DIP Lender; (c) DIP Lender has made no representation to the undersigned as to the credit-worthiness of Borrower; and (d) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition.

   4.2     COVENANTS OF GUARANTOR. Covenants and agrees that (a) Guarantor shall keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty; and (b) DIP Lender shall have no obligation to disclose to Guarantor any information or documents acquired by DIP Lender in the course of its relationship with Borrower. Guarantor shall perform all duties and obligations under the DIP Documents (as defined in the DIP Term Sheet) that relate to Guarantor including regarding delivery of notices, audits, financial statements and certificates.

5.     GUARANTOR'S WAIVERS

   5.1     WAIVERS. Except as prohibited by applicable law, Guarantor waives any right to require DIP Lender to: (a) make any presentment, protest, demand, or notice of any kind, including notice of change of any of the terms of payment of principal, interest or other amounts owing under the DIP Term Sheet or any other DIP Obligations, default by Borrower or any other guarantor or surety, any action or non-action taken by Borrower, DIP Lender, or any other surety of Borrower; (b) proceed against any Person, including Borrower, before proceeding against Guarantor; (c) proceed against any collateral for the payment of amounts owing under the DIP Term Sheet or any other DIP Obligations, including collateral pledged by the Borrower, before proceeding against Guarantor; (d) apply any payments or proceeds received against amounts due or becoming due under the DIP Term Sheet or any other DIP Obligations in any order; (e) give notice of the terms, time, and place of any sale of any collateral held by DIP Lender pursuant to the Uniform Commercial Code or any other law governing such sale; (f) disclose any information about the DIP Term Sheet or any other DIP Obligations, the Borrower, Guarantor, any collateral, or any other guarantor or surety, or about

any action or non-action of DIP Lender; (g) pursue a claim relating to any failure to properly document any DIP Obligations or perfect any liens in any collateral; or (h) pursue any remedy or course of action in DIP Lender's power whatsoever.

5.2     ADDITIONAL WAIVERS BY GUARANTOR. Without limiting the generality, scope or meaning of any of the foregoing or any other provision of this Guaranty, to the extent it is determined that California law is applicable to this Guaranty:

(a)     Guarantor hereby waives any and all benefits and defenses under California Civil Code Section 2810 and agrees that by doing so Guarantor shall be liable even if Borrower had no liability at the time of execution of DIP Term Sheet, or any other DIP Document (as defined in the DIP Term Sheet), or thereafter ceases to be liable. Guarantor hereby waives any and all benefits and defenses under California Civil Code Section 2809 and agrees that by doing so Guarantor's liability may be larger in amount and more burdensome than that of Borrower. Guarantor waives all rights to require DIP Lender to pursue any other remedy it may have against Borrower, or any member or shareholder of Borrower, including any and all benefits under California Civil Code Section 2845 to 2850 inclusive. In accordance with Section 2856 of the California Civil Code, each Guarantor further waives any rights, defenses and benefits that may be derived from Sections 2787 to 2855, inclusive, 2899 and 3433 of the California Civil Code or comparable provisions of the laws of any other jurisdiction and further waives all other suretyship defenses Guarantor would otherwise have under the laws of California or any other jurisdiction.

(b)     Upon a default by Borrower, DIP Lender in its sole discretion, without prior notice to or consent of Guarantor, may elect to: (i) foreclose either judicially or nonjudicially against any real or personal property security it may hold for the DIP Loans, (ii) accept a transfer of any such security in lieu of foreclosure, (iii) compromise or adjust the DIP Loans, or any other DIP Obligations, or any part of it or make any other accommodation with Borrower or any Guarantor, or (iv) exercise any other remedy against Borrower, any other obligor, or any security in any order and in any combination. No such action by DIP Lender shall release or limit the liability of Guarantor, who shall remain liable under this Guaranty after the action, even if the effect of the action is to deprive Guarantor of any subrogation rights, rights of indemnity, or other rights to collect reimbursement from Borrower for any sums paid to DIP Lender, whether contractual or arising by operation of law or otherwise. Guarantor expressly agrees that under no circumstances shall it be deemed to have any right, title, interest or claim in or to any real or personal property to be held by DIP Lender or any third party after any foreclosure or transfer in lieu of foreclosure of any security for the DIP Loans.

(c)     Regardless of whether Guarantor may have made any payments to DIP Lender, Guarantor hereby waives: (i) all rights of subrogation, indemnification, contribution and any other rights to collect reimbursement from Borrower or any other party for any sums paid to DIP Lender, whether contractual or arising by operation of law (including the Bankruptcy Code (as defined in the DIP Term Sheet) or any successor or similar statute) or otherwise, (ii) all rights to enforce any remedy that DIP Lender may have against Borrower, and (iii) all rights to participate in any security now or later to be held by DIP Lender for the DIP Loans. The waivers given in this subsection (c) shall be effective until the DIP Loans have been paid and performed in full.

(d)     Guarantor waives all rights and defenses arising out of an election of remedies by DIP Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed Guarantor's rights of subrogation and reimbursement against Borrower by operation of Section 580d of the California Code of Civil Procedure or otherwise. Guarantor further waives any right to a fair value hearing under California Code of Civil Procedure Section 580a, or any other similar law, to determine the size of any deficiency owing (for which any Guarantor would be liable hereunder) following a non-judicial foreclosure sale.

(e)     Without limiting the foregoing or anything else contained in this Guaranty, Guarantor waives all rights and defenses that Guarantor may have because Borrower's DIP Loans or any other DIP Obligations are secured by real property. This means, among other things (i) that DIP Lender may collect from Guarantor without first foreclosing on any real or personal property collateral pledged by Borrower; and (ii) if DIP Lender forecloses on any real property collateral pledged by Borrower: (x) the amount of the DIP Loan may be reduced only by the price for which that collateral is sold at the foreclosure sale, even if the collateral is worth more than the sale price; and (y) DIP Lender may collect from Guarantor even if DIP Lender, by foreclosing on the real property collateral, has destroyed any right Guarantor may have to collect from Borrower. This subsection (e) is an unconditional and irrevocable waiver of any rights and defenses Guarantor may have because Borrower's DIP Loans are secured by real property. These rights and defenses include, but are not limited to, any rights or defenses based upon Sections 580a, 580b, 580d, or 726 of the California Code of Civil Procedure.

(f)     Guarantor waives all rights and defenses arising out of any failure of the DIP Lender to disclose to the Guarantor any information relating to the financial condition, operations, properties or prospects of Borrower now or in the future known to the DIP Lender.

4

5.3 GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

6. SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the obligations of Borrower to DIP Lender under the DIP Term Sheet or any other DIP Obligations shall be prior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that DIP Lender may now or hereafter have against Borrower under the DIP Term Sheet or any other DIP Obligations. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both DIP Lender and Guarantor shall first be paid to DIP Lender and shall be first applied by DIP Lender to the obligations of Borrower under the DIP Term Sheet or any other DIP Obligations. Guarantor does hereby assign to DIP Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided, however, that such assignment shall be effective only for the purpose of assuring to DIP Lender full payment in legal tender of the obligations of Borrower under the DIP Term Sheet or any other DIP Obligations.

7. DISCHARGE OF OBLIGATION. Neither the obligation of Guarantor to make payments owing under the DIP Term Sheet or any other DIP Obligations in accordance with the terms of this Guaranty, nor any remedy for the enforcement thereof, shall be impaired, modified, changed, released, or limited in any manner whatsoever by any impairment, modification, change, release, or limitation of the liability of Borrower, or its estate in bankruptcy, or otherwise, or of any remedy for the enforcement thereof, resulting from the operation of any present or future provision of the federal Bankruptcy Code or any other statute, or from the decision of any court. The liability of the undersigned under this Guaranty shall not be terminated by the dissolution or revocation of the charter of the undersigned and all obligations of Borrower under the DIP Term Sheet or any other DIP Obligations becoming due thereafter or due but unpaid at the dissolution or revocation of the charter, shall survive and become payable by the estates of each individual Guarantor.

8. SURVIVAL OF OBLIGATION. This Guaranty will continue to be in full force and effect even if Borrower assigns its obligations under the DIP Term Sheet or any other DIP Obligations to any successor, assignee, or subtenant, whether or not the undersigned is given notice of or consents to any such assignment.

9. MISCELLANEOUS

9.1    NOTICES. All notices, requests, demands or other communications permitted or required under this Guaranty shall be effective only if in writing, and shall be deemed to have been delivered and received (a) when personally delivered, (b) on the third business day after the date on which mailed by certified or registered mail, return receipt requested, (c) on the date on which transmitted by facsimile or other electronic means generating a receipt evidencing a successful transmission (provided that on that same date a copy of such notice is deposited in the United States mail, postage prepaid, certified or registered mail, return receipt requested), or (d) on the next business day after the date on which deposited with a regulated public carrier (e.g., Federal Express) designating overnight delivery service with a return receipt requested or equivalent thereof administered by such regulated public carrier, freight prepaid, and addressed in a sealed envelope to the party for whom intended at the address or facsimile number set forth on the signature page of this Guaranty, or such other address or facsimile number, notice of which is given in a manner permitted by this Section 9.1.

9.2    BINDING EFFECT, This Guaranty shall bind the undersigned, their respective successors, administrators, executors, heirs, and assigns.

9.3    GENDER AND NUMBER. If there is more than one Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where this Guaranty is executed by more than one Guarantor, the word "Guarantor" shall mean all and any one of them.

9.4    ATTORNEYS' FEES. If any action at law or in equity is commenced to construe or enforce the terms of this Guaranty or the rights and duties created hereunder, then the party prevailing in that action shall be entitled to recover its costs and fees therein, all costs and fees of any appeal thereof, and all costs and fees of any action to enforce any such judgment rendered therein.

9.5    CONSTRUCTION. This Guaranty is the result of negotiations. None of the parties entering into this Guaranty has acted under any duress or compulsion, whether legal, economic or otherwise. The parties hereby waive the application of any rule of law that ambiguous or conflicting terms or provisions should be construed against the party who (or whose attorney) prepared this Guaranty or any earlier draft of the same. In this Guaranty, the word "Person" includes any individual, company, trust or other legal entity of any kind, and the word "include(s)" means "include(s), without limitation," and the word "including" means "including, but not limited to." Unless the context of this Guaranty otherwise clearly requires, references to the plural include the singular and the singular the plural. References to any note, instrument or other type of agreement of any kind shall be deemed to also refer to any permitted amendment, modification or restatement thereof. The words "hereof," "hereunder" and similar terms in this Guaranty refer to this Guaranty as a whole and not to any particular provision of this Guaranty. The word "or" means "and/or." The word "any" means "any one or more." All references to "Section" herein shall refer to the

sections and paragraphs of this Guaranty unless specifically stated otherwise. The section and other headings, if any, contained in this Guaranty are inserted for convenience of reference only, and they neither form a part of this Guaranty nor are they to be used in the construction or interpretation of this Guaranty.

9.6     GOVERNING LAW; JURISDICTION. The undersigned (a) agrees that this Guaranty is made and executed under and shall be construed in accordance with the laws of the State of Delaware, and (b) consents to the jurisdiction of the Courts of the State of Delaware in any action brought upon this Guaranty.

9.7     COUNTERPARTS. This Guaranty may be executed in two or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same original, binding on each signatory thereto.

9.8     BINDING EFFECT; AMENDMENTS. This Guaranty (a) represents the entire agreement of the parties regarding the subject matter hereof, and supersedes all prior and contemporaneous understandings regarding such subject matter, whether oral or written, and (b) may not be modified or amended, except by a written instrument executed by all of the parties after the effective date of this Guaranty.

**9.9     WAIVER OF JURY. THE PARTIES HEREBY WAIVE THE RIGHT TO ANY JURY TRIAL IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER OR ANY OTHER PROCEEDING RELATING TO THIS GUARANTY.**

[Signatures appear on following page.]

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty on the date set forth below.

Guarantor:

**AMERICAN OPTICAL SERVICES, INC.**

By: _____
    Name: Thomas J. Allison
    Title: Chief Executive Officer

Guarantor:

**OPTICAL MANAGEMENT SYSTEMS, INC.**

By: _____
    Name: Thomas J. Allison
    Title: Chief Executive Officer

Guarantor:

**RIVERFRONT HEARING, INC.**

By: _____
    Name: Thomas J. Allison
    Title: Chief Executive Officer

Guarantor:

**AOS-OMS, LLC**

By: _____
    Name: Thomas J. Allison
    Title: Chief Executive Officer

Guarantor:

**EHS-RIVERFRONT, LLC**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer


Guarantor:

**AMERICAN OPTICAL SERVICES,
LLC**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer


Guarantor:

**EXELA HEARING SERVICES, LLC**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**THOMAS RETINAL EYE**
**SPECIALISTS, P.C.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**STEVEN T. OLKOWSKI, M.D., P.C.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**JOSEPH D. HOVARI, JR., O.D., P.C.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**LARRY R. MOORMAN, M.D., P.C.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**PHILIP H. CLARK, O.D., P.A.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**LAKEWOOD EYE CLINIC, P.C.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**THOMAS G. ABELL, M.D., P.S.C.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**EYES ON YOU EYE CARE, INC.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**EPIC MANAGEMENT GROUP, LLC**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**EYEGLASSES ETC., INC.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**J. RICHARD SUSI, D.O., P.A.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**JOSEPH KURSTIN, M.D., P.A.**

By:

Name: Thomas J. Allison
Title: Chief Executive Officer

Guarantor:

**GENESIS BILLING SYSTEMS, LLC**

By:
Name: Thomas J. Allison
Title: Chief Executive Officer


Guarantor:

**GENESIS EYE CENTER, PLLC**

By:
Name: Thomas J. Allison
Title: Chief Executive Officer


Guarantor:

**926 N. WILCREST, LLC**

By:
Name: Thomas J. Allison
Title: Chief Executive Officer


Address, Facsimile & Email for Notices for
each Guarantor:

c/o MacKeyser Holdings, LLC
8076 W. Sahara Ave.
Las Vegas, NV 89117
Attention: Cathryn Kennedy
Email: cathryn.kennedy@aos-ehs.com

## Schedule 1 – Guarantors

AMERICAN OPTICAL SERVICES, INC., a Delaware corporation

OPTICAL MANAGEMENT SYSTEMS, INC., a Michigan corporation

RIVERFRONT HEARING, INC., a Michigan corporation

AOS-OMS, LLC, a Delaware limited liability company

EHS-RIVERFRONT, LLC, a Delaware limited liability company

AMERICAN OPTICAL SERVICES, LLC, a Delaware limited liability company

EXELA HEARING SERVICES, LLC, a Delaware limited liability company

THOMAS RETINAL EYE SPECIALISTS, P.C., a Pennsylvania professional corporation

STEVEN T. OLKOWSKI, M.D., P.C., a Pennsylvania professional corporation

JOSEPH D. UDVARI, JR. O.D., P.C., a Pennsylvania professional corporation

LARRY R. MOORMAN, M.D., P.C., a Georgia professional corporation

PHILIP H. CLARK, O.D., P.A., an Arkansas professional association

LAKEWOOD EYE CLINIC, P.C., a Colorado professional corporation

THOMAS G. ABELL, M.D., P.S.C., a Kentucky professional services corporation

EYES ON YOU EYE CARE, INC., a Georgia corporation

EPIC MANAGEMENT GROUP, LLC, a California limited liability company

EYEGLASSES ETC., INC., a Florida corporation

J. RICHARD SUSI, D.O., P.A., a Florida professional association

JOSEPH KURSTIN, M.D., P.A., a Florida professional association

GENESIS BILLING SYSTEMS, LLC, a California limited liability company

GENESIS EYE CENTER, PLLC, a North Carolina professional limited liability company

926 N. WILCREST, LLC, a Texas limited liability company

## SCHEDULE C TO DIP TERM SHEET

### Interim DIP Order

[See form of Interim DIP Order attached to Motion]